**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SELECTQUOTE, INC. SECURITIES LITIGATION | Case No. 1:21-cv-06903-AKH<br><br>CLASS ACTION<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

**Page**

**EXCHANGE ACT CLAIMS** .............................................................................................. 2

I.     INTRODUCTION ................................................................................................... 2

II.    JURISDICTION AND VENUE ............................................................................ 10

III.   PARTIES ............................................................................................................... 11

     A.    Lead Plaintiffs ............................................................................................ 11

     B.    Corporate Defendant ................................................................................. 12

     C.    Officer Defendants .................................................................................... 12

     D.    The Brookside Defendants ........................................................................ 13

IV.   RELEVANT BACKGROUND ............................................................................. 16

     A.    SelectQuote's History and Business ......................................................... 16

     B.    SelectQuote's Senior Division Sells Medicare Advantage and Medicare
          Supplement Plans ...................................................................................... 17

V.    DEFENDANTS' FRAUDULENT SCHEME ....................................................... 18

     A.    SelectQuote's Use of "Lifetime Value" (LTV) Accounting ................................ 18

          1.    SelectQuote's LTV-Based Financial Results Were Statements of
               Present Fact Under GAAP Accrual Accounting ....................................... 27

     B.    Months Before the SelectQuote IPO, Brookside Saddles the Company With
          Debt .......................................................................................................... 32

     C.    The SelectQuote IPO ................................................................................ 33

     D.    The IPO Pricing Was Based on Inflated Revenue and LTVs Figures, Driven
          by a Growth "At All Costs" Business Model ........................................... 34

     E.    While SelectQuote Falsely Attributed its Pre-IPO Growth to its
          "Technology Driven" Differentiated Business Model, its Purported Massive
          Growth Prior to the IPO Was Fueled by an Untrained and Ineffective Sales
          Staff Selling Medicare Policies "At All Costs" ....................................... 38

     F.    SelectQuote Helped its Agents Cheat on Certification Exams, Further
          Confirming the Company's Sell "At All Costs" Business Model ..................... 43

G.     Churn and Persistency Issues Plague SelectQuote ................................................ 47

     1.     By the Time of the IPO, Concerns With Churn and Persistency Were Prevalent in the Industry and the Company Knew About its Own Persistency Issues .............................................................................. 47

     2.     Statistical Analysis of SelectQuote's Persistency Disclosures Indicates That by the Time of IPO Persistency Rates Were Inflated by at Least 15% ....................................................................................... 52

     3.     SelectQuote's Technology Also Revealed to the Company, Much Sooner Than Disclosed, That its 2018, 2019, 2020 and 2021 Cohorts Were Experiencing Poor Persistency and Lapses ...................... 56

     4.     Former Employees Further Corroborate That "Persistency" in the Company's Medicare Business Was Far Worse Than Disclosed ............ 58

     5.     Former Employees Confirm That SelectQuote Executives Knew About and had Access to Frequently Updated Data Reflecting the Persistency Issues .................................................................................. 62

H.     During the Class Period Defendants Falsely Reassured Investors About the Strength of SelectQuote's Business and Repeatedly Misrepresented and Concealed the Company's Poor Persistency, Churn and Lapse Rates ................. 64

VI.     THE TRUTH EMERGES .............................................................................. 67

VII.     POST-CLASS PERIOD EVENTS ................................................................. 77

VIII.     DEFENDANTS' LTV ACCOUNTING VIOLATED GAAP ......................... 79

IX.     DEFENDANTS HAD AN AFFIRMATIVE DUTY TO DISCLOSE THE TREND OF LOWER RENEWAL COMMISSIONS ..................................... 80

X.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS ................................... 80

A.     Statements Concerning Persistency and Financial Results ................................ 80

     1.     Financial Disclosures ............................................................... 81

        a.     Reporting of Revenue and Receivables ....................... 81

        b.     Disclosures Relating to LTV Figures and Persistency ................ 87

        c.     Disclosures Concerning the Calculation of Lifetime Value (LTV) ................................................................... 91

B.     Additional Quantitative and Qualitative Statements Regarding Persistency ........ 92

C.    Statements Concerning Hiring and Training of SelectQuote Employees........... 100

D.    Statements Treating Already-Materialized Risks as Hypothetical .................... 105

XI.    ADDITIONAL ALLEGATIONS OF SCIENTER.......................................... 107

XII.    LOSS CAUSATION................................................................................ 116

XIII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR .......................... 117

XIV.    PRESUMPTION OF RELIANCE ............................................................. 117

XV.    EXCHANGE ACT COUNTS ................................................................... 119

COUNT I .............................................................................................. 119

COUNT II ............................................................................................. 121

**SECURITIES ACT CLAIMS**................................................................. 122

XVI.    VIOLATIONS OF THE SECURITIES ACT.............................................. 122

A.    The Securities Act Defendants.................................................. 122

1.    Officer Defendants........................................................ 122

2.    Director Defendants...................................................... 123

3.    The Underwriter Defendants......................................... 124

B.    SelectQuote and the IPO ........................................................... 127

C.    The Offering Materials Contain Untrue Statements Of Material Fact And Omitted Other Facts Necessary To Make The Statements Made Not Misleading.................................................................................... 127

D.    Defendants Had An Affirmative Duty To Disclose The Trend Of  Lower Renewal Commissions................................................................ 135

XVII.    SECURITIES ACT COUNTS ................................................................. 136

COUNT III............................................................................................ 136

COUNT IV ........................................................................................... 138

COUNT V ............................................................................................. 139

XVIII.    CLASS ACTION ALLEGATIONS .......................................................... 140

XIX.    PRAYER FOR RELIEF ................................................................................................ 142

XX.    JURY TRIAL DEMANDED ........................................................................................ 143

1.      A note on the organization of this document: Plaintiffs assert two sets of claims. The first arise under the Securities Exchange Act of 1934 (the "Exchange Act"), and are set forth in Sections I-XV.  The second set of claims arise under the Securities Act of 1933 (the "Securities Act"), which do not sound in or require pleading of fraud.  This Complaint proceeds by first providing an introduction in connection with Exchange Act claims (Section I).  The Complaint provides a narrative discussion regarding the substantive details of the Exchange Act claims (Sections IV through VII), which describe Defendant SelectQuote's business, accounting methods, its initial public offering, the factual bases supporting plaintiffs' liability claims and the revelation of the truth through several corrective disclosures.  In Section X, statements and omissions relevant to the Exchange Act claims are set forth with allegations describing why they bring rise to liability, as required by the statutory framework.  In Section XI, Plaintiffs summarize their allegations concerning scienter.  Following the counts for the Exchange Act claims in Section XV, the Complaint sets forth the Securities Act violations in Sections XVI and XVII.  In light of several industry-specific and other defined terms, the Complaint attaches a Glossary as Appendix A, and to help illustrate the chronology of certain basic facts, a timeline, as Appendix B.

2.      Lead Plaintiffs West Palm Beach Police Pension Fund and City of Fort Lauderdale Police & Fire Retirement System (collectively, "Lead Plaintiffs" or "Plaintiffs"), bring this action on behalf of themselves and all other persons and entities that (a) purchased shares of SelectQuote, Inc. ("SelectQuote" or the "Company") common stock in or traceable to the Company's initial public offering of common stock conducted on or around May 20, 2020 (the "Offering" or "IPO"); and/or (b) purchased shares of SelectQuote's common stock between May 20, 2020 and February 7, 2022, inclusive (the "Class Period"), and where damaged thereby (the "Class").

3.      Lead Plaintiffs allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.   Lead Plaintiffs' information and belief is based upon, *inter alia*, Lead Counsel's investigation, which includes: (a) review and analysis of regulatory filings made by SelectQuote with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued and disseminated by the Company; (c) analyst and media reports concerning SelectQuote; (d) other public information concerning SelectQuote; (e) transcripts of SelectQuote's investor and analyst conference calls; (f) Lead Counsel's review and analysis of trading data for SelectQuote securities and related documents; (g) other publicly available sources as described below; (h) Lead Counsel's consultations with relevant experts and consultants, who have provided statistical and other analyses; (i) Lead Counsel's communications with knowledgeable individuals, including former employees of SelectQuote; and (j) other sources.

## EXCHANGE ACT CLAIMS

## I.      INTRODUCTION

4.      SelectQuote grew rapidly in the years immediately prior to its May 2020 IPO[1], and that growth allowed Defendants to achieve a high IPO valuation.  However, the growth purportedly reflected in SelectQuote's financial results was predicated on assumptions about insurance policy renewals that were contradicted by reality.  In fact, based on statistical analysis of information SelectQuote disclosed during and following the Class Period about its key "persistency" rate, reflecting renewals of policies sold in prior coverage years, SelectQuote's persistency rates were overstated by at least 15% at all times during the Class Period.  This analysis further indicates that

---

[1] *See* Appendix A hereto, a Glossary and explanation of certain defined and industry terms used in this Complaint.  In the discussion of the Exchange Act claims, any references to Defendants, means SelectQuote, Danker and Sadun.

at the time of the IPO, SelectQuote's revenue and EBITDA were overstated by approximately 30% and approximately 70%, respectively.

5.    In the run-up to SelectQuote's IPO, the Company, its CEO Timothy Danker, and CFO Raffaele Sadun—prodded by its controlling shareholder and private equity patron—Defendant Brookside Equity Partners LLC ("Brookside")—created the impression that the Company had grown substantially and that its business of generating commissions from sales of Medicare health plans was profitable.  That false impression of profit and growth boosted the IPO offering price to $20 per share, allowing Brookside to receive approximately $120 million in proceeds, while Danker received approximately $4.2 million and Sadun received approximately $2.6 million.  However, the financial picture painted in the IPO was premised on the grossly inflated assumption, contradicted by facts then in-hand, that SelectQuote's customers would renew the policies they purchased at an average annual rate of approximately 84% .  But these Defendants have now conceded that by no later than February of 2019, they knew that the renewal rates (persistency) for policies had fallen off, and were much lower—calculated to be around 68% over the same period.  This lower persistency did not support the Company's disclosed financial results, including the lifetime value ("LTV") of commissions from such sales.[2]  The decline in renewal experience was the product of the "sell at all costs" approach SelectQuote employed prior to the IPO and during the Class Period.  By the time the truth had been fully disclosed, SelectQuote's shares traded at just $3.44, a remarkable 83% decline from the IPO price.  Plaintiffs and the Class

---

[2] *See* Appendices B and C, attached hereto, respectively, a timeline reflecting information concerning SelectQuote's fiscal years, the Medicare enrollment periods, and certain key dates in the case, and graph plotting SelectQuote's share price, Senior Segment revenue, and Adjusted EBITDA per MA/MS policy.

of investors seeking recovery in this lawsuit suffered the effects of Defendants' fraudulent misrepresentations.

6.     SelectQuote is a direct-to-consumer insurance distribution platform that offers senior health, life, and auto and home insurance policies from a curated panel of insurance carriers. A significant majority of the policies SelectQuote sells are Medicare Advantage and Medicare Supplement plans.  The Company's Medicare Policy business is recorded in the "Senior" operating segment, which at the time of the IPO represented 70% of the Company's total revenue.  Beginning at age 65, Americans are eligible for federal health insurance coverage known as Medicare ("Original Medicare").  An alternative to this coverage, known as Medicare Advantage ("MA"), is offered to Medicare-eligible patients by private health insurance companies, and includes the same benefits as Original Medicare, but often includes additional coverage such as prescription drugs or vision and dental benefits.  Medicare Supplement ("MS") plans work in tandem with Original Medicare to provide patients with additional coverage.

7.     Although exceptions exist, most Americans enroll in or make changes to their Medicare Advantage plans between October 15 and December 7, which is the Medicare Annual Enrollment Period ("AEP").  Beginning in 2019, however, Medicare patients were given a new opportunity to make adjustments to their Medicare Advantage Plans outside the AEP.  Now, after an individual has enrolled in a Medicare Advantage Plan, they are permitted to change plans during the Medicare Advantage Open Enrollment Period ("OEP"), which runs from January 1 to March 31 of each year.

8.     Insurance policies are often grouped by their effective date into yearly cohorts. Prior to the Class Period, SelectQuote enrolled the Company's 2019 cohort, made up of all polices

with a policy effective date in 2019.  The 2019 cohort was the first cohort to be impacted by the new OEP.

9.      As an insurance broker, when SelectQuote sells a policy, accounting rules allow it to record as revenue the entire LTV of commissions on renewals of that policy.  Importantly, customers purchasing such insurance are under no obligation to renew and may let the policy "lapse," switch to a different policy, or go back to Original Medicare.  Under generally accepted accounting principles ("GAAP") that SelectQuote purported to employ when preparing its Class Period financial statements, the Company must **write down** the recognized revenue from renewal commissions **as soon as it becomes <u>probable</u> that the policy will not be renewed**.  Thus, once Defendants knew that their persistency, lapse or churn experience reflected a decline in renewals, their continued reliance on the inflated, outdated was inconsistent with GAAP.  Critically, SelectQuote's LTV accounting produces purportedly GAAP-compliant financial statement items that are not forward-looking and, as a matter of law, not subject to the PSLRA's safe-harbor for forward-looking statements.  These financial **results** are the present value of a stream of cash-flows, and are not projections or predictions like earnings guidance.

10.      In connection with the IPO, SelectQuote reported average revenue per Medicare Policy sold during fiscal 2019 of $1,547 and reported an expected operating profit (EBITDA) of $725 per policy.  Since it had sold approximately 171,000 such MA policies during the nine months leading up to the IPO, the commission revenue and associated commissions receivable were significant, over $220 million.  That LTV revenue includes not only the contracted commission rate for the one-year policy contract, but also commissions on policy renewals.  By contrast, after Defendants revealed the truth concerning their actual renewal persistency in February 2022, SelectQuote's total expected revenue was just $1,051 per policy along with a staggering **loss of**

*$142 per policy*.  These results declined further by the end of fiscal 2022 to total revenue of $893 per policy and a *loss of $290* per policy.

11.    Due to the marketing, advertising and sales costs associated with booking the initial sale, SelectQuote only makes a profit if it receives commissions for several renewal years after the initial sale.  Otherwise, those sales are not profitable.  For this reason, it was critical that SelectQuote create the impression that its sales had high "persistency"—many renewals, and low "churn" or "lapses" that occur during a coverage year, which reduce persistency.  Without a high rate of persistency, the Company's main business is not profitable, as became apparent by the end of the Class Period (see above).  Thus, the inflated persistency assumptions that generated purportedly high LTVs were the economic lynchpin of SelectQuote's business.  Put another way, even if SelectQuote sold many, many Medicare Policies—as it did immediately before the IPO and during most of the Class Period—the Company would not generate *any profit* unless those policies were repeatedly renewed.  And the process of collecting the revenue from the actual renewals takes years, so this accounting method gave Defendants the ability to conceal and manipulate its LTVs.  If the Company had disclosed true and realistic LTVs based on the actual persistency rates it experienced, the value of the shares sold in the IPO would have been far lower.

12.    SelectQuote's disclosed LTVs were predicated on accounting requiring many customers to renew their policies for as many as ten years.  However, by the time of the IPO in May 2020, Defendants knew that the renewal experience for earlier cohorts was declining.  Defendants simply chose not to incorporate these lower persistency rates in their IPO and Class Period disclosures.  Effectively, Defendants' inflation of persistency and sell at all costs approach to growth created a "bubble" in the Company's share price so that they could liquidate their own holdings at the expense of Plaintiffs and the Class.

13.     Knowing how focused investors were on persistency, throughout the Class Period Defendants repeatedly assured investors that persistency rates were good.  Defendants even emphasized "the separation of persistency in LTV results versus [SelectQuote's] peers."  When questions of "churn" (customers not renewing) and potential persistency concerns were raised in investor calls, Defendant Sadun went as far as dismissing any issues, stating, "I wouldn't get too hung up on [churn and persistency] in isolation," adding, "just focusing on churn I think is a mistake."

14.     To enhance the proceeds they would receive in the IPO and in sales thereafter, the Defendants not only relied on inflated persistency assumptions—which inflated the per-policy LTVs—they also massively expanded the volume of sales in the periods immediately prior to the IPO.  For example, the Company's Senior segment grew by 88% in 2019 and by another 73% in the nine-months preceding the IPO.  This massive growth was fueled by a sell at all costs approach that further reduced the expected persistency of the Medicare Policies sold.

15.     SelectQuote's sales process and growth were founded on a massive increase in the number of agents employed to sell Medicare Policies.  Despite its actual sales practices and massive growth, Defendants falsely assured investors that SelectQuote's persistency should be considered in light of the superiority of the Company's business and sales practices.  Here Defendants emphasized that the Company had not been "growth at all costs," while touting their "sophisticated marketing technology," which allowed the Company to "deliver the right lead to the right agent at the right time."  Defendants repeatedly claimed that SelectQuote's agents were "highly trained" and provided with "up to 10 weeks of proprietary in-house training."  The Defendants touted SelectQuote's training and "highly skilled agents" as competitive advantages and specifically tied the Company's (purportedly) above-industry norm persistency rates to agent

training and skill; the training was touted as designed to ensure that customers would "buy the right plan" and renew repeatedly. These statements were critical to investors and relied upon by analysts, who labeled the Company's unique focus on training as "a key contributor" to SelectQuote's high persistency rate. However, as multiple former SelectQuote employees confirm, these statements were not true.

16.    Despite disclosures to the contrary, SelectQuote's agents were trained for as little as four weeks and were incentivized to just sell, sell, sell. Critically, sales agents' commissions were not tied to persistency, or any other measure of quality or "fit." They were compensated solely based on making an initial sale and encouraged to increase sales volume. The cynical sales culture is perhaps best personified by the fact that *sales managers facilitated cheating by agents on required certification tests*. Managers would give agents answer keys—screenshots of correct answers stored in "Google Docs" and shared indiscriminately—to ensure that their ability to sell would not be interrupted, irrespective of whether they possessed even minimum knowledge about the complex insurance products they were selling to, sometimes vulnerable, senior citizens. This practice was widely known and corroborated by multiple former SelectQuote employees, as detailed below.

17.    Due to the confluence of SelectQuote's fast growth, driven by a sales culture that eschewed proper training and sales incentives, and major changes in the Medicare landscape due to the OEP and COVID SEP, by the beginning of the Class Period SelectQuote had no basis to rely upon its persistency experience from prior to 2019 as a basis for reporting its LTV and other financial results. SelectQuote's "world had changed" by magnitudes and its old persistency rates would not be replicated in that post-growth, post-sell at all costs world. Continuing to rely on outdated persistency data was clearly inconsistent with the facts in hand and the requirements of

GAAP/ASC 606.  And, Defendants have now admitted multiple times that they knew about the persistency declines well before the IPO, but failed to disclose them until the end of the Class Period (*see infra* ¶309).

18.     The truth began to emerge on May 11, 2021, when SelectQuote disclosed that its fourth quarter 2020 results would be impacted by a (then estimated) "negative cohort and tail adjustment" (effectively, an expected write down) due to "lower second-term persistency for the 2019 cohort."  This news began to reveal certain of the true facts and caused the Company's share price to decline by $5.50 per share, or 20%.

19.     Then, on August 25, 2021, SelectQuote disclosed that lack of policy renewals affected both the 2019 and 2020 cohorts, and that the Company was including a $65 million placeholder for a reduction in the LTVs it had on its books.  This reduction was purportedly driven by lower-than-assumed persistency results in the 2020 cohort but generally revealed the previously hidden persistency issues.[3]  This news caused SelectQuote's share price to decline by an additional $6.46 per share, or 45%.

20.     On November 4, 2021, the Company announced that it was seeing "elevated lapse rates versus last year," and reported that MA LTVs were down 16% year-over-year.  On this news, SelectQuote's share price declined another $3.24, or 23%.

21.     The truth about the fraud finally fully emerged on February 7, 2022, when the Company disclosed that it had to make a tail adjustment *of $145 million* and absorb losses of an additional *$60 million* on its Senior LTVs, reducing the value of its LTVs by a total of *$205 million*.  In explaining this massive decline, ***Defendant Sadun admitted*** that it was driven by lower

---

[3] SelectQuote's fiscal year runs from July 1 to June 30.

persistency that SelectQuote had observed "*over the last three years*," *or since February 2019*.[4] The Company further admitted that its growth at all costs strategy was a failure and would need to be "reset," while also stating it would walk away from its reliance on the previously touted "flex" agents such growth was fueled by. On this news, SelectQuote's share price declined by another $3.09, or 47%, to close at $3.44 per share on February 8, 2022.

22.    All told, SelectQuote shares declined by 83% from their IPO price to the end of the Class Period. Unlike the members of the Class, the Defendants here fared extremely well. During the Class Period, *Danker sold shares worth $13.7 million* and *Sadun sold shares worth $9 million*, both at prices well over $25 a share. And *Brookside*, the Company's largest and controlling shareholder, was a massive beneficiary of the Company's inflated share prices during the Class Period—*receiving proceeds of over $257 million* on its sales.

23.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

### (Both Securities Act and Exchange Act Claims)

24.    The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated under those sections, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

---

[4] Unless otherwise noted, any emphasis in quoted material is added.

25.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d).  The Underwriter Defendants (defined below) are all based in or maintain offices in this District.  Many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in this District.  In addition, at all relevant times SelectQuote's common stock was offered, sold, and traded on the New York Stock Exchange ("NYSE"), which is located in this District.

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Lead Plaintiffs

27.     Co-Lead Plaintiff West Palm Beach Police Pension Fund ("West Palm Beach Police") is a pension plan providing benefits for eligible police officers in West Palm Beach, Florida.  As of March 31, 2024, West Palm Beach Police manages approximately $480 million in assets on behalf of over 500 participants.  As set forth in the certification previously filed with the Court reflecting all of its Class Period transactions, West Palm Beach Police purchased SelectQuote common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

28.     Co-Lead Plaintiff City of Fort Lauderdale Police & Fire Retirement System ("Fort Lauderdale P&F," and, together with West Palm Beach Police, "Lead Plaintiffs" or "Plaintiffs") is a public pension fund providing benefits for eligible police officers and firefighters in the City of Fort Lauderdale, Florida.  As of March 31, 2024, Fort Lauderdale P&F manages approximately

$1.16 billion in pension assets on behalf of over 1,900 police officers and firefighters and their families. As set forth in the certification previously filed with the Court reflecting all of its Class Period transactions, Fort Lauderdale P&F purchased SelectQuote common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.    Corporate Defendant**

29.    Defendant SelectQuote is incorporated under the laws of Delaware with its principal executive offices located in Overland Park, Kansas. The Company is the issuer of the common stock shares sold in the Offering. SelectQuote's common stock trades on the NYSE under the symbol "SLQT." As of August 26, 2021, SelectQuote had over 163 million shares of common stock outstanding.

**C.    Officer Defendants**

30.    Defendant Timothy Danker ("Danker") is, and was at all relevant times, the Chief Executive Officer ("CEO") of SelectQuote. Defendant Danker signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

31.    Defendant Raffaele Sadun ("Sadun") was at all relevant times, the Chief Financial Officer ("CFO") of SelectQuote. Defendant Sadun signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials. Sadun resigned from SelectQuote in May 2022, shortly after the end of the Class Period.

32.    Defendants Danker and Sadun are collectively referred to herein as the "Officer Defendants." The Officer Defendants, because of their positions with SelectQuote, possessed the power and authority to control the contents of SelectQuote's reports to the SEC, press releases,

and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

### D.   The Brookside Defendants

33.   Defendant Brookside Equity Partners LLC and its affiliates identified herein (collectively, "Brookside") is a private equity fund. At the time of the IPO, Brookside was the largest shareholder in SelectQuote with a 22.25% equity interest in the Company.

34.   Brookside was affiliated with or employed two of the seven members of the SelectQuote Board of Directors (the "Board") at the time of the IPO.

35.   SelectQuote's Chairman, Defendant Donald L. Hawks, III ("Hawks"), has served as a Managing Director and the President of Brookside since it was founded in 2012. Hawks was appointed to the Company's Board of Directors (the "Board") in 2014 in conjunction with the Stockholders Agreement (defined below). In February 2020, Hawks was appointed to serve as Chairman of the Board and continues to serve in that capacity.

36.   Defendant Raymond F. Weldon ("Weldon") is a Managing Director and co-founder of Brookside. Weldon was appointed to the Board in 2014 in conjunction with the Stockholders Agreement (defined below) and continues to serve as Director of the Company.

37.   Brookside, Hawks and Weldon are referred to collectively herein as the "Brookside Defendants."

38.     In 2014 Brookside invested in SelectQuote.  At the time of its initial investment, Brookside and SelectQuote entered into a Series D Preferred Stock Investors Rights and Stockholders Agreement (the "Stockholders Agreement"). The agreement granted Brookside and its affiliates certain rights, including the right to appoint directors, information rights, and registration rights.

39.     Those rights empowered Brookside to designate two directors.  The agreement also prohibited the removal of the Brookside-designated directors from SelectQuote's Board, except by Brookside itself.  Brookside was also given the right to invite a representative to attend all meetings of the Board in a nonvoting capacity.  Brookside's right to appoint two directors to SelectQuote's Board led to the appointment of Defendant Hawks and Defendant Weldon as directors.

40.     Brookside was also given the right to periodic financial information, including, within 30 days of the end of each calendar month, unaudited monthly financial information. Brookside also was given access to calendars of regularly scheduled internal senior management meetings, and was given the right to participate in or monitor those meetings.  The Stockholders Agreement further permitted Brookside to visit and inspect Company premises and properties, inspect books and records, and to discuss the business, finances and accounts of SelectQuote and its subsidiaries with Company officers.  Thus, Brookside had access to financial information that other investors did not have and could not access.

41.     The Stockholders Agreement was amended on November 4, 2019, pursuant to the Amended and Restated Series D Preferred Stock Investors' Rights and Stockholders Agreement ("Amended Stockholders Agreement").

42. The Amended Stockholders Agreement stated that, upon the closing of the IPO, certain of Brookside's director designation rights would terminate. However, Brookside retained other critical rights, including those governing access to information described above. Brookside's designees to the board, Defendants Hawks and Weldon, have remained on the board.

43. In 2017, Brookside entered into a consulting agreement with SelectQuote. In exchange for "certain advisory services," Brookside was paid $800,000.

44. As detailed further below, in 2019, months before the IPO, Brookside directed the Company to borrow hundreds of millions of dollars, the vast majority of which was used to pay existing shareholders a cash dividend. Brookside received $63 million in cash as a result of that dividend.

45. Prior to the IPO, Brookside beneficially owned 22.25% of SelectQuote's shares. According to the Prospectus, following the IPO, Brookside would continue to hold a plurality of the Company's shares, at 16%. At all times relevant to this Complaint, Brookside was by far the largest holder of SelectQuote stock.

46. Over the course of the Class Period, Brookside has opportunistically and dramatically reduced the size of its holdings of SelectQuote shares, reaping massively inflated proceeds while continuing to effectively control the Company through its rights under the Amended Stockholders Agreement and the role of its two designees—Hawks and Weldon—on the Company's Board.

47. Brookside sold approximately 5.9 million SelectQuote shares in the IPO at $20 per share (before underwriting fees), reaping gross proceeds of approximately $120 million. In a Secondary Public Offering conducted on March 8, 2021 (the "Secondary" or "SPO"), Brookside sold another 4,991,304 SelectQuote shares at $27.50 per share (before underwriting fees),

receiving gross proceeds of over $137 million. In total, Brookside received over $257 million on its Class Period sales of SelectQuote stock. Had those shares been sold at $3.44 per share—the stock price after Defendants' last corrective disclosure—Brookside's proceeds would have been reduced to just over $37 million, a massive difference of approximately $220 million.

48.     The Brookside Defendants, Defendants Hawks and Weldon, along with Defendants SelectQuote, Danker and Sadun, are referred to herein as the "Exchange Act Defendants."

## IV.    RELEVANT BACKGROUND

### A.    SelectQuote's History and Business

49.     SelectQuote was founded in 1985. SelectQuote is a direct-to-consumer brokerage business that sells various insurance products on behalf of several insurance carriers. SelectQuote merely acts as an agent or broker for insurance companies; it does not underwrite, insure or provide related services.

50.     SelectQuote has three business lines: SelectQuote Senior, SelectQuote Life and SelectQuote Auto & Home. Prior to 2010, SelectQuote was focused on life insurance sales. In 2010, William "Tom" Grant, II bought a significant portion of the business. Grant II, alongside his son William Grant III, who joined SelectQuote at roughly the same time, launched SelectQuote's Senior and Auto & Home Divisions. Several years later, another son of Grant II, Robert "Bob" Grant, was also hired to assist in running SelectQuote. At the time of the IPO, the Grant Family was collectively the third largest shareholder in SelectQuote, and all three Grants were either executive officers or on the Board of Directors of SelectQuote.

51.     The Company's Senior business line was its "fastest growing and largest segment" "provid[ing] unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans." The MA and MS plans ("Medicare Policies") accounted

for 74% of the Company's approved Senior policies during fiscal year 2019 and 78% of approved Senior policies during the nine-month period ended March 31, 2020.

52.     SelectQuote disclosed that its "overall operating results are substantially dependent upon our success in our Senior segment."  In fiscal year 2018, 44% of the Company's total revenue derived from the Senior segment; that rose to 57% in fiscal year 2019.  For the nine-month period ended March 31, 2020, 70% of SelectQuote's total revenue was from the Senior segment.

**B.      SelectQuote's Senior Division Sells Medicare Advantage and Medicare Supplement Plans**

53.     Beginning at age 65, Americans are eligible for federal health insurance coverage known as Medicare ("Original Medicare").  While Original Medicare provides coverage for hospitalization, which is covered under Medicare Part A without premiums, and certain outpatient medical services, under Medicare Part B, Original Medicare does not cover many medical expenses that are typically covered by private health insurance policies.  An alternative to this coverage, known as Medicare Advantage, is offered to Medicare-eligible patients by private health insurance companies, and includes the same benefits as Original Medicare, but often includes additional coverage such as prescription drugs or vision and dental benefits.

54.     Medicare Supplement policies supplement Original Medicare to provide patients with additional coverage.  Unlike Medicare Advantage plans, which act as a replacement to Original Medicare, Medicare Supplement policyholders enroll concurrently in Original Medicare.

55.     Although exceptions exist, most Americans enroll in or make changes to their Medicare Advantage or Medicare Supplement plans between October 15 and December 7, which is the Medicare Annual Enrollment Period ("AEP").  *See* Appendix B.  Beginning in 2019, however, Medicare patients were given a new opportunity to make adjustments to their Medicare Advantage or Supplement plans outside the AEP.  Now, after an individual has enrolled in a

17

Medicare Advantage or Supplement Plan, they are permitted to make a one-time plan change during the Medicare Advantage Open Enrollment Period ("OEP"), which runs from January 1 to March 31 of each year.

56.     In response to the COVID pandemic, the government established a COVID-19 Special Enrollment Period ("COVID SEP"). The ability to take advantage of the COVID SEP, which was effective from March 1, 2020 through June 30, 2020, was limited to Medicare recipients who "*qualified for a Special Enrollment Period but missed the deadline because* [*they*] *were impacted by COVID-19*[.]" Thus, unlike AEP and OEP, COVID SEP was not a third enrollment period open to any and all Medicare recipients.

## V.     **DEFENDANTS' FRAUDULENT SCHEME**

### A.     **SelectQuote's Use of "Lifetime Value" (LTV) Accounting**

57.     To guide its process of setting GAAP, the Financial Accounting Standards Board ("FASB") promulgates a Conceptual Framework that establishes the underlying concepts the FASB considers in developing GAAP. The Conceptual Framework is described in a set of Concept Statements, known as Statement of Financial Accounting Concepts or "FASCONs," that provide a general overview of accounting concepts, definitions, and ideas, as well as the building blocks that the FASB utilizes to establish GAAP. According to the Conceptual Framework, the objective of financial statements "is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity."[5,6]

---

[5] FASCON No. 8, *Conceptual Framework for Financial Reporting* ("FASCON 8"), Chapter 1, *The Objective of General Purpose Financial Reporting*, as amended in December 2021 ("Chapter 1"), at OB2.

[6] Note that while the FASB states that this objective applies to an entity's "financial reporting and

58.     SelectQuote reported that its financial statements were prepared in accordance with GAAP.  GAAP is the official standard for accounting mandated by the Securities and Exchange Commission ("SEC") of the United States and is primarily promulgated by the FASB.  GAAP is recognized by the accounting profession as conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  Essentially, GAAP establishes a common language that allows the information reported in a company's financial statements to be based on the same set of rules and guidelines that any other business following GAAP would use.

59.     Further, SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  The FASB has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC"), which has been adopted as the framework for financial reporting for all public filers.

60.     FASB identifies "***qualitative characteristics of useful financial information***" contained in financial statements that purport to be in accordance with GAAP.  FASCON No. 8, Chapter 3, *Qualitative Characteristics of Useful Financial Information*, as amended in August 2018 ("Chapter 3"), at QC1.  The "useful financial information" is that which is "likely to be most useful to the existing and potential investors . . . for making decisions about the reporting entity on the basis of information in its financial report (financial information)."  *Id.*  Meanwhile, the "fundamental qualitative characteristics" are "relevance and ***faithful representation***."  *Id.* at QC5. Faithful representation with respect to financial reporting, according to the FASB, "not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports

---

not just of financial statements," the FASB also states that "[f]inancial statements are a central part of financial reporting, and most of the issues that the [FASB] addresses involve financial statements."  FASCON 8, Chapter 1, at BC1.4.

to represent." *Id.* at QC12. "To be a perfectly faithful representation, a depiction would have three characteristics. It would be *complete, neutral,* and *free from error.*" *Id.*

61.     ASC Topic 606, *Revenue from Contracts with Customers* ("ASC 606"), prescribes the relevant guidance that companies, such as SelectQuote, utilize to record revenue. As an insurance broker, when SelectQuote sells a policy, ASC 606 allows the Company to consider the entire lifetime value ("LTV") of renewal commissions when recording revenue at the time the policy is sold in addition to the contracted commission rate for the one-year initial policy contract. Under ASC 606 this is defined as "the sum of probability-weighted amounts in a range of possible consideration amounts."

62.     SelectQuote's LTV of renewal commissions is regarded as "variable consideration" under ASC 606 due to the fact that the event that would allow the Company to collect on such commissions, i.e., the policyholder's decision to renew the policy, has not occurred at the time revenue is recorded. The first year of renewal commissions reported to be received on policies that had already been sold or renewed was reported on SelectQuote's balance sheet as "accounts receivable, net," while the reported commissions on policies that had not yet been renewed were reported as "commissions receivable" on SelectQuote's balance sheet. According to public filings, "commissions receivable" accounted for at least half of SelectQuote's assets reported on the balance sheets contained in the Company's Class Period financial statements. In addition to the balance sheet accounting, both types of commissions were simultaneously reported as revenue on SelectQuote's statement of income.

63.     When reporting revenue associated with variable consideration, ASC 606 requires SelectQuote to incorporate all information known to the Company at the time of reporting. In fact, ASC 606 constrains reporting of variable consideration by stating that "[a]n entity shall include in

the transaction *price some or all* of an amount of variable consideration estimated . . . *only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur* when the uncertainty associated with the variable consideration is subsequently resolved." *One of the factors identified in ASC 606 that "could increase the likelihood or the magnitude of a revenue reversal" is the judgment or actions of third parties, including customers.* This would include the Company becoming aware that the underlying policies will not be renewed at the rate previously assumed and reflected in the prior recording of revenue, particularly where, as alleged here, if the sales process associated with those renewal commissions was not designed or directed at ensuring the highest possible rates of renewal.

64.    ASC 606 further requires SelectQuote to reassess whether the variable consideration it previously recorded is constrained at each reporting period in order "to represent faithfully the circumstances present at the end of the reporting period and the changes in circumstances during the reporting period." Thus, when SelectQuote knew that the persistency rates it had incorporated into its LTV, revenue and receivable disclosures were even only slightly greater than its experience was, it was obligated to revise those assumptions to reflect the changed reality. By Defendants' own admissions that reality had changed by February 2019, but SelectQuote continued to use outdated, and materially inflated persistency rates throughout the Class Period, until belatedly disclosing a massive $205 million reduction to LTVs in February 2022.

65.    Because SelectQuote's reported revenue and LTVs are based on its application of ASC 606, those disclosures are highly subject to the Officer Defendants' discretion, judgments and manipulation concerning the assumptions used to determine the LTV associated with renewal commissions that SelectQuote reports to earn on policy renewals. Critically, the assumptions

about "persistency"—the number of times a policy will be renewed—had massive effects on the Company's reported revenue and commissions receivable. Despite the absolutely critical nature of persistency assumptions used by the Company to report its financial results, SelectQuote never disclosed detailed information about persistency rates or assumptions during the Class Period.

66.    SelectQuote described its LTV accounting as follows:

In accordance with ASC 606, revenue is recognized when a customer obtains control of promised goods or services and is recognized in an amount that reflects the consideration that an entity expects to receive in exchange for those goods or services. We apply the following five-step model in order to determine this amount: (i) identification of the promised goods in the contract; (ii) determination of whether the promised goods are performance obligations, including whether they are distinct in the context of the contract; (iii) measurement of the transaction price, including the constraint on variable consideration; (iv) allocation of the transaction price to the performance obligations; and (v) recognition of revenue when (or as) we satisfy each performance obligation.

67.    SelectQuote added that:

Significant management judgments and estimates must be made in connection with determination of the revenue to be recognized in any accounting period. If we made different judgments or utilized different estimates for any period, material differences in the amount and timing of revenue recognized could result.

68.    SelectQuote further explained:

The estimates of renewal commissions and production bonuses and other revenue are considered variable consideration in the transaction price and require significant judgment including determining the number of periods in which a renewal will occur and the value of those renewal commissions to be received if renewed. We utilize the expected value approach to do this, ***incorporating a combination of historical lapse and premium increase data, available industry and carrier experience data, historical payment data by segment and insurance carrier, as well as current forecast data*** to estimate forecasted renewal consideration and production bonuses and then to constrain revenue recognized to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur.

69.    Prior to adopting ASC 606 in 2018, SelectQuote said it was "already using a similar method to calculate the lifetime revenue value of a contract for internal forecasting purposes . . . ***and [had] the appropriate accounting policies and controls in place to do so***."

22

70.    SelectQuote also disclosed that uncertainties in variable consideration get resolved upon renewal of a policy:

> The uncertainty associated with the variable consideration is subsequently resolved when the policy renews, and any adjustments in variable consideration are recognized in the period incurred. Commissions receivable represent the variable consideration for policies that have not renewed yet and therefore are subject to the same assumptions, judgements and estimates used when recognizing revenue as noted above.

71.    While SelectQuote did not specifically detail the assumptions supporting its LTV accounting on Medicare Policies, it appears that the base assumption for SelectQuote's LTV accounting was that each Medicare Policy it sold would be renewed annually for ***ten years***, subject to certain persistency adjustments.

72.    Securities analysts provided various attempts to recreate SelectQuote's LTV calculations.  For example, in a report published on July 1, 2020, by RBC Capital Markets, the analysts said the following about the Company's LTV accounting policies:

> [SelectQuote] note[s] that the company estimates future renewal commissions using "contracted renewal commission rates constrained by a persistency-adjusted 10-year renewal period." In other words, SLQT's ***LTV reflects the effective booking of 10 years of revenue***, but each subsequent year of commissions is lower than the year before because it reflects a smaller average customer base consistent with SLQT's historical cumulative persistency experience for each of the ten renewal years. The aggregate renewal commission estimate is combined with the initial commission to yield LTV (before conservatism constraints).

73.    Similarly, a July 1, 2020 report by Credit Suisse provided an illustration behind SelectQuote's LTV accounting for Medicare Policy commissions, based on meetings with Defendants Danker and Sadun, stating that:

> Describing its approach to calculate Life Time Value (LTV), management notes that it is the upfront commission that SLQT is receiving plus an estimate of the renewal stream. SLQT calculates that renewal stream based on a 10-year renewal period. The ***company sees*** its first year persistency (the inverse of churn rate) ***at roughly 65% on an approved member basis (low 70% on a paying member basis). For renewal years 2 through 10, SelectQuote's average persistency (on an approved member basis) is about 80% and is upward sloping (i.e. the later years***

*have a higher persistency than the earlier years)*. The cumulative persistency of each year, i.e. the product of each year's persistency up to that point, is then multiplied by $350 which is the average renewal year revenue. The aggregate sum of these values over a 10 -year renewal cycle is roughly $1,015. SLQT then applies two constraints: First, an 8% constraint for mid -year fall off since not every policy is going to make it to the end of the year and, second, a 5% constraint for conservatism. That brings the renewal figure down to roughly $890 ($1,015 * 0.92 * 0.95). This, combined with the first year's commission results in an LTV of roughly $1,250 per approved MA policy.

74.     Thus, under this framework, at the time SelectQuote sells a Medicare Policy, the Company records commission revenue assuming that about 70% of the policies will renew in the first year, and that, on average, 80% of the previously renewed policies will renew in each of the subsequent nine years. These figures are subject to modest percentage discounts (of 8% and 5%). The overall set of renewal assumptions is referred to as "persistency."

75.     Despite the critical nature of persistency to the Company's financial results, the Company provided very little information about its actual persistency experience or "churn." Beyond information that was provided in a few analyst reports shortly after the IPO, SelectQuote provided very few details concerning the actual "persistency" of its policies, generally indicating that its expected persistency was "around 70%." For example, in a report dated July 7, 2020, Evercore ISI noted that SelectQuote "does not release data that allows others to independently calculate its churn rate." The lack of detail as to persistency and churn rates, as well as cohort-specific persistency, continued throughout the Class Period and thereafter. The opacity concerning persistency gave the Defendants very broad discretion to manipulate the reported LTVs and associated revenue and receivables.

76.     Over time, as discussed below, Defendants have admitted that they overvalued the Senior division LTVs dramatically and that persistency experience was substantially less than the assumptions necessary to achieve the LTVs they publicly reported throughout the Class Period.

As alleged herein, those persistency rates were in decline prior to the IPO, and were adversely affected by the massive, low-quality sales growth that occurred in the lead up to the IPO.

77.    Perhaps even more importantly, due to advertising, marketing and sales-related expenses that were necessary to complete the initial sale of MA and MS policies, SelectQuote actually lost money on the initial sales.  Those initial sales were taken at loss and would only later become profitable if the Company's publicly disclosed renewal and persistency assumptions were borne out.  Otherwise, if a policy was renewed less than two or three times, SelectQuote would not generate any income on such sale.  As CFO Sadun informed investors, during the September 9, 2020 FY Q4 2020 earnings call ("FY 4Q 2020 and FY 2020 Earnings Call"), it "takes about two to three years to break even" on a Medicare Policy after the policy is sold, assuming the persistency assumptions the Company made remained correct.  The "cost of writing new policies exceeds the first-year cash" the Company was receiving.

78.    If the Medicare Policies SelectQuote issued did not, as a whole, maintain a high level of persistency over a two to three-year period, the entirety of the Company's Senior business would become unprofitable.  At the end of the Class Period, the Company admitted that its per-policy LTVs were negative – reflecting a loss of $142 per MA policy, that would eventually grow to a loss of $290 per policy.

79.    The effect of the Company's rather high up-front costs was made apparent in a report published on June 15, 2020 by RBC Capital Markets, indicating that in FY 2019 (the last year prior to the IPO), SelectQuote's "Total Unit Cost per approved core policy" was $959.57. That compared to an LTV of $1,262.58 for a Medicare Advantage policy sold during fiscal 2019. Thus, even with the persistency assumptions SelectQuote applied, those policies would each generate profit of only about $300.  If renewal rates are even slightly lower than assumed at that

valuation, SelectQuote will lose money on the sale. The analysts following SelectQuote's stock acutely understood this and knew that even a minor drop off in persistency would be devastating to the Company's financial performance.

    80.    Defendants' own Class Period disclosures provide a similar illustration:



Much of the revenue SelectQuote claimed as part of its valuation was inflated, as illustrated by the above graph of the 2020 cohort Defendant Sadun presented during the FY 4Q 2020 and FY 2020 Earnings Call. In the graph, the orange represents the cost of writing the Medicare Policy, and the green bar represents the cash the Company claimed it would receive from renewals over the next ten years.

81.    Because persistency was the key component of SelectQuote's LTV calculations, if it disclosed a lower persistency to investors, the Company would then have to drastically lower the LTVs of its policies.  The LTVs disclosed by Defendants in connection with the IPO and throughout the Class Period were materially inflated based on the incorrect and unsupportable assumptions regarding persistency.  Furthermore, as facts on the ground changed impacting the rate of persistency, GAAP required the Company to make adjustments to revenues reflecting changed persistency whenever it reported financial statements publicly.

### 1.    SelectQuote's LTV-Based Financial Results Were Statements of Present Fact Under GAAP Accrual Accounting

82.    The LTV accounting used by SelectQuote during the Class Period, as required by GAAP, purported to reflect the then-present value of SelectQuote's commissions receivable using accrual accounting.  The FASB requires financial information in financial statements to be recorded and transmitted using the accrual method of accounting in order to be considered useful.  The accrual method of accounting requires the entity to depict "the effects of transactions, and other events and circumstances on a reporting entity's economic resources and claims in the periods in which those effects occur, even if the resulting cash receipts and payments occur in a different period."[7]  The FASB states that financial information accounted for and transmitted using accrual accounting is more useful than the cash method of accounting (i.e., accounting for transactions when cash is received/paid) "because information about a reporting entity's economic resources and claims and changes in its economic resources and claims during a period provides a better basis for assessing the entity's past and future performance than information solely about cash receipts and payments during that period."[8]

---

[7] FASCON 8, Chapter 1, at OB17.

[8] *Id*.

83.     Because GAAP requires the use of the accrual method of accounting and does not permit companies such as SelectQuote to maintain and report its financial information based on just cash receipts/payments, the FASB recognizes that financial statements prepared in accordance with GAAP are, to "[a] large extent . . . based on estimates, judgments, and models rather than exact depictions."[9]  This does not convert the GAAP-compliant financial statement items into projections or forward-looking statements.

84.     In the Conceptual Framework, the FASB identifies five attributes that companies use to measure assets and liabilities in accordance with GAAP.  While the FASB notes that certain assets and liabilities are measured based on *historical cost* (one of the five attributes identified in the Conceptual Framework that is used to measure assets and liabilities), referring to the amount of cash or its equivalent that was either paid to acquire an asset or will be required to settle a liability, the measurement of other assets and liabilities require attributes that necessitate some level of estimating of future events.  For example, the Conceptual Framework states that the attribute used to measure long-term receivables is *the present (or discounted) value of future cash flows*, which the FASB describes as "the present or discounted value of future cash inflows into which an asset is expected to be converted in due course of business less present values of cash outflows necessary to obtain those inflows."[10]  Accordingly, the use of *the present (or discounted) value of future cash flows* to measure long-term receivables requires considerable judgment regarding the amount of cash the company expects to receive in the future through the use and/or sale of the asset, as well as the interest rate which should be used in discounting to the present. Under these principles of accrual accounting, financial statement items required by GAAP to

---

[9] FASCON 8, Chapter 1, at OB11.

[10] FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, as amended December 2021 ("FASCON 5"), at 3.

reflect the present value of future cash flows, such as under ASC 606, are not projections and are statements of present fact.

85.    Because the FASB requires the accrual method of accounting in the preparation of financial statements in accordance with GAAP, the application of GAAP requires companies to make numerous estimates and assumptions about certain items and future events that directly affect its reported financial condition.  Such estimates and assumptions require a company such as SelectQuote to use the most relevant information available to it when preparing its financial statements in accordance with GAAP.  If a company does not use the most relevant information available to it to determine its material estimates and assumptions when preparing its financial statements, such financial statements are deemed to violate GAAP.

86.    The following provides specific examples whereby the FASB requires companies such as SelectQuote to incorporate some level of estimating to measure certain facts and circumstances in accordance with GAAP:

- Accruals for Ongoing Litigation – GAAP[11] requires companies to accrue (i.e., record) a loss contingency (i.e., a reserve) for cash payments it expects to incur to settle an ongoing litigation matter if the company expects a loss is both probable and reasonably estimable as of the reporting date.  Such loss contingencies are required to be accrued based on the best information that is available as of the reporting date.

- Impairment of Assets – In many cases, GAAP requires companies to reduce the carrying (i.e., book) value of an asset through the recognition of an impairment loss if the net realizable value of that asset is estimated to be less than its carrying value.  In turn, the determination of an asset's net realizable value typically require estimates of future cash flows the company expects to obtain from the asset, which usually entails various assumptions about future circumstances and events which may, in hindsight, turn out to be incorrect.

- Depreciation of Property, Plant and Equipment (PP&E) – GAAP[12] requires a company to depreciate its PP&E in such a way as to allocate the value of the asset

---

[11] ASC 450-20, *Contingencies.*

[12] ASC 360, *Property, Plant and Equipment.*

as equitably as possible to the periods during which services are obtained from the use of the asset. Depreciation accounting requires a number of estimates, including how long the asset is expected to provide economic value (i.e., the asset's estimated useful life) and whether the asset will have any salvage value at the end of its estimated useful life.

87.     The above examples are only three of many significant judgments and estimates companies make in order to properly prepare its financial statements in accordance with GAAP. Accounting for revenue in accordance with ASC 606, *Revenue from Contracts with Customers*, at issue in this case, is no different than the examples described above, in that GAAP requires companies such as SelectQuote to make significant estimates and assumptions in order to recognize revenue in accordance with GAAP. For example, ASC 606 requires companies to "estimate the amount of consideration to which the entity will be entitled in exchange for transferring the promised goods or services to a customer."[13]

88.     Notwithstanding the required use of estimates by SelectQuote in recording its revenues under GAAP, specifically ASC 606, the Company was nonetheless required to use the best information available that was reasonable in the specific circumstances and free from management bias. The Company would be responsible under GAAP to develop a reliable process to establish the estimate used, including evaluating whether the data used in making the estimate and the significant assumptions inherent therein have a reasonable basis and are appropriately applied under the applicable financial framework.

89.     Historical financial statement items prepared in accordance with GAAP, even if using estimates, differ materially from projections and forecasts of anticipated results in future periods, such as management financial guidance. In fact, the definition of a "forward-looking

---

[13] ASC 606-10-32-5. ASC 606 is the section of GAAP that prescribes a universal framework that companies such as SelectQuote are required to use to recognize revenue from customer sales.

statement" specifically and explicitly *excludes* information "included in a financial statement prepared in accordance with generally accepted accounting principles."[14] As such, GAAP reported financial disclosures, such as those detailed in Section X.A below, are not subject to the safe harbor protections under the securities laws.

90.    The application of GAAP that is required to be made by a specific section therein, such as ASC 606, which includes the need to establish estimates associated with certain events and transactions, serves to improve the consistency, clarity, and comparability of financial information across all businesses and industries.  Since GAAP establishes a common financial language, it allows the financial information reported to be compared across businesses.  Thus, estimates made during the application of GAAP differ from projecting future results because estimates established during the application of GAAP primarily measure transactions, events, and/or circumstances that have already occurred and are required to have been established by using consistent processes and methods developed by reporting companies, and must be based on data that is sufficient (i.e., accurate, complete, sufficiently precise and detailed) and appropriate for the purposes of the estimate being made.

---

[14] 15 U.S.C. § 78u–5(b)(2)(A).  A "forward-looking statement" is defined as "(A) a statement containing a ***projection*** of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; (B) a statement of the ***plans and objectives of management for future operations***, including plans or objectives relating to the products or services of the issuer; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission." 15 U.S.C. § 78u–5(i)(1).

91.     SelectQuote's treatment of LTV revenue and commissions receivable as current financial statement items, and not projections, is consistent with the understanding shared by analysts covering SelectQuote.  For example, in the RBC Capital Markets July 1, 2020 report, the application of ASC 606 to SelectQuote and other brokers of managed healthcare insurance was clearly described as the present value of yet-to be received but already earned renewal commissions: "Importantly, the entire commission that the distributor expects to collect, which is recorded as revenue at the time of the sale, ***includes latter-year renewal payments not yet received***, even though some policy durations ultimately run longer or shorter than average."

**B.     Months Before the SelectQuote IPO, Brookside Saddles the Company With Debt**

92.     In addition to forcing SelectQuote on an unsustainable growth trajectory, in the months before the IPO, Brookside saddled the Company's then-future shareholders with more than $400 million in new debt, which was largely used to pay a cash dividend to Brookside, and which would then be carried by the Company's post-IPO public shareholders in the Class.

93.     Specifically, on November 5, 2019 (one day after Brookside and SelectQuote entered the Amended Stockholders Agreement), SelectQuote entered into the Senior Secured Credit Facilities (the "Loan Facility"), which included a $425 million term loan.  Pursuant to the Loan Facility, the Company drew down $275 million in borrowing, and used that debt to pay a cash dividend of $265.8 million to its then existing shareholders.  Brookside itself received approximately $63 million as a result of that dividend payment.

94.     Just three weeks later, on November 27, 2019, SelectQuote filed the initial registration statement for the IPO with the SEC.  A portion of the proceeds from the IPO were also used to repay outstanding term loan debt.

95.     While this new debt, and the generous dividends it paid out, may have helped Brookside maximize its return on investment, public investors—including the earliest IPO investors—bore the burden of that debt and debt service, which sat on SelectQuote's balance sheet.

**C.     The SelectQuote IPO**

96.     The Class Period begins on May 20, 2020, when the SEC declared SelectQuote's registration statement for the Offering effective.   On or around May 20, 2020, SelectQuote conducted an Offering pursuant to a registration statement that the Company filed with the SEC on November 27, 2019 and which, after six amendments, was declared effective by the SEC on May 20, 2020 (the "Registration Statement").   On May 22, 2020, SelectQuote filed a prospectus for the Offering on Form 424B4 (the "Prospectus"), which formed part of the Registration Statement (collectively, the "Offering Materials").   The Registration Statement was signed by the Officer Defendants, Weldon and Hawks.   By means of the Offering Materials, SelectQuote offered and sold 18 million shares of common stock at $20 per share, resulting in $360 million in gross proceeds.   Also by means of the Offering Materials, certain "selling stockholders" offered 14,775,000 shares (inclusive of the Underwriters' optional purchase and sale of 4,275,000 shares from the selling stockholders) at $20 per share, resulting in gross proceeds of over $295 million to those investors.

97.     Selling Stockholders included Brookside, the Company's controlling stockholder, which reduced its stake in SelectQuote from 22.25% to 16.09% by selling more than 5.9 million shares, receiving approximately $119 million in proceeds.   Defendants Sadun and Danker sold 90,181, and 147,296 shares, respectively.   Sadun received approximately $1.8 million in proceeds, and Danker received approximately $2.9 million in proceeds.   Other selling stockholders included SelectQuote's Vice Chairman of the Board, William T. Grant, II, and his son, SelectQuote's Chief Operating Officer William Grant, III, who sold 477,434 and 259,195 shares, respectively.   Grant

II received approximately $9.5 million in proceeds, and Grant III received approximately $5.2 million in proceeds.

98.    As discussed further below, the IPO Offering Materials contained materially false and misleading disclosures concerning the LTV revenue and receivables from commissions on MA and MS policies, the Company's overall growth and quality, and the nature of the Company's sales process.

**D.    The IPO Pricing Was Based on Inflated Revenue and LTVs Figures, Driven by a Growth "At All Costs" Business Model**

99.    During the run-up to the IPO, the Company saw an explosion in the number of policies it sold, driven by an increase in agents hired, which, as discussed below, were undertrained and directed to sell without respect to the likely persistency of any such policies.  Thus, the reported growth was not the result of any extrinsic or structural changes in the availability of insurance plans or the size of the Medicare Policy market.  Rather, SelectQuote's growth, especially in the all-important Senior segment, was driven by Defendants' decisions to aggressively pursue low-quality bookings to create an impression of scalable profitability and increase the IPO price. SelectQuote's sell-at-all costs strategy for growth was directed and overseen by Sadun and Danker, and benefited the Brookside Defendants directly.  For example, on September 9, 2020, SelectQuote issued a press release announcing its first set of financial results as a public company, which quotes Defendant Danker personally touting SelectQuote's growth: "Our Fourth Quarter demonstrates SelectQuote's ***significant growth potential*** and we are excited to share our results following the company's successful initial public offering this past May. The power of our leading technology-enabled direct-to-consumer model paired with our 100% in-house agent-led customer service approach positions SelectQuote well to take advantage of demographic tailwinds and a large market opportunity for years to come."

34

100.    As the Prospectus points out, in the fiscal year prior to the IPO, 2019, the Company reported $337.5 million in revenue, which represented **44% growth** over the $233.7 million reported for fiscal year 2018. Similarly, for the nine-month period ended March 31, 2020 (the nine months prior to the IPO), the Company reported $390.1 million in revenue, which represented **48.3% growth** over the $263.1 million the Company reported for the nine-month period ended March 31, 2019. As disclosed in filings in connection with the Company's fourth quarter 2020 and fiscal year 2020 results, the Company reported $531.5 million in revenue for fiscal year 2020, an increase of $194 million over revenue for fiscal year 2019, which represents **growth in revenue of 36.5%**. Accordingly, the Company's revenue grew **127.4%** from fiscal year 2018 to fiscal year 2020.

101.    This growth was fueled almost exclusively by increased sales volumes in the Senior segment. Senior segment revenue grew from $102.4 million for fiscal year 2018 to $192.3 million for fiscal year 2019, representing **growth of 88%**. Similarly, Senior segment revenue grew from $158.5 million for the nine-month period ended March 31, 2019, to $273.8 million for the nine-month period ended March 31, 2020, representing **growth of 73%.** As disclosed in filings in connection with the Company's fourth quarter 2020 and fiscal year 2020 results, the Company's Senior division reported $361.7 million in revenue for fiscal year 2020, an increase of $169.4 million over revenue for fiscal year 2019, which represents **growth of 88%.** Accordingly, the Company's senior revenue grew an astounding **253%** from fiscal year 2018 to fiscal year 2020.

102.    This growth in Senior segment revenue was a result of the massive increase in approved policies during this time period. As explained in the Prospectus, "[s]ubmitted policies are counted when an individual completes an application with [a] licensed agent and provides authorization to them to submit it to the insurance carrier partner." Senior segment approved

policies *increased by 58%* for the fiscal year 2019, and *increased by 88%* in fiscal 2020. Accordingly, the Company's Senior segment approved policies grew an astounding *196%* from fiscal year 2018 to fiscal year 2020.

103.    As the Prospectus also details, the increase in agents was directly responsible for the increase in approved policies.  In the Prospectus, the Company disclosed that as of March 31, 2020, they employed a total of 922 core agents and 73 flex agents across their Senior, Life and Auto & Home segments, which was up from 400 agents in fiscal 2019.  Similarly, for the nine-month period ended March 31, 2020, the Company attributed its increase in Senior segment policies to an increase in average productive agents by 56%.  In fact, the Company expected its agent count to continue to grow and reach well over 1,200 by fiscal year 2022.

104.    In addition to reporting a significant, and rapid, increase in the amount of revenue it was generating on Medicare Policies, SelectQuote's disclosures in connection with the IPO created the impression that the LTVs associated with the sales of those polices would make such sales profitable.

105.    In the IPO Prospectus, SelectQuote disclosed that in fiscal 2019, the Company had an LTV of $1,279 per each MA policy sold.  For MS policies, the Company reported an LTV of $1,312 for fiscal 2019.  As quoted above, these LTVs (and the others disclosed in the Prospectus) were severely inflated by the persistency assumptions that failed to comport with the reality well understood at the Company prior to the IPO.

106.    Furthermore, a review of the per unit cost per approved Senior policy shows thin profit margins, explaining Defendants' urgency to "sell at all costs" and the importance of policy renewals to the success of SelectQuote's business.  For example, for fiscal year 2019, the per unit cost per approved policy—which consists of sales, fulfillment, marketing and general and

administrative costs—amounted to $822, which in turn meant that on the sale of a MA policy (with an LTV of $1,279) SelectQuote only made 35% in gross profit. For the sale of a MS policy (with an LTV of $1,312) SelectQuote made only slightly more—37%. Across all Medicare Policies SelectQuote reported an EBITDA (profit) of $725 per policy. However, as persistency dropped, as would be belatedly revealed, the profitability of those policies dwindled, and then by the end of the Class Period in February 2022, *turned into a loss of $142 per policy*.

107. SelectQuote's massive growth in revenues and sales volumes, combined with inflated LTVs, in the run-up to the IPO, was an attempt by the Defendants to maximize their proceeds from shares sold in the IPO. While this strategy was successful in the short term, the methods used to increase the Company's financial results created undisclosed risks that were transferred to public investors who purchased shares in the IPO and during the balance of the Class Period.

108. As discussed above, that growth in revenue and Senior segment policies was driven by aggressively increasing the size of the salesforce, and, as discussed below, largely by hiring unqualified agents who were barely trained and encouraged to sell at all costs. The sales growth that was reported in connection with the IPO was the product of a "high-volume" approach to sales, already known to be generating lower persistency experience. Notwithstanding the adverse correlation between this growth and persistency, the Defendants provided the above-mentioned inflated LTV figures in connection with the IPO. These disclosures were intended to, and in fact did, increase the IPO share price that the Company and the Selling Stockholders benefited from in connection with the IPO. By the end of the Class Period in February 2022, shares traded at $3.44 per share, a tiny fraction of the Company's $20 per share IPO price.

E.    **While SelectQuote Falsely Attributed its Pre-IPO Growth to its "Technology Driven" Differentiated Business Model, its Purported Massive Growth Prior to the IPO Was Fueled by an Untrained and Ineffective Sales Staff Selling Medicare Policies "At All Costs"**

109.    In its Prospectus, SelectQuote boasts of having "proprietary technology" that allows the Company to "take a broad funnel approach to marketing by analyzing and identifying high quality consumer leads."  The Company states that its proprietary routing and workflow system is a key competitive advantage and driver of their business performance—allowing SelectQuote "to rapidly conduct a needs-based, bespoke analysis for each consumer that maximizes sales, enhances customer retention and ultimately maximizes policyholder lifetime revenues."  The Company's systems allow SelectQuote to gain "valuable insights from the rich sources of consumer information [they] have gathered over three decades," and "use data analytics and proprietary algorithms to enhance [] sales and marketing strategies in an effort to maximize our return on our marketing spend and enhance our agents['] close rates."

110.    The Company purports to utilize data science across all of its key business functions and systems and claims that its focus on data quality ensures that their data scientists can draw deep insights as accurately and efficiently as possible. Their "proprietary technology and tech-enabled agent model is focused on maximizing policyholder lifetime value," which means that their "insurance carrier partners enjoy higher quality business from each transaction sourced through us."

111.    The Offering Materials (and other Class Period disclosures) also highlight the "highly trained and licensed agents" "[that] are subject matter experts in the products they sell," and, "in combination with [their] purpose-built software and business process, differentiates the service [they] provide to consumers relative to other insurance distributors[.]"  With respect to its Senior business, SelectQuote claimed to provide "personalized advice and guidance from policy

research to enrollment" which was a "key differentiator" "as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options." SelectQuote claims that its agents are "trained to offer unbiased advice in order to be more aligned to the specific needs of each customer" and underwent "up to 10 weeks" of "proprietary in-house training" to ensure they are "well-equipped with a deep understanding of the products he or she sells and the customer service and sales skills necessary to best service the customer."

112.    Analysts accepted these statements about the quality of SelectQuote's training and agents as a competitive advantage and differentiator. For example, in a July 1, 2020 Credit Suisse report reflecting comments from the Company, SelectQuote's management touted its training and salesforce as a competitive "moat"–specifically its "highly skilled agent force (running the sales center, recruiting, retention, incentives, career developments etc.)." In that same report, Defendants went even further, stating that SelectQuote's highly skilled agents were the reason why it had persistency rates that were higher than industry norms: "Management believes its higher persistency (low 70% vs 64% for EHTH on a paying member basis) is a result of the company's better technology combined with its highly skilled agents. One of the areas SLQT has been very focused on is making sure that the customer is in the right plan to begin with as well as deploying its customer care team to follow-up with the policy-holder." Similarly, RBC Capital Markets noted in a July 1, 2020 report about both SelectQuote and its competitor eHealth, that the companies "developed formidable technology platforms geared toward making the placement of beneficiaries in the right plan the first time a key component of both companies' LTV enhancement strategies."

113.    The Company's growth strategy was purported to be focused on maximizing policyholder lifetime value—i.e., renewals.  SelectQuote purports to enhance LTVs by continued investment in their agent experience and customer care team, which work together to enhance close rates, commissionable premium, and their ability to earn renewal and cross-sell revenue. These representations were made, repeated and emphasized throughout the Class Period. However, as discussed below, they were materially false and misleading.

114.    In reality, former employees of the Company confirm that the massive sales growth leading up to the IPO was not based on the Company's "technology driven" "differentiated model," but rather was based on lower quality sales that would have low persistency and generate high levels of disenrollment.  This was particularly true because SelectQuote expanded the volume of its sales prior to the IPO, and during the Class Period, as discussed above, to the tune of agent hiring increases of 64%, by bringing on vast numbers of low-paid, undertrained employees, who were often ineffective in selling complex Medicare-based insurance policies.  Nor were the sales agents in the Senior division financially incentivized to sell policies that would "stick" and be renewed.  To the contrary, sales agents were encouraged and incentivized to sell quickly without taking the time to match clients with policies that cover their particular doctors or medicines. SelectQuote's willingness to cheat on important certification tests, including those published by both AHIP [15] and specific insurance carriers that SelectQuote sold policies for, reflects and reinforces a sales culture that was not focused on anything but increasing short-term sales volumes. Unsurprisingly, these sales were subject to increased lapse rates and lower persistency.

---

[15] AHIP (Association of Health Insurance Providers) testing is established by AHIP to ensure that sales agents have a baseline of knowledge concerning health insurance and industry recognized methods for selling Medicare Policies in a manner that is compliant with the Centers for Medicare & Medicaid Services (CMS) policies and guidelines.

115.    As discussed above, the Company's disclosures misleadingly tout the importance of making high quality sales by **_matching_** sales leads with an agent best equipped **_to place the customer in a policy that is a good fit and would be serially renewed_**.  These statements were not true. As Former Employees confirm SelectQuote approached the sales process with a "sell at all costs" approach that emphasized volume of sales over quality of sales.

116.    The growth at all costs is corroborated by information provided by knowledgeable former employees ("FEs") of SelectQuote.[16]

117.    For example, FE 1 was a Sales Manager in the Senior division, and also was a trainer of new agents.[17]  FE 1's responsibilities included hiring and training new agents.  FE 1 indicated that when she first joined SelectQuote they would only hire "quality people," many of whom had prior sales experience.  However, as the Company expanded right before the IPO, FE 1 indicated that the Company would hire "anyone with a pulse."  FE 1 estimated that 50-70% of new hires did not have sales experience.

118.    Around the time of the IPO, FE 1 reported that the hiring goals were so high that they were only obtainable if they "said yes to everyone who came in the door."  FE 1 reported that after the IPO recruiters were "almost forced" to say yes to every applicant.  FE 1 recalled seeing resumes of individuals "who should have never gotten through to my desk."

119.    FE 1 provided a further example of how the hiring process and criteria changed in the summer of 2019 to allow the Company to meet its hiring goals.  FE 1 stated that when she started working at SelectQuote, applicants were given a basic screening test that required them to

---

[16] Former SelectQuote employees are referred to herein as "FEs" and are all referenced using feminine pronouns to maintain their confidentiality.

[17] FE 1 joined SelectQuote in 2014 as an Assistant Sales Trainer in the Senior business, was promoted to Trainer and then Manager before leaving the Company in 2022.

enter data into a simulated point-of-sale system. The test replicated the use of software the agent applicants would employ as sales agents, with the goal of making sure that the applicant had the needed computer skills. FE 1 indicated that up until the summer of 2019, those test scores were provided to managers, including FE 1, when they interviewed agent applicants, and if the scores were too low, the applicant would not be hired. FE 1 indicated that in the summer of 2019, the recruiting managers removed those scores and she could no longer access them. FE 1 indicated that after the summer of 2019, since the managers hiring agents no longer had access to this information, agents were hired who "couldn't even log into their Gmail accounts." FE 1 confirmed that the scores were concealed after she "pushed back" against a recruiting manager concerning this issue and never regained access to the test scores.

120.    FE 1 confirmed that the growth in the size of the sales force was 100% tied to revenue expectations. FE 1 indicated that the hiring goals were not based on the quality of applicants, but rather the Company's expectations for sales growth. From 2019 and afterwards, it was "all about bodies." FE 1 indicated for example, that Bobby Grant[18] said in a sales meeting that the Company increased the targeted number of Humana policies that they should sell in the Senior division and that resulted in a corollary increase in the number of agents hired. FE 1 heard about what Grant had said in that sales meeting from Kayla Cooper,[19] who was present in the meeting.

121.    FE 1 recalled that all management cared about was the large number of policies sold; they did not care if the agents had bad policy falloffs (disenrollments). FE 1 observed that

---

[18] On information and belief, Robert "Bobby" Grant was President of SelectQuote's Senior division between 2019 and 2021, and currently serves as President of the Company.

[19] On information and belief, Kayla Cooper was the Senior Director of Sales Operations at SelectQuote from 2018 through 2020, and has served as Senior Vice President, Strategy and Implementation at the Company from January 2021 through the present.

agents who "were doing all the wrong things" were considered successful based on the sales number they were putting up. FE 1 observed agents neglecting to ask customers about basics, such as if the customer had specialists or took medication. FE 1 indicated that sales like this would "fall off" because once customers realized their specialists or medicines were not covered they would revert to their prior coverage. FE 1 reported that this was tolerated at SelectQuote because upper management just saw big enrollment numbers, which was all they cared about.

122.    FE 1 also reported that at the time of the IPO SelectQuote's training program was condensed to four weeks. That proved to be severely inadequate. FE 1 recalled asking some trainees three weeks into their training what was the difference between Medicare Part A and Medicare Part B ; some trainees *did not even know* the answer to that simple, foundational question. According to FE 1, "it was all about efficiency." The entire training process, according to FE 1, was "not even close to ten weeks."

123.    FE 2 was a Senior Sales Agent in SelectQuote's Senior Division from January 2021 through August 2022. FE 2 indicated that during her tenure as a Senior Sales Agent she was also tasked with recruiting sales agents. In that role, FE 2 reported that SelectQuote tried to hire 5,000 sales agents in a single quarter, and only 50% of them "showed up" to work at the Company.

F.    **SelectQuote Helped its Agents Cheat on Certification Exams, Further Confirming the Company's Sell "At All Costs" Business Model**

124.    Several former SelectQuote employees have confirmed the existence of systematic cheating by SelectQuote agents on certification tests required under the AHIP certification guidelines necessary to sell Medicare Policies and certification tests similarly required by SelectQuote's insurance carrier partners. Passing these tests was a prerequisite for agents to complete before being allowed to sell policies on behalf of SelectQuote's insurance carrier

partners. This cheating was facilitated by numerous of the Company's senior managers and was openly discussed and widely known.

125.    FE 2 reported that there was widespread cheating on certification tests administrated to sales agents by each of SelectQuote's insurance carrier partners and in connection with AHIP testing. FE 2 indicated that sales agents would have three chances to pass the tests each year and if they failed that agent would have to wait 90 days and then try again. Since SelectQuote would have been adversely affected by having its agents sidelined for a whole quarter, according to FE 2 agents would go to their managers if they felt like they could not pass the test on the second try and the managers would provide them with an answer key. FE 2 reported that the answer keys to these tests were widely shared within the Company by managers and that if the insurance carriers were aware of this they would be "livid."

126.    FE 3 was a Sales Agent in SelectQuote's Senior division from August 2017 through May 2021, and in that role was familiar with SelectQuote's sales and training process. FE 3 confirmed that SelectQuote managers gave agents the answer keys for annual insurance carrier and AHIP certification tests. FE 3 confirmed that "screen shots" of the correct answer keys for test questions were available in a Google Doc that agents had access to. FE 3 reported that the existence of the answer keys in a Google Doc was widely known among the sales agents and their managers. FE 3 indicated that she knew that the managers reporting to Ben Gasper were aware of this practice.[20]

127.    FE 4 worked at SelectQuote from February 2020 until separating from the Company in July 2022. FE 4 was a Senior Sales Agent and then an Assistant Sales Manager in

---

[20] On information and belief, Ben Gasper was a Senior Manager of Agent Development, and worked at SelectQuote from June 2013 through at least February 2022.

the Senior segment, selling Medicare Policies to senior citizens. FE 4 indicated that she personally knew that managers within SelectQuote's Senior division provided the answer keys for insurance carrier and AHIP certification tests to sales agents. FE 4 further confirmed that if a sales agent in the Senior division had taken a certification test and "fail[ed] twice, you let your manager know, and they would give you the answers." FE 4 indicated that this was not a secret at the Company, stating that "it was well known."

128.    FE 5 was a Sales Agent and then a Senior Sales Agent in the Company's Senior Division from June 2013 until January 2019. FE 5 sold Medicare Policies to seniors during her nearly six-year tenure at the Company and is personally familiar with SelectQuote's sales practices and training. FE 5 reported to David Rechsteiner, who was a Sales Manager in the Senior division. FE 5 reported that from 2017 through at least 2018, Rechsteiner reported to Josh Matthews, who, on information and belief, is currently President of SelectQuote's Senior division and has been with the Company since 2014.

129.    FE 5 also confirmed that sales managers at SelectQuote made sure agents passed both the AHIP testing and carrier tests because if an agent reported that they did not pass the test, managers would respond by saying "I will email you the answers." FE 5 heard this because she sat close to agents who did not pass and overheard the conversations. FE 5 reported that these conversations happened openly and that management helped agents that needed answers to pass the test.

130.    FE 5 reported that David Mergen, upon information and belief, a manager with responsibility for training and certifications in connection with the AEP each year, was one of the managers who distributed answer keys. FE 5 also indicated that Rechsteiner held weekly routine

sales meetings, and during those meetings advised agents to "go see their managers" if they failed an AHIP or insurance carrier certification exam.

131.    FE 6 was a Sales Agent in the Senior and Life divisions at SelectQuote from May 2020 through January 2021.  In that capacity FE 6 was personally familiar with the Company's sales and training practices.  FE 6 stated that she personally observed answer keys to insurance carrier certification tests being provided both in document form and over video calls to ensure that sales agents in the Senior division passed those exams.  FE 6 indicated that the answer keys for certification tests required by every single insurance carrier that SelectQuote worked with in the Senior division were shared.  FE 6 indicated that some of the carriers' testing platforms allowed agents to access the tests that they had taken and passed, making it possible to share the correct answers with other agents.  FE 6 added that for carriers whose tests could not be accessed after they were completed, agents at SelectQuote would take screen shots of the tests to be shared with other agents.  FE 6 confirmed that managers in the Senior division encouraged the practice of sharing answers on carrier certification tests.

132.    FE 7 was employed at SelectQuote from July 2019 until October 2021, first as a Customer Care/Cross Sales Agent, from July 2019 to 2020.  In 2020, she became a Sales Agent in the Senior division.  Thereafter, she was an Assistant Sales Manager in the Senior segment, from April 2021 to October 2021, reporting to Jessica McCunniff.  FE 7 explained that she witnessed cheating on the carrier certification tests.  FE 7 said that all agents used "cheat sheets" when taking the tests.  If an agent did not have the "cheat sheet" during the test, SelectQuote individuals responsible for training would come by and help the agents with the answers.  SelectQuote did not allow agents to take the test a third time if the agent did not have the help of a trainer because failing a test three times meant that the agent could not sell for a given carrier.  The Company,

cognizant of not wanting to appear to be engaged in facilitating cheating, called the "cheat sheets" "study sheets." FE 7 said that agents would take screen shots of their tests, after submission, where it shows the right and wrong answers—and create a PDF or a Google Doc with the answers, which would then get shared.

133.    SelectQuote's willingness to cheat on important carrier certification tests reflects and reinforces a sales culture that was not focused on anything but increasing short-term sales volumes. Unsurprisingly, these sales were subject to increased lapse rates and lower persistency.

### G.    Churn and Persistency Issues Plague SelectQuote

#### 1.    By the Time of the IPO, Concerns With Churn and Persistency Were Prevalent in the Industry and the Company Knew About its Own Persistency Issues

134.    By March of 2020 the first and second renewal periods, respectively, for policies sold in the 2019 and 2018 cohorts were over. *See* Appendix B. This was approximately two months before the May 2020 IPO. Thus, by the time of the May 2020 IPO SelectQuote and the Officer Defendants knew what ***they would later admit in May and September of 2021 and further in February 2022—that both the 2018 and 2019 cohorts had experienced lower rates of persistency than the Company had seen historically***. In February of 2022, at the end of the Class Period, Defendant Sadun admitted that the decline in persistency had occurred "***over the last three years***," resulting in a $205 million reduction to SelectQuote's LTVs.

135.    In each of these instances, the persistency declines were either not quantified or misrepresented, and were accompanied by soothing statements meant to assuage the perception of a declining persistency trend, but this smokescreen has now completely fallen apart, as SelectQuote's LTVs and per-policy EBITDA have fallen off and proven the inherent unprofitability of its business. Notwithstanding their knowledge of declines in two consecutive

cohorts, Defendants predicated the LTVs disclosed in the Prospectus and throughout the Class

Period, on then unfounded assumptions about persistency.

136.    In August 2020, Defendant Sadun said that the Company had experienced a "slight

uptick in sort of second term lapses."[21]    While purposefully opaque, Sadun's statement refers to

information about the second-term renewals for the 2018 cohort that would have taken place by

March of 2020.    Given that policies renew annually until no later than March, the 2018 cohort

renewed for their first-term by March of 2019, and for their "second-term" by March of 2020.

Similarly, in September 2020, two reports indicated that SelectQuote had been aware of lower

persistency in the "last couple of renewal years"[22] (i.e., for the 2018 and 2019 cohorts, which

renewals were completed by March 2020) and falsely stated that "first and second term persistency

is down a few hundred basis points [~2%] because of the OEP and SEP."[23]

137.    Then in May of 2021 Defendants further revealed that the 2019 cohort had "lower

first and second term persistency and higher lapse rates."[24]    In September of 2021, it was revealed

that "at the time of the IPO, SLQT did highlight lower first-term persistency for the 2019 cohort."[25]

Again, to be clear, the 2019 cohort's "first-term" renewals were to have been completed by the

---

[21] Credit Suisse analyst report, August 13, 2020.

[22] Barclays analyst report, September 10, 2020.  The report conditioned the above quote by stating notwithstanding that persistency was down "the impact of this on lifetime value (LTV) of members is only one facet of the full LTV calculation."

[23] Credit Suisse analyst report, September 10, 2020.  This report similarly qualifies the above quote by indicating that "the older policies [pre-2018 cohorts] are performing ahead of expectations."

[24] Credit Suisse analyst report, May 12, 2021.

[25] Credit Suisse analyst report, September 6, 2021.  While the report indicates that this persistency trend was "highlighted" "around the time of the IPO" no disclosure of this information is included in the Prospectus or the subsequent filings prior to what is outlined herein.  To the extent disclosure of this fact was made in "roadshow" presentation in connection with the IPO, such a disclosure was itself a violation of the law and does not inoculate any Defendant named in this Complaint from the violations of the securities laws alleged.

end of the OEP in March 2020, before the IPO. This adverse persistency trend, affecting the last two cohorts prior to the IPO, was not only not revealed, but actively concealed, and not taken into account at all in the assumptions underlying the grossly inflated LTVs provided to investors throughout the Class Period. As discussed further below, the opaque and evasive revelations in 2020 and 2021, always accompanied by reassurances about overall persistency, portended the later revelations which make completely clear that all of Defendants' disclosed assumptions and statements concerning LTV and persistency were materially false and misleading.

138. Critically, information concerning the 2018 cohort's second-term persistency and the 2019 cohort's first-term persistency was far more representative of future persistency expectations for at least three reasons, all of which were completely known to the Officer Defendants before the IPO and throughout the Class Period. First, since the 2018 and 2019 cohorts were the first that were sold during SelectQuote's massive expansion of its sales volumes, which have been marked by a decline in sales quality, Defendants did and should be expected to have lower persistency than in prior historical cohorts. Basically, 2019 was very different than 2017, and 2020 was likely to be even more different from 2017, so those differences necessitated different, and lower, persistency assumptions, especially in light of GAAP requirements under ASC 606 as discussed above. Second, the introduction of the OEP in connection with the 2019 cohort has been cited repeatedly by the Company in explaining the drop off in persistency. But SelectQuote had two cohorts of OEP experience by the time of the May 2020 IPO and knew and should have incorporated the lower persistency experienced as a result of the OEP into its LTV assumptions. Finally, declining persistency numbers across competitors (discussed below) provided information for SelectQuote to consider in lowering its own assumptions. While

SelectQuote repeatedly said that the quality of its training, sales processes and technology differentiated it from those competitors, these explanations were illusory.

139.    Noting these concerns, investors repeatedly questioned SelectQuote about its persistency experience and assumptions.  As early as June 2020, analysts were flagging concerns of already existing churn (a form of persistency—when customers disenroll and return to Original Medicare or a different MA or MS plan) both in SelectQuote and in the industry.  For example, an analyst report from June 15, 2020 by Jefferies noted that churn is an important risk, by stating that "[i]ndustry churn has been ticking up, which shortens duration."

140.    Analysts also noted that churn was increasing in the business of SelectQuote competitor eHealth.  For example, on June 17, 2020 an analyst report by Evercore ISI noted that investors "have become worried about increasing churn" and stated that one of the reasons for the uptick in churn is the fact that both eHealth and SelectQuote "have a **large portion of members who are in their first year**, when churn in the highest."  The report also stated that eHealth has specifically noted that churn is ~36% in year 1 and 30% in years 2-3 and had also determined that "those seniors enrolled in **AEP in 2019 had higher than expected churn in the 2020 OEP season**[.]"  The report noted that "[g]iven these industry-wide and company-specific factors, **we see churn rates as likely to tick up in the short term**.".  A July 21, 2020 analyst report by Jefferies also noted that churn at eHealth had increased 600 basis points YoY to 38% LTM in 1Q 2020.  These reports further put Defendants on notice of the persistency declines and related risks they knew about, but as detailed below, including in Sections X.A.1.b-c, and X.B, they repeatedly misrepresented SelectQuote's persistency rates, churn, and otherwise sought to allay investors and analyst concerns about persistency.

141.    Despite knowledge by at least March of 2020 that SelectQuote was experiencing lower first term persistency for the 2019 cohort, as discussed below, Defendants did not accurately disclose the magnitude of any persistency issues until at least May 2021.  In May 2021, the Company disclosed that it had "experienced lower second term persistency for the 2019 cohort," meaning, that policies purchased in fiscal year 2019 were not being renewed at the Company's assumed levels of renewal at the second-year mark or second term—the year 2021.

142.    In the summer of 2021 and in early 2022, the Company was forced to confront the deteriorating quality of the policies it had approved and began to estimate tail adjustments that disclosed to investors what Defendants had known all along—lower persistency plagued its cohorts since at least the time of the IPO.  The amount of LTV reductions the Company was forced to take—a total of $205 million, in a $145 million tail adjustment and a $60 million reduction in Senior LTVs—represented a significant amount when juxtaposed with the Company's reported total revenue and current commissions for the period in each period for which it was reported, demonstrating the magnitude of the tail adjustment.

143.    In early 2022, analysts began to press the Company on exactly how low the persistency numbers were.  For example, Credit Suisse analysts asked on February 8, 2022, if the persistency numbers were "more like close to 50% persistency in year 1?"  While the Company refused to directly answer, it did admit that persistency was "certainly lower than several years ago."

144.    On August 25, 2021, in the Company's fourth quarter of fiscal year 2021 earnings call, Defendants announced a $65 million placeholder with a potential risk of a cohort tail adjustment.  For the fourth quarter of fiscal year 2021, Defendants announced total revenue and current commissions receivable of $188.4 million and $89.1 million, respectively.  Accordingly,

the $65 million placeholder represented 34% and 72%, respectively, of the total revenue and commissions receivable for the Company for that quarter. In February 2022, the Company announced that it had increased the cohort/tail adjustment to $145 million—a ***123% increase.*** On February 7, 2022, the Company disclosed total revenue of $195 million for second quarter of fiscal year 2022 and current commissions receivable of $202.3 million. Accordingly, the increased cohort/tail adjustment represented 74% and 72%, respectively, of total revenue and commissions receivable for the quarter. Moreover, the February 2022 disclosure revealed that the Company's "EBITDA per MA/MS Policy" was ***a loss of $142***. This is in stark contrast with the disclosure at the time of the IPO where the Company reported EBITDA per MA/MS Policy of $725 (for fiscal 2019), meaning an expected profit of $725 per policy.

145.    Following the end of the Class Period, SelectQuote took additional tail adjustments totaling $193 million, and has admitted that rather than make a profit on the Medicare Policies it sells, ***it stood to lose $290 per policy.***

### 2.    Statistical Analysis of SelectQuote's Persistency Disclosures Indicates That by the Time of IPO Persistency Rates Were Inflated by at Least 15%

146.    Statistical analysis of SelectQuote's disclosures indicates that Defendants' Class Period financial results and other statements incorporated persistency rates that were inflated by over 15% at all times.

147.    As noted above, SelectQuote's financial disclosures included the "LTV" of commissions from sales of Medicare policies on a "per approved policy" basis. These disclosures included the calculation of "per policy" amounts, which included per-policy revenue and EBITDA (profit), as well as total "commissions receivable," which reflected the aggregate value of the LTV of policies sold and the stream of cash flows purportedly payable to SelectQuote. Both per-policy and aggregate values were predicated on the persistency of those policies, i.e., the rate of renewals,

over a ten-year period.  SelectQuote did not provide details or quantify the persistency rates used in its LTV calculations.  However, a statistical analysis of SelectQuote's disclosed per-policy LTVs, the maximum commission rates set by the Centers for Medicare & Medicaid Services ("CMS"), and information disclosed by the Company allows for the persistency assumptions underlying SelectQuote's financial results to be calculated.  This statistical analysis principally comparing the per-policy LTVs disclosed in the IPO Prospectus with the per-policy LTVs disclosed at the end of the Class Period, on February 7, 2022, which reflected the decline in persistency that SelectQuote belatedly admitted it had observed over the prior **three years**, reflects that at the time of the IPO and at all times during the Class Period, SelectQuote's disclosed financial results inflated the Company's observed persistency rates by at least 15%.

148.    In the IPO Prospectus, SelectQuote represented that its LTV commissions for each MA Policy sold was $1,297 during the nine months ended on March 31. 2020, which used "contracted renewal commission rates constrained by a persistency-adjusted 10-year renewal period."  Contracted commission rates, the details of which SelectQuote did not disclose, were subject to maximum amounts set by the CMS.  The CMS caps for the 2020 cohort were $510 per initial commission and $255 for each subsequent renewal commission.  As previously discussed, based on SelectQuote's public disclosures, including those made in SEC filings and to analysts at RBC Capital Markets and Credit Suisse, the Company assumed the persistency of renewals over ten years following the initial sale of the policy, with annual persistency rates increasing over time and cumulative persistency rates decreasing over time.[26]  The Company then applied a "constraint" of 8% for intra-year lapses, another form of persistency to adjust LTV for customers dropping out

---

[26] *See, e.g.*, RBC Capital Markets report, July 1, 2020, at 7 (quoted above at ¶ 72).

of plans mid-year, and a further "conservatism constraint" of 5%.[27] These two constraints, in conjunction with annual persistency assumptions and CMS caps on commissions, provided the basis for the $1,297 per MA policy LTV.[28] Based on these data, the inflated persistency rates that SelectQuote used for each renewal year are reflected in the table below:

| IPO Prospectus Reported LTV | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year (since initial sale) | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| Reported LTV per MA Policy | $1,297 | | | | | | | | | | |
| Reported Mid-year Falloff Constraint | 8% | | | | | | | | | | |
| Calculated Annual Persistency | | 65% | 80% | 87% | 87% | 87% | 88% | 88% | 88% | 88% | 88% |
| Average Annual Persistency Y1-10 | 84% | | | | | | | | | | |
| Average Annual Persistency Y2-10 | 87% | | | | | | | | | | |

149.   However, SelectQuote has since admitted that its LTVs and commissions receivable had been decreasing since prior to the IPO, revealing a reduction of $205 million to the total value of its Senior LTVs and disclosing that its LTV per MA policy had fallen to $922 as of the second quarter of fiscal 2022 (ended December 31, 2021), thus for policies sold for the 2022 cohort.  Defendant Sadun admitted that these reductions reflected declines in persistency observed over the last "three years," that is, dating back to the 2018 cohort.  Still, SelectQuote did not disclose the Company's actual persistency rates, but those can be calculated by using the same statistical analysis as above (and adjusting for the 2022 commission caps).  Using the CMS caps of $573 for initial sales and $287 for renewals for the 2022 cohort, the calculated persistency rates

---

[27] *See, e.g.*, RBC Capital Markets report, July 1, 2020, at 6 ("The companies assess these factors over a number of historical periods in order to arrive at a time series average. SLQT, for example, bases its persistency curve on a three-year average using its own experience with customer retention. For conservatism, both companies apply a 'constraint' assumption to their LTV forecast. . . . In addition, the constraint accounts for customers that drop out of their plans before the effective date. SLQT applies an 8% constraint to adjust LTV for mid-year membership fall-off and then a 5% constraint off the top for added conservatism.").

[28] Securities analysts covering SelectQuote used the same methodology, and information provided to them by SelectQuote management, to model the Company's LTVs.  *See, e.g.*, Credit Suisse report, July 1, 2020, at 4-5 (quoted above at ¶ 73).

that SelectQuote used for each year in its February 7, 2022 disclosures for the quarter ended December 31, 2021 are reflected in the table below:

| 2Q22 10-Q Reported LTV | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Year (since initial sale) | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| Reported LTV per MA Policy | $922 | | | | | | | | | | |
| Reported Mid-year Falloff Constraint | 15% | | | | | | | | | | |
| Calculated Annual Persistency | | 49% | 64% | 70% | 71% | 71% | 71% | 71% | 72% | 72% | 72% |
| Average Annual Persistency Y1-10 | 68% | | | | | | | | | | |
| Average Annual Persistency Y2-10 | 70% | | | | | | | | | | |

150.    A comparison of the persistency rates calculated based on the IPO Prospectus disclosures and those calculated based on the February 7, 2022 disclosures indicates a massive inflation of persistency in the LTVs disclosed in the IPO Prospectus and at all times during the Class Period:

| IPO Prospectus vs 2Q22 10-Q | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Year (since initial sale) | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| Calculated Annual Persistency | | | | | | | | | | | |
| IPO Prospectus | | 65% | 80% | 87% | 87% | 87% | 88% | 88% | 88% | 88% | 88% |
| February 7, 2022 Disclosures | | 49% | 64% | 70% | 71% | 71% | 71% | 71% | 72% | 72% | 72% |
| Persistency Inflation | | 16% | 16% | 16% | 16% | 16% | 16% | 16% | 16% | 16% | 16% |

151.    The above statistical analysis reflects a massive inflation of persistency, which in turn inflated the reported LTVs in the IPO Prospectus and throughout the Class Period.  Applying the lower persistency rates calculated based on SelectQuote's February 7, 2022 disclosures, as well as the higher reported mid-year falloff constraint of 15%, to the CMS commission caps for the 2020 cohort that was being disclosed at the IPO, a true LTV per MA policy of $820 should have been disclosed in the IPO Prospectus.  These inflated persistency rates were in use and concomitantly inflated SelectQuote's LTVs, revenue, and receivables, at all times throughout the Class Period.

152.    Based on the above statistical analysis, the LTV per MA policy in SelectQuote's IPO Prospectus was overstated by $477 or 37%. The Company reported that it had sold 171,099 MA policies during the period preceding the IPO. Therefore, in the aggregate, SelectQuote's revenue and EBITDA for the nine months ended March 31, 2020 were inflated by over $80 million, representing an approximately 30% overstatement of the $263 million reported revenue and an approximately 70% overstatement of the $114 million reported EBITDA, respectively. The Company's commissions receivable were similarly overstated, as the reported commissions receivable were based on the same inflated persistency assumptions.

153.    Critically, where SelectQuote's MA LTV per policy was actually $820 at the time of the IPO, SelectQuote had a negative EBITDA-per policy, a loss, as its per-policy costs were estimated by analysts to be approximately $900. This loss was borne out in the Company's admissions at the end of the Class Period, where it disclosed a negative EBITDA (loss) of $142 per policy.

### 3.    SelectQuote's Technology Also Revealed to the Company, Much Sooner Than Disclosed, That its 2018, 2019, 2020 and 2021 Cohorts Were Experiencing Poor Persistency and Lapses

154.    As discussed below, the Company has proprietary technology that allows it to rapidly conduct an analysis for each customer, enhancing customer retention and maximizing policy lifetime revenues. The Company claims to rely on data scientists that can draw deep insights as accurately and efficiently as possible to make these pairings.

155.    Furthermore, the Company's "SelectQuote Revenue Tracking System," or "SRTS" supposedly provides SelectQuote with customer falloff / retention prediction algorithms that give the Company the ability to track lower persistency and lapses issues in time to allow real-time action.

156.    In its May 22, 2020 IPO Prospectus, the Company boasted that this SRTS tracking system is a "*[f]ully integrated, proprietary revenue tracking and financial reporting tool* that also supports financial and customer falloff / retention prediction algorithms, *allowing for real-time workflow* and actions with our customer service teams."

157.    In countless subsequent investor conferences, earnings calls, and periodic reports, the Company continued to tout its ability to use its technology to detect persistency issues in real time.  For example, on July 1, 2020, Credit Suisse hosted Defendants Danker and Sadun for an interview.  As Credit Suisse reported in an analyst report titled "Putting the Pedal to the Metal; Virtual NDR Takeaways," SelectQuote boasted of having "higher persistency" as "a result of its better technology combined with its skilled agents" and of being able "[t]o recapture its members who are looking to change plans" by "leveraging its data and real-time feeds from carrier partners," "as well as deploying its customer care team to follow-up with the policy-holder."  The Company represented that they are "constantly trying to leverage its data to be able to get in front of what could be a counter-persistency event."

158.    One month later, SelectQuote's August 13, 2020 investor presentation described SRTS as a "[p]roprietary revenue tracking and ASC 606 financial reporting tool."  That same slide claimed that, "Our Approach is Rooted in Sophisticated Technology" and that the Company's "[r]obust, fully-integrated technology platform drives customer lifetime value / ROI."  The Company repeated this claim in investor presentations dated October 5, 2020, December 10, 2020, and February 23, 2021.

159.    The Company continued to highlight SRTS in annual reports throughout the Class Period.  In the annual reports dated September 10, 2020 and August 26, 2021, the Company said its "Competitive Strengths" included its "[l]eading technology-based sales platform."  These

annual reports lauded SRTS specifically as a "**[f]ully integrated, proprietary revenue tracking and financial reporting tool** that also supports financial and customer falloff / retention prediction algorithms, **allowing for real-time workflow** and actions with our customer service teams."

160.   Indeed, Danker directly touted SelectQuote's technology as a "really important part of the business."  At a December 2, 2020 Credit Suisse Technology Conference, in response to analyst questions about the importance of technology to the Company's business model, Danker responded, "We even use it **for revenue tracking**, which doesn't sound very sexy, but it's **a really important part of the business**."  At that same conference, SelectQuote shared an investor presentation that echoed this, calling SRTS a "[p]roprietary revenue tracking and ASC 606 financial reporting tool."

161.   The Company attributes the persistency underperformance of the 2019 cohort to the OEP period, which began and closed before the close of the IPO.  Per the Company's own description of its purported technology, SelectQuote was able to determine that issues with persistency were more serious than it led on during the Class Period.  The Company has not, to date, walked back its statements concerning its sophisticated technology and its representations about its capabilities.

### 4.   Former Employees Further Corroborate That "Persistency" in the Company's Medicare Business Was Far Worse Than Disclosed

162.   Former employees of SelectQuote further confirm that the Company's "persistency" experience was inconsistent with its public disclosures and the assumptions needed to support the revenue and "LTV" of accounts receivable in SelectQuote's Senior business.

163.    FE 8 worked at SelectQuote from 2019 through November 2021, ultimately having responsibility for the training of customer care agents (CCAs) in the Company's Senior Division.[29] In that role FE 8 reported to Terresha Dinkel[30] and was responsible for training CCAs and provided remedial training if CCAs failed to meet performance metrics.

164.    Based on her role as a CCA, Supervisor and then Manager responsible for training other CCAs, FE 8 had direct insight into the renewal and persistency experience of clients she interacted with, and the customers who were serviced by the CCAs she trained or supervised.  FE 8 observed that over time there was a decrease in the number of people who were renewing the MA and MS policies sold to them by SelectQuote.

165.    FE 8 detailed that SelectQuote developed an exhaustive process to fight disenrollments and to convince clients to renew their policies, indicating that the Company's employees could reach out to such former policyholders four to five times, based on a specific timeline.  If the first calls were not answered, or the client did not ask to not be called again, SelectQuote's agents would continue calling.  FE 8 confirmed that since a call that was not answered by the client "didn't count," a client who was attempting to disenroll could be called upwards of 20-30 times in a month by SelectQuote's agents.

166.    FE 8 indicated that SelectQuote was focusing on cancelations and trying to avoid them right after the OEP ended in March 2020.  FE 8 indicated that the clients' insurance companies would notify SelectQuote within 30 days of a cancelation, and that there were internal

---

[29] FE 8 joined SelectQuote in September 2019 as CCA in the Senior division, was promoted to Supervisor in November 2020, and served as Manager of CCA training from February 2021 through November 2021, at which time she left the Company.

[30] On information and belief, Terresha Dinkel, worked at SelectQuote from 2016 through 2021, and was the Director of Customer Care Agents at SelectQuote from 2020 through 20201, and a Sales Manager from 2018 through 2020.

reports published weekly reflecting renewal rates and "churn." FE 8 indicated that the annual persistency and renewal data went through David Cable.[31]

167.    FE 2 was a Senior Sales Agent in Select Quote's Senior Division from January 2021 through August 2022. She reported high pressure sales tactics that the Company used. For example, FE 2 was chastised by her managers for refusing to push Medicare plans on an 89 year-old who FE 2 believed had no clue what was going on. FE 2 indicated that this happened regularly.

168.    FE 9 worked at SelectQuote in Quality Assurance, to review and audit calls sales agents would have with clients in the Senior division.[32] Through her responsibilities to observe and review many sales and renewal calls conduct by agents in the Company's Senior division, FE 9 is personally aware of the SelectQuote's sales practices and goals. FE 9 estimated that 70% of the calls she listened to were concerning renewals.

169.    FE 9 indicated that she believed that nine out of 10 agents were "bad." For example, on a call FE 9 observed, the agent told a customer that a specific medication was covered by the Medicare Policy they were eventually enrolled in, even though this medication, which cost $500 a month, was not covered by the policy the client signed up for, or any other policy. FE 9 stated that coverage for that medication was the main reason the client had agreed to that plan. FE 9 indicated that when discrepancies like that came up later it would result in complaints to the carrier.

170.    FE 7 stated that SelectQuote was solely focused on the speed and volume of sales. FE 7 stated that to the Company, "production is king," and because of this, SelectQuote was absolutely willing to overlook improper sales practices during the AEP.

---

[31] On information and belief, David Cable is currently Vice President of Finance at SelectQuote, and from 2020 through 2021 was the Senior Director of Client Retention at the Company.

[32] FE 9 worked at SelectQuote as Quality Assurance Specialist from September 2020 through July 2021.

171.    FE 7 explained that SelectQuote failed to monitor and audit the work of its agents. FE 7 explained that SelectQuote's quality control ("QA") team was supposed to perform QA on the calls of new agents.  FE 7 found out that they were not doing so.  Jason Westover, a Senior Manager in SelectQuote's Senior segment, told FE 7 in meetings that they did not really do serious auditing or serious QA for new hires for their first 2.5-3 months.  When Westover told FE 7 about that information, he said, "it does not leave this room."

172.    FE 7 said that "there was a fundamental shift" at the Company leading up to the IPO.  The attitude became how can we find a way to sell as many things as possible and get as much revenue numbers in as possible.  Additionally, the QA for all sales agents in the lead up to the IPO was almost zero.  The Company would not take QA seriously because they wanted people to sell as many policies as possible.

173.    In addition to the observed factors affecting persistency describe above, former employees also confirmed that the Company's compensation practices for agents in SelectQuote's Senior division did not even take persistency or renewals into account.  For example, FE 8 confirmed that agents' performance was not measured by how "sticky" a policy was and that if the client retained a policy for more than six months, the agent would not receive a "claw back" of their original sale compensation.

174.    FE 9 confirmed sales agents were primarily evaluated based on how many policies they sold, not based on how many of those policies continued to stay in place.  To that point, FE 9 further confirmed that the focus of sales agents was volume, not necessarily the quality of the match between the policy and the clients.

175.    FE 4 also reported that the compensation of sales agents in the Senior division was not tied to whether a policy was renewed or "stayed on the books."  FE 4 confirmed that not until

the time she was leaving the Company, in July 2022, did SelectQuote incorporate any persistency incentives into sales agents' compensation.

176.    FE 5 confirmed that sales agents were not incentivized or compensated based on persistency.  FE 5 further confirmed that agents did not lose any compensation they had obtained on the sale of a policy if the customer did not renew.

> **5.    Former Employees Confirm That SelectQuote Executives Knew About and had Access to Frequently Updated Data Reflecting the Persistency Issues**

177.    Senior executives of SelectQuote, including Defendants Danker and Sadun, knew about and received reports reflecting the Company's deteriorating persistency experience.

178.    As previously discussed, FE 8 said that carriers reported to SelectQuote on a monthly basis, on renewals and disenrollments.  FE 8 stated that renewals and disenrollments reports were run frequently and the full year persistency and renewal data information was sent to David Cable, current Vice President of Finance at SelectQuote.

179.    FE 10 was a Senior Auditing Specialist at SelectQuote who worked at the Company from October 2018 through March 2022.  In her role at SelectQuote FE 10 was responsible for reconciling and validating the policy status of insurance policies that SelectQuote had sold, principally working on verification of policies within the Senior Division.  FE 10 would receive reports on a daily, or at least weekly basis from the carriers that had hired SelectQuote to sell their policies and was responsible for reconciling the status of those policies between the records provided by the carriers and SelectQuote's internal records.  FE 10 stated that one of the audits she performed on the carrier data was to confirm that SelectQuote received commission payments from carriers when the customers paid their premiums to the carriers.

180.    FE 10 stated that the information provided by carriers included the policies that SelectQuote had sold for the carrier, including account/policy numbers, the current status of the

policy (active, lapsed, cancelled), the effective date of the policy, the term date and the payments SelectQuote received, and whether the customer had changed policies.

181.     FE 10 made clear that this data was received by SelectQuote on a daily basis.  For example, FE 10 stated that she was personally responsible for downloading policy data on a daily basis from carriers including SilverScript, ManhattanLife, and Central United Life.  FE 10 further stated that Humana and UHC (United Healthcare) would send SelectQuote reports on a weekly basis.  FE 10 said that she accessed a site maintained by Cigna to download reports containing policy status data.

182.     FE 10 was not aware of any period of time during her tenure when there was a delay in the receipt of policy status data from carriers of more than a couple of weeks.  FE 10 also indicated that if such a delay had occurred, given her role at the Company, she would have been aware of that delay as she was the person responsible for collecting and reconciling the data, including from large carrier-partners such as Humana, Cigna and UHC.

183.     FE 10 confirmed that the data from carriers, including policy status, was reflected in the SRTS system and that any SelectQuote employee, including senior executives, could see and run inquiries on the data.  The data in SRTS was updated daily.  FE 10 stated that SelectQuote's headquarters had an open floor plan, and she would see SRTS open on "pretty much every computer I walked by."  FE 10 noted that SRTS was the first thing she was given access to when she started, and her understanding was that it was the first thing anybody working at SelectQuote got access to.

184.     As detailed below, SelectQuote's SRTS system provided real time updates to senior executives on the Company's deteriorating persistency.

H.    **During the Class Period Defendants Falsely Reassured Investors About the Strength of SelectQuote's Business and Repeatedly Misrepresented and Concealed the Company's Poor Persistency, Churn and Lapse Rates**

185.    During the Class Period, in investor conferences, earnings calls, investor presentations, financial filings, and press releases, Defendants repeatedly misrepresented SelectQuote's issues with poor persistency and lapses, and concealed the deterioration of the cohorts, all while touting the strength of the Company's business.

186.    In earnings calls and investor conferences, Defendants represented that SelectQuote had "sophisticated marketing technology," which allows the Company to "deliver the right lead to the right agent at the right time." They also pointed to their "highly trained and licensed agents" and their philosophy of "building a permanent career-focused agent force." Defendants explicitly represented that their agents were given at least 10 weeks of training, and it was that training and licensing of agents which differentiated SelectQuote from its competitors. For example, during a November 5, 2020 conference call, Defendants represented to investors that SelectQuote had "a very robust onboarding process that includes rigorous training, licensing and carrier appointment." During a February 8, 2021 conference call, Defendants claimed that all "new agents undergo an extensive 10-week training program to ensure that they are subject-matter experts the day they begin speaking with customers." And in a Q&A session with Credit Suisse published on November 7, 2021, Defendants represented that an agent's training period "begins with six weeks of classroom training[, t]hen 4-6 weeks of outgoing training on the phone until someone is expected to be ramped up."

187.    The market and analysts viewed Defendants' statements about training and licensing as a key driver of the stock's value. For example, on November 6, 2020, Jefferies remarked that SelectQuote's "strong training," high "agent productivity," and "investments [SelectQuote] made to improve efficiency" was "a key contributor to [SelectQuote] raising its

FY21 financial outlook."  Two days later, Piper Sandler wrote, "We are encouraged by [SelectQuote]'s focus on training and believe its agent model and high retention will improve the quality of plans sold."  On February 8, 2021, Jefferies attributed increased productivity to how "[i]nvestments in training are paying dividends."  The next day, Credit Suisse issued an analyst report describing a question-and-answer session with Company management, in which SelectQuote attributed rising agent productivity and increasing leads to "that training that the agents received."  On April 6, 2021, Piper Sandler observed, "Further, we believe [SelectQuote]'s proprietary tech[nology] platform that scores, bids, and routes leads, combined with a strong track record of recruiting, training, and retaining a flexible staff of producing agents, are the pillars of a flywheel model that attracts partners with rich products and creates satisfied consumers."

188.    In the calls and conferences, while touting SelectQuote's "high-skilled agents" and the 10-week comprehensive training they must undergo, Defendants downplayed churn and persistency, noting at times that "there's a lot of focus on churn and persistency."  To the extent Defendants admitted at times that SelectQuote's cohorts "experienced slightly lower overall persistency" they were quick to dismiss concerns by representing to investors that the lower persistency is included in LTV calculations.  They also continuously emphasized that "there are more long-term tailwinds to the drivers that impact LTV than headwinds[.]"

189.    Defendants also downplayed lower persistency concerns by assuring investors that even if there were reductions in persistency, "overall profitability from these cohorts will still be very positive and the return very attractive."  Furthermore, Defendants also touted the Company's "separation of persistency in LTV results versus [SelectQuote's] peers" and reported being encouraged by lower first-year lapse rate trends.

190.   For example, in an August 13, 2020 investor meeting, Defendant Sadun downplayed any churn concerns by stating that the focus should be on a holistic review of all metrics.  Sadun told investors, "[a]nd obviously, there's a lot of focus on churn and persistency," before adding, "I wouldn't get too hung up on that metric in isolation."  Sadun directed investors to not look at churn specifically, arguing that "just focusing on churn I think is a mistake. It's really the holistic combination of all those things, which ultimately, all of that gets represented in sort of the EBITDA that you're producing and sort of the EBITDA per policy, and I think that looking [at] it on [a] holistic basis is really important."  Not only did Defendants mislead investors by downplaying concerns with churn and persistency, as noted by an Evercore ISI analyst report, dated July 7, 2020, "SLQT does not release data that allows others to independently calculate its churn rate."

191.   On August 13, 2020 Sadun addressed churn, emphasizing that "one of the things that we look at obviously is sort of the lapse rate year-over-year," "[g]enerally speaking, there's nothing fundamentally which has sort of changed in terms of the business over the last 12, 16 weeks," (i.e., from April 2020).  Similarly, on September 9, 2020, Defendant Sadun again touted that the OEP period, as well as the COVID SEP period, actually helped the Company, telling investors, "***We also benefited from the special election period in May and June*** that allowed seniors to make a change to their plan if they had been impacted by COVID. While this special election period was one-time in nature and beneficial to the quarter, ***it just added to the already strong growth we were seeing in April before the special election period.***"  Sadun went on to indicate that between September 2020 and March of 2020 (before the IPO) the COVID SEP had ***helped*** SelectQuote: "[l]et me state clearly, ***nothing has fundamentally changed on the***

*persistency front in the last five months and MA LTVs for the fourth quarter and full year were actually slightly ahead of our expectations*."

192.    In press releases published during the Class Period, Defendants did not pass up the chance to represent to investors that SelectQuote's success was credited to its "more than 1,000 highly-trained and skilled agents who provide a consultative needs analysis for every consumer, and proprietary technology that sources, scores, and routes high-quality sales leads."

193.    In investor presentations published in connection with earning releases and earnings calls, SelectQuote also made representations that its agents were "highly trained," "[c]onduct[ed] personalized, needs-based analysis," are "[i]ncented to place customer in the best policy," and undergo "[p]re-hire assessment through seasonal Flex program."

194.    Finally, in its various financial filings, SelectQuote also touted that its "highly trained" agents were "subject matter experts" in the products they sell and are provided with up to ten weeks of proprietary in-house training.  The Company also represented that its technology allowed it to "analyz[e] and identify[] high quality consumer leads" and match the lead "with an agent" determined to be "best suited to meet the customer's needs."

195.    As would later be fully revealed, these statements and explanations were materially false and misleading.

## VI.    **THE TRUTH EMERGES**

196.    The truth began to emerge on May 11, 2021, after close of the financial markets, the Company announced its results for the third quarter of fiscal 2021.  During the Company's May 11, 2021 FY 3Q 2021 earnings call (the "FY 3Q 2021 Earnings Call"), Defendant Sadun disclosed that the Company had in fact "experienced lower second term persistency for the 2019 cohort" which "will impact the fourth quarter results" and that they "anticipate having a negative cohort and tail adjustment in the fourth quarter" as a result.  This was the Company's first

concession that the LTVs of its Medicare policies would be reduced.  On this news, the Company's share price fell $5.50, or 20%, to close at $21.90 per share on May 12, 2021, on unusually heavy trading volume.  Despite this decline in the Company's stock price, SelectQuote securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations and omissions regarding the true scope and severity of the Company's issues with lower persistency in its cohorts.

197.    There was, however, some analyst concern and indications that the disclosure was a surprise.  For example, Morgan Stanley, in an analyst report dated May 12, 2021, noted that the tail revenue adjustment impacting 4Q 2021 revenue as a result of the 2019 cohort "deliver[ing] lower second term persistency than previously expected" "was not well understood by the market heading into the print."

198.    When analysts sought clarification regarding the underperformance of a two-year old cohort, Defendant Sadun continued Defendants' deception, stating that the "specific cohort has been underperforming" and blamed this decrease in persistency on "the ability for Seniors to change more frequently," a reality that had been in place since early 2019.

199.    Furthermore, based on SelectQuote's reassurances, analysts continued to issue positive guidance, believing the persistency issue to be isolated to the 2019 cohort.  For example, a report by Credit Suisse, dated May 12, 2021, expected a small tail adjustment of under $10 million, noting that "SLQT's FY4Q21 expectations include high single digit mln unfavorable tail revenue adjustment related to the persistency trends for the 2019 cohort."

200.    In a May 18, 2021 RBC Capital Markets Healthcare Conference, in response to a question concerning whether the issues with the 2019 cohort were likely to repeat, Defendant Sadun reassured the market that the lower persistency was "isolated to the 2019 cohort," that they

were "not seeing the same dynamic with later cohorts than we are with 2019 cohorts" and that "the 2019 cohort had persistency assumptions from prior years that didn't include that type of switching activity."

201.    On May 18, 2021, RBC Capital Markets published a report and stated that the "recent tail adjustment that SLQT discussed on its quarterly earnings call is specific to several of its 2019 patient cohort." In a May 21, 2021 Piper Sandler report, it dismissed the tail adjustment as "minor" and "old news."

202.    Then, on August 25, 2021, after the close of the financial markets, the Company held its FY 4Q 2021 and FY 2021 earnings call (the "FY 4Q 2021 and FY 2021 Earnings Call") and the Company disclosed that lack of policy renewals affected both the 2019 and 2020 cohorts, and that the Company was including a $65 million placeholder for tail adjustment during the fourth quarter. This was a revelation that the Company was planning to reduce the aggregate value of the LTVs associated with the 2019 and 2020 cohorts by $65 million. Defendant Sadun stated that "[a]ctual persistency in 2019 and 2020 has trended below initial model" and falsely blamed the tail adjustment on the fact that the Company "received data from carriers later this year than we have in the past" which is "a bit of an anomaly" and "as a result, persistency from the January renewal event has declined over time as we have gotten updated data." Sadun also disclosed that the Company experienced higher first year and renewal lapse rates this year and blamed it on the fact that the Company "onboarded a new carrier last year who we've had some onboarding and data integrity issues with." Sadun provided no details concerning the problematic carrier. Finally, Sadun disclosed that there might be further tail adjustments for the 2019 cohort next year.

203.    During the Q&A section of the FY 4Q 2021 and FY 2021 Earnings Call, an analyst asked if the $65 million represents a base case scenario, or if there is a situation where the

69

magnitude could end up higher. Defendant Sadun answered, "the $65 million is a placeholder for the potential risk of a cohort tail adjustment next fourth quarter, because that's when we do the MA analysis, and it's based on what we're seeing right now."

204.    While the Company failed to provide truthful and complete disclosure concerning its persistency experience, its disclosures acknowledge that the profitability of SelectQuote's Medicare Policy sales was ***highly*** sensitive to decreases in persistency.  For example, the August 25, 2021 Earnings Call Presentation delivered in connection with the Company's FY 4Q 2021 and FY 2021 Earnings Call provided additional detail regarding the Internal Rate of Return, or IRR, of each of its Medicare Advantage cohorts.  In response to investor inquiries regarding the relationship between profitability and persistency, SelectQuote included the following slide, which shows that relationship between IRR (as a measure of profitability) and persistency:

**Persistency Impact on IRR in Context**
Internal rates of return remain attractive

| Annual Percent Variance in Persistency | FY21 Cohort | | Change in Original Renewal Year Revenue |
| --- | --- | --- | --- |
| | IRR | | |
| 10% | 36% | | 49% |
| 5% | 31% | | 22% |
| 0% | 26% | | 0% |
| -5% | 22% | | -17% |
| -10% | 17% | | -31% |
| | | | Average 10-Year Returns |
| Private Equity | | | 15.5% |
| S&P 500 | | | 13.4% |
| Hedge Funds | | | 5.9% |
| Commercial Real Estate | | | 5.9% |
| US Corporate Bonds | | | 5.0% |

Note: Commercial Real Estate – as of July 2020

Sources: Bloomberg · Bain & Company · Eurekahedge · S&P Global · Fed Reserve Real Estate Value

◯ SELECTQUOTE                                                                            7

205.    On this news, the Company's share price ***declined by 45% on August 26, 2021***, in extremely heavy trading volume of over 31 million shares traded, to close at $7.89.  Despite this

decline in the Company's stock price, SelectQuote securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations and omissions regarding the true scope and severity of the Company's issues with lower persistency in its cohorts.

206.    Nevertheless, after the August 25, 2021 disclosures in the FY 4Q 2021 and FY 2021 Earnings Call, analysts were surprised and justifiably concerned about the Company's performance.  For example, an August 26, 2021 report published by Morgan Stanley remarked that as a result of the persistency issues SelectQuote was facing, "[i]t now appears the bear case is becoming more like the base case, with higher churn leading to negative revenue tail revenue and lower profitability."  Similarly, an August 25, 2021 report published by Credit Suisse stated that "the key concern coming out of the quarter is 'persistencies' trending below expectations, which dragged not only FY4Q21 results but also FY22 outlook."

207.    While SelectQuote had discussed the OEP and AEP periods on various occasions, including in the Offering Materials, it *did not disclose any persistency concerns with the 2019 cohort*.  However, in a September 6, 2021 post-quarterly conference call with Credit Suisse (the "September 6, 2021 Call"), Defendants finally admitted that at the time of the IPO SelectQuote saw lower first-term persistency for the 2019 cohort.  In the September 6, 2021 Call (a write-up of the conversation is included in a report published by Credit Suisse titled "Q&A Our Way: Discussion Around Persistency Trends, FY22 Outlook, & LT Expectations"), analysts from Credit Suisse indicated that SelectQuote's disclosures were at odds with its previous statements.  For example, an analyst asked, "Last quarter when we asked about persistency trends, the response was that the company was not seeing anything unusual with respect to either 2020 or 2021 cohort. The issue was primarily concentrated with 2019 cohort.  How come the company did not see this

coming?"  In response to the analyst's query, SelectQuote falsely claimed that the Company was missing information from some of its carriers at the time of the May disclosure and had only received it recently, as discussed above this explanation was false and misleading as there was never a gap or delay in carrier reporting on policy status during the Class Period. The Company claimed that as a result of the missing information and an unusually high spike in lapse rate, SelectQuote had been unable to predict the poor persistency of the 2020 cohort until well past May 2021.

208.    Then, on November 4, 2021, after the close of trading, the Company released its earnings and conducted the FY 1Q 2022 earnings call (the "FY 1Q 2022 Earnings Call").  During that call Defendant Sadun announced that SelectQuote was seeing "elevated lapse rates versus last year," that the decline in MA LTVs is expected to be higher than 8% in the first three quarters and reported that for Q1 MA LTVs were down 16% year-over-year.  SelectQuote also reported that it will likely have difficulty fulfilling their hiring needs for AEP, potentially affecting their future enrollment.

209.    In the Q&A session of the FY 1Q 2022 Earnings Call, when asked to comment on the factors that impacted LTV in the quarter, Defendant Sadun responded, "So, I think on the call, we stated that the LTV was down for MA policies, was down 15% year-over-year. Roughly one third of that was a function of the move to policy-level persistency . . . and then two thirds of it was really a combination of lower overall persistency based on the three-year weighted average – trailing three-year weighted average and then increased provision rates for both first year and renewal year lapses offset by a little bit of commission rates."

210.    Regarding their agent hiring problems, in the FY 1Q 2022 Earnings Call Defendant Sadun said that while the Company believed it is well-positioned to achieve the growth outlined

in the full year outlook, SelectQuote expected the timing and cadence of that growth to be delayed this year, given some slower than expected hiring heading into the season.  He claimed that the beginning of the year's agent production ramp was delayed given the tighter labor market heading into the year's AEP season.

211.    When asked what had changed from last quarter, when SelectQuote reported in August, that it was on track with respect to its hiring plan, William Grant, III, Chief Operating Officer at SelectQuote, responded that the labor market was "quite different from last year" and that many agents accepted verbal offers, "but didn't follow through with the required licensing process[.]"

212.    On this news, the Company's share price fell $2.32, or 17.7%, to close at $10.76 per share on November 5, 2021 on heavy trading volume.  Despite this decline in the Company's stock price, SelectQuote securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations and omissions regarding the true scope and severity of the Company's issues with lower persistency in its cohorts.

213.    At least one analyst expressed concerns with churn.  A Morgan Stanley report, titled "Key Debates Unchanged" and dated November 5, 2021, pointed out, "**SLQT is still seeing elevated lapse rates in 1Q22.**  As a result, the company is maintaining its -$65M placeholder for potential tail adjustment in its FY22 guidance. **We expect churn to remain the key debate for SLQT."**  Morgan Stanley lowered its price target.

214.    Analyst sentiment remained largely bullish, reflecting that Defendants' assurances were effective.  In a November 5, 2021 report Piper Sandler reiterated its overweight rating, stating that while "new hire productivity and marketing regulations dragged early AEP (mid-Oct.), both were resolved."  A November 5, 2021 RBC Capital Markets report noted, "SLQT posted better

than expected results in what is seasonally an un-eventful, investment-laden quarter ahead of AEP. With guidance affirmed, there isn't too much new to report other than the company's flex agent hiring progress, which has exceeded goals, albeit much later than expected."

215.    Still, SelectQuote continued to reassure investors in two separate post-quarterly discussions with analysts.  An Evercore ISI report, dated November 4, 2021, contained a write-up from a conversation with management post the FY 1Q 2022 Earnings Call.  With respect to LTVs, the analysts wanted to understand the two-thirds that was related to lower overall persistency on 3-year weighted average and increased provision rate for lapses.   The analysts asked, "the increased commission rates were a partial offset, correct? Are there other nuances to consider here?"  SelectQuote responded reassuringly, stating that the increased commission rates partially offset lower overall persistency, the increased provision for lapses, and the move to policy level persistency.  A Credit Suisse report dated November 7, 2021, also included comments from a post-quarterly discussion with SelectQuote.   The analyst stated that with respect to SelectQuote reducing its expected FY 2Q 2020 revenues by ~$50 - $60 million, that it was "surpris[ing] that the company had that much revenue tied to the productivity of the agents who were not even on-board in late Aug."  SelectQuote responded, "SLQT started offers in March and April.  However, the first class didn't begin until July. The internal math plays out if they would have come in during that July/August timeframe.  A significant amount of production comes from productive agents with 2Q21 historically the biggest and most efficient quarter.  Thus, having a slower ramp of a significant portion of that fluctuation group is impactful."

216.    The whole truth regarding the Company's undisclosed persistency issues, dating back to the beginning of the Class Period, was finally disclosed on February 7, 2022, when, after the close of the financial markets, SelectQuote published an earnings release announcing the

Company's second quarter 2022 (period ended December 31, 2021) results (the "FY 2Q 2022 Earnings Release"). In the FY 2Q 2022 Earnings Release, Defendant Danker claimed that "a series of unexpected challenges" in the Senior segment had "negatively impacted profitability." He also disclosed that the Company had recognized a $145 million downward cohort/tail adjustment. This adjustment reduced the value of the Company's Senior LTV by a massive $145 million. Defendant Danker referred to the Company's year-to-date performance as "disappointing." In the FY 2Q 2022 Earnings Release, the Company reported *a **loss** of $142 in adjusted EBITDA per MA/MS policy* for fiscal year 2021.

217.    SelectQuote also published an Earnings Conference Call Presentation to investors on February 7, 2022. On page 5 of that Presentation, Defendants disclosed a further negative impact of ***$60 million*** to their quarterly EBITDA due to "negative LTV" in the Senior Division. When combined with the $145 million tail adjustment noted above, belatedly revised persistency assumptions revealed on February 7, 2022 resulted in a ***$205 million reduction in Senior segment LTV*** (recorded as negative EBITDA). The Company's Form 10-Q for 2Q 2022 (filed on February 14, 2022), further indicated that this $60 million charge to earnings was due to a "27% reduction in LTV's of approved MA policies, as result of ***lower persistency assumptions***."

218.    During the February 7, 2022 Earnings Call ("FY 2Q 2022 Earnings Call"), Defendant Sadun admitted that the reductions to LTVs revealed in 2Q 2022 are "***large adjustments and reflect a pretty significant decline in persistency over the last three years, mostly concentrated in the first several renewal years of the policy.***"

219.    During that same FY 2Q 2022 Earnings Call, when discussing Slide 5 of the Presentation, and both the $145 million tail adjustment and the $60 million reduction to Senior LTV, Defendant Danker said, "you can see the additional impact that we've experienced from

senior LTV, ***primarily driven by lower persistency***, as well as the impact we've imposed with wider assumptions on our constraint as well as our first year in renewal provisions."  Sadun also said that the $205 million reduction was due to Senior LTVs "***being down 27%***.  This incremental decline was driven by 3 factors:  ***lower persistency, higher constraints and higher provision for intra-year lapses***."  Those three factors are effectively the same as each reflects a measure of policy renewals and related commissions.  In the Q&A portion of the call, Defendant Sadun was asked by a Morgan Stanley analyst specifically whether "churn in the older cohorts is the main issue" driving the revealed declines, and he confirmed this, stating, "[y]eah . . . it really seems to be concentrated in the first 2 or 3 renewal periods."

220.    Defendants also finally disclosed that their growth at all costs strategy was a sham—both in terms of the unsupported volume of submissions and the unqualified nature of their agent force.  As Defendant Danker stated in the FY 2Q 2022 Earnings Call, "we believe our ultimate strategy for the Medicare Advantage business will be to ***reset our growth*** philosophy[.]"  He added, "Next year, we will likely build a plan that ***pulls back on submissions*** year-over-year to reset the baseline with the ***intention of growing modestly*** from there. This ***will allow us to operate more efficiently with a higher mix of tenured agents and lower flex agent*** hiring needs, which reduces volatility and lowers costs."  Defendant Sadun also added, "[a]s Tim alluded to, this year, ***agent productivity was negatively impacted by multiple factors, including higher flex versus core agent mix***, a more competitive marketplace, and lower close rates associated with planned design parody."

221.    On this news, the Company's share price declined by another $3.09, or 47%, to close at $3.44 per share on February 8, 2022.

222.    Analyst reaction reflected their understanding that the $205 million reduction to SelectQuote's Senior division LTVs was the result of persistency declines dating back to the beginning of the Class Period.  For example, a Barclays report titled "Perfect Storm of Negative Factors," published on February 8, 2022, stated that the Company's weak performance, including the LTV reduction, was attributed to "***higher levels of churn in older cohorts*** negatively impacting LTVs."  Similarly, a Credit Suisse report published on February 8, 2022, titled "Q&A Our Way: When It Rains, It Pours," noted that the LTV reduction "related to customers who purchased a plan from SLQT ***in prior years*** (not in the most recent AEP)" and that "[t]he biggest driver of that tail adjustment was ***lower overall persistency over the last few years***."  Similarly, the Q&A portion of a February 8, 2022 Evercore report titled "Tough Sledding During AEP Drives Business Rethink," represented that the Company reinforced that "[t]he biggest driver of the tail adjustment is ***overall lower persistency over the last couple of years*** relative to where it originally booked those policies."

## VII.    POST-CLASS PERIOD EVENTS

223.    Even after the Class Period ended, SelectQuote continued to disclose lower and lower levels of persistency, resulting in falling LTVs and negative EBITDA per policy.

224.    In the Company's fiscal year third quarter of 2022 earnings call (the "FY 3Q 2022 Earnings Call") on May 5, 2022, Defendant Sadun stated that MA LTVs continued to be down year over year for the same factors that had continually dogged SelectQuote: "lower persistency, higher provisions, and higher constraints."  EBITDA continued to drop on a per-policy level, reported as a loss of $195 per policy.

225.    Senior segment revenue, which the Company described as vital to its operations, continued to drop.  For the year ended June 30, 2022, the Company disclosed in its FY 2022 10-

K that Senior segment revenue for fiscal year 2022 dropped to $595.4 million—a drop of 18.3% from its Class Period high.

226.    On May 19, 2022, Defendant Sadun stepped down from his role as CFO and left the Company.

227.    In the Company's fiscal year fourth quarter of 2022 earnings call (the "FY 4Q 2022 Earnings Call"), on August 29, 2022, Ryan Clement, the interim CFO, continued to report LTVs and EBITDA numbers that had been revised lower because of persistency issues.  Clement reported that there had been a "22% year-over-year decline in our Medicare Advantage LTV, which . . . has been driven by lower policy persistency[.]"

228.    During the FY 4Q 2022 Earnings Call, the Company announced it would be taking yet another negative tail adjustment of $48.3 million.  In response, Evercore ISI, in an August 29, 2022 report, described this adjustment as attempting to "de-risk the forecast."

229.    Alongside the tail adjustment, the Company reported that the "consolidated adjusted EBITDA was negative $61 million, or negative $13 million when excluding the $48 million cohort tail adjustment recognized in the quarter."  On a per-policy level, EBITDA was reported as a loss of $290.

230.    In the Company's fiscal year first quarter of 2023 earnings call, on November 3, 2022, Interim CFO Clement reported that the Company's consolidated EBITDA continued to drop, now to a low of negative $27 million. While EBITDA was slightly higher on a per-policy level, it remained well in the red at a loss of $265 per policy. Clement reported that the LTV of Medicare Advantage plans sold by the Company was $875 — a drop of roughly 30% from the artificially inflated LTV of $1,250 which the Company put forward at the time of the IPO.

231.    In sum, the slow-drip of bad news beginning in May 2021 revealed the truth about a Company that had been propped up from the time of its IPO by inflated, and unrealistic persistency values.  A Company that went public at $20 per share and conducted the Secondary Offering in March of 2021, at an astounding $27.50 per share, enriching Brookside massively, later traded well under a dollar per share for months.

## VIII.   DEFENDANTS' LTV ACCOUNTING VIOLATED GAAP

232.    In their Class Period public filings, SelectQuote continuously purported to consider, through the use of the expected value approach, "a combination of historical lapse and premium increase data (where applicable), available insurance carrier experience data, historical payment data by segment and insurance carrier to estimate forecasted renewal consideration and constrain revenue recognized to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur."  In fact, as noted above, throughout the Class Period, the Company and the Officer Defendants continuously offered reassurances to investors that SelectQuote's process of estimating commission revenue for policies that had not yet been reviewed was in accordance with GAAP, specifically ASC 606.

233.    In actuality, however, SelectQuote and the Officer Defendants failed to incorporate lower persistency and higher lapse rates they observed prior to, and during the Class Period when recording revenue periodically and filing various financial statements that contained overestimated commission revenue.  Specifically, statistical analysis reveals that SelectQuote's persistency experience was overstated by at least 15% at all times during the Class Period (*see supra* Section V.G.2), and these inflated persistency rates were incorporated into Defendants' purportedly-GAAP compliant financial results.  Accordingly, the financial information contained in SelectQuote's Class Period financial statements, beginning with its IPO disclosures, did not faithfully represent the phenomena that it purported to represent, one of the key characteristics of

financial statements that are purported to be prepared in accordance with GAAP. This was confirmed when SelectQuote recorded a reduction of its Senior LTVs by $205 million, driven by lower overall persistency.

## IX.    DEFENDANTS HAD AN AFFIRMATIVE DUTY TO DISCLOSE THE TREND OF LOWER RENEWAL COMMISSIONS

234.    Pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303, SelectQuote and the Officer Defendants had an affirmative, independent duty to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." By failing to disclose the ongoing trend, since the time of the IPO, that the actual renewal commissions SelectQuote earned were falling far below the estimated future renewal commission the Company had already recognized as revenue, defendants failed to satisfy their duty under 17 C.F.R. § 229.303(a)(3)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues, and income for continuing operations, rendering Defendants' Class Period disclosures materially misleading (half-truths).

235.    These omissions give rise to Lead Plaintiffs' claims because they render statements by the Defendants, including the ones enumerated below as, materially false and/or misleading.

## X.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

236.    The materially false and misleading statements made by the Officer Defendants and SelectQuote during the Class Period are detailed below, along with the reasons why each statement was false or misleading.

### A.    Statements Concerning Persistency and Financial Results

237.    Throughout the Class Period, SelectQuote, Danker and Sadun made financial disclosures and reported financial results that discussed, incorporated or were based on inflated

persistency assumptions.  Those materially false and misleading statements and reported financial results are set forth below.

### 1.       Financial Disclosures

### a.       Reporting of Revenue and Receivables

238.    SelectQuote's IPO Prospectus reported the following financial results for fiscal year 2019 (ended June 30, 2019) and for the nine months ended March 31, 2020, which purported to comply with GAAP:

| | FY 2019 (millions) | % Growth from FY 2018 | Nine-months, ended March 31, 2020 (millions) | % Growth from Nine-months, ended March 31, 2019 |
|---|---|---|---|---|
| Total Revenue | $337.5 | 44% | $390.1 | 48% |
| Commission Revenue | $296 | 43% | $353.9 | 53% |
| Senior Division Revenue | $192.3 | 88% | $273.8 | 73% |
| Commissions Receivable, current | $36.1 | 30% | $46.7 | n/a |
| Commissions Receivable, net | $279.5 | 43% | $411.35 | n/a |

239.    On September 9, 2020, SelectQuote published an earnings release announcing the Company's fourth quarter 2020 (period ended June 30, 2020) and fiscal year 2020 (twelve-months ended June 30, 2020) results (the "FY 4Q 2020 and FY 2020 Earnings Release").  In the FY 4Q 2020 and FY 2020 Earnings Release, the Company reported the following financial results:[33]

---

[33] In each quarterly and annual reporting period during the Class Period, SelectQuote also issued a presentation that accompanied their call with investors.  These presentations incorporated the same financial disclosures published in their earnings press releases and SEC filings, which are quoted in this Complaint, as relevant.  To avoid further unnecessary duplication, Plaintiffs have not included those duplicate financial disclosures here, but incorporate them by reference.

|  | FY 4Q 2020 (millions) | FY 2020 (millions) |
|---|---|---|
| Total Revenue | $141.4 | $531.5 |
| Commission Revenue | $122.7 | $476.6 |
| Senior Division Revenue | $87.87 | $361.7 |
| Commissions Receivable, current | n/a | $51.2 |
| Commissions Receivable, net | n/a | $461.8 |

240. On September 10, 2020, the Company filed its annual report with the SEC on Form 10-K for the fiscal year ended June 30, 2020 (the "FY 2020 10-K"). The FY 2020 10-K was signed by Defendants Danker and Sadun, and contained signed certifications, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), by Defendants Danker and Sadun wherein they attested to the purported accuracy and completeness of the FY 2020 10-K. In the FY 2020 10-K SelectQuote reported the same figures regarding revenue and commissions receivable as stated in ¶¶ 238-39, which purported to comply with GAAP.

241. In the FY 2020 10-K, SelectQuote also stated the following, "2019 compared to 2018— **Total revenue per policy increased 5%** for the year ended June 30, 2019 compared to the year ended June 30, 2018, due to a shift in mix to MA, **the higher persistency of MA policies**[.]"

242. On November 5, 2020, SelectQuote published an earnings release announcing the Company's first quarter of fiscal year 2021 results (period ended September 30, 2020) (the "FY 1Q 2021 Earnings Release"). For FY 1Q 2021, the Company reported the following financial results:

|  | FY 1Q 2021 (millions) |
|---|---|
| Total Revenue | $124 |
| Commission Revenue | $106.5 |
| Senior Division Revenue | $73.2 |
| Commissions Receivable, current | $56.3 |
| Commissions Receivable, net | $502.6 |

243.    On November 6, 2020, the Company filed its quarterly report with the SEC on Form 10-Q for FY 1Q 2021 (the "FY 1Q 2021 10-Q").  The FY 1Q 2021 10-Q was signed by Defendants Danker and Sadun and contained signed certifications, pursuant to SOX, by Defendants Danker and Sadun wherein they attested to the purported accuracy and completeness of the FY 1Q 2021 10-Q.  In the FY 1Q 2021 10-Q, SelectQuote reported the same figures regarding revenue and commissions receivable as stated in ¶ 242, which purported to comply with GAAP.

244.    On February 8, 2021, SelectQuote published an earnings release announcing the Company's second quarter of fiscal year 2021 (period ended December 31, 2020) results (the "FY 2Q 2021 Earnings Release").  In the FY 2Q 2021 Earnings Release, the Company reported the following financial results:

|  | FY 2Q 2021 (millions) |
|---|---|
| Total Revenue | $358.3 |
| Commission Revenue | $321 |
| Senior Division Revenue | $315.5 |
| Commissions Receivable, current | $76.3 |
| Commissions Receivable, net | $655.8 |

245.    On February 8, 2021, the Company filed its quarterly report with the SEC on Form 10-Q for FY 2Q 2021 (the "FY 2Q 2021 10-Q").  The FY 2Q 2021 10-Q was signed by Defendants Danker and Sadun and contained signed certifications, pursuant to SOX, by Defendants Danker and Sadun wherein they attested to the purported accuracy and completeness of the FY 2Q 2021 10-Q.  In the FY 2Q 2021 10-Q, SelectQuote reported the same figures regarding revenue and commissions receivable as stated in ¶ 244, which purported to comply with GAAP.

246.    On May 11, 2021, SelectQuote issued an earnings release announcing the Company's third quarter of fiscal year 2021 (period ended March 31, 2021) results (the "FY 3Q 2021 Earnings Release").  In the FY 3Q 2021 Earnings Release, the Company reported the following financial results:

|  | FY 3Q 2021 (millions) | Nine months ended March 31, 2021 |
|---|---|---|
| Total Revenue | $266.9 | $749.4 |
| Commission Revenue | $236.8 | $664.3 |
| Senior Division Revenue | $215.6 | $604.3 |
| Commissions Receivable, current | $79.6 | n/a |
| Commissions Receivable, net | $684.6 | n/a |

247.    On May 12, 2021, the Company filed its quarterly report with the SEC on Form 10-Q for FY 3Q 2021 (the "FY 3Q 2021 10-Q").  The FY 3Q 2021 10-Q was signed by Defendants Danker and Sadun and contained signed certifications, pursuant to SOX, by Defendants Danker and Sadun wherein they attested to the purported accuracy and completeness of the FY 3Q 2021 10-Q.  In the FY 3Q 2021 10-Q, SelectQuote reported the same figures regarding revenue and commissions receivable as stated in ¶ 246, which purported to comply with GAAP.

248.   On August 25, 2021, SelectQuote issued an earnings release announcing the Company's fourth quarter 2021 (period ended June 30, 2021) and fiscal year 2021 (twelve months ended June 30, 2021) results (the "FY 4Q 2021 and FY 2021 Earnings Release").  In the FY 4Q 2021 and FY 2021 Earnings Release, the Company reported the following financial results:

|  | FY 4Q 2021 (millions) | FY 2021 (millions) |
| --- | --- | --- |
| Total Revenue | $188.4 | $937.8 |
| Commission Revenue | $162.3 | $826.6 |
| Senior Division Revenue | $124.4 | $728.7 |
| Commissions Receivable, current | n/a | $89.1 |
| Commissions Receivable, net | n/a | $756.8 |

249.   On August 26, 2021, the Company filed its annual report with the SEC on Form 10-K for the full year ended June 30, 2021 (the "FY 2021 10-K").  The FY 2021 10-K was signed by Defendants Danker and Sadun and contained signed certifications, pursuant to SOX, by Defendants Danker and Sadun, wherein they attested to the purported accuracy and completeness of the FY 2021 10-K.  In the FY 2021 10-K, SelectQuote reported the same figures regarding revenue, commissions receivable and LTV as stated in ¶ 248, which purported to comply with GAAP.

250.   On November 4, 2021, SelectQuote published an earnings release announcing the Company's first quarter of fiscal year 2022 results (quarter ended September 30, 2021) (the "FY 1Q 2022 Earnings Release").  In the FY 1Q 2022 Earnings Release, the Company reported the following financial results:

|  | FY 1Q 2022 (millions) |
|---|---|
| Total Revenue | $159.9 |
| Commission Revenue | $134.7 |
| Senior Division Revenue | $106.3 |
| Commissions Receivable, current | $155.5 |
| Commissions Receivable | $748.2 |

251.    On November 5, 2021, the Company filed its quarterly report with the SEC on Form 10-Q for FY 1Q 2022 (the "FY 1Q 2022 10-Q").  The FY 1Q 2022 10-Q was signed by Defendants Danker and Sadun, and contained signed certifications, pursuant to SOX, by Defendants Danker and Sadun wherein they attested to the purported accuracy and completeness of the FY 1Q 2022 10-Q.  In the FY 1Q 2022, 10-Q SelectQuote reported the same figures regarding revenue and commissions receivable as stated in ¶ 250, which purported to comply with GAAP.

252.    As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs (*see supra* ¶¶ 146-53, 162-76, 196-22), the financial results quoted or referenced in each ¶¶ 238-51 were materially false and misleading because:  (1) Defendants knew that, since before the Company's May 2020 IPO, and continuing throughout the Class Period, the Company's actual persistency rates were too low to support SelectQuote's reported financial results, including the figures quoted above because: (i) by the time of the IPO Defendants knew that the 2018 and 2019 cohorts had experienced lower rates of persistency than the Company had seen historically (*see supra* ¶¶ 134-45); (ii) by the time of the IPO Defendants knew that the Company was experiencing lower first-term persistency for the 2019 cohort (*see supra* ¶¶ 134-45); (iii) the introduction of the OEP in connection with the 2019 cohort has been cited repeatedly by the Company in explaining the drop off in persistency (*see supra* ¶¶ 138-41); (iv) SelectQuote had two cohorts of OEP experience by the time of the May

2020 IPO and knew and should have incorporated the lower persistency experienced as a result of the OEP into its LTV (*see supra* ¶¶ 138-41); and (v) declining persistency numbers across competitors provided information for SelectQuote to consider in lowering its own assumptions (*see supra* ¶¶ 138-41); (2) these financial results were clearly misleading by creating the impression that the Company's business was and would remain profitable based on totally unsupported expectations around renewal rates and persistency; (3) statistical analysis reveals that the GAAP-reported financial results were based on persistency experience that was overstated by at least 15% at all times during the Class Period (*see supra* ¶¶146-53); and (4) the embedded persistency assumptions were misleading for failing to disclose that the Company's rapid and massive pre-IPO growth was fueled by a "sell at all costs" approach that would encourage rather than discourage churn and turnover, including because sales agents' compensation did not account for persistency and encouraged short term sales that were not "matched" to customer needs, while adversely affecting historical persistency trends.

### b.    Disclosures Relating to LTV Figures and Persistency

253.    In connection with the IPO and throughout the Class Period, SelectQuote's financial reports included disclosure of the LTVs from its sales of Medicare Policies on a per-policy basis, including for both Medicare Advantage (MA) and Medicare Supplement (MS) policies.  SelectQuote also disclosed on a per-policy basis, the LTV of revenues (Total Revenue Per Policy (TTM)) and EBITDA (effectively operating profit, or Earnings Before Interest Depreciation and Amortization) from its sales of all policies in the Senior division.  Each of these "per policy" figures was reported on a "trailing twelve month basis" (TTM) in the Company's SEC filings or earnings releases discussed above, and which purported to comply with GAAP (except for EBITDA per policy).  These materially false and misleading reported figures are set forth in the table below:

| Reporting Period | Source | LTV – MA | LTV – MS | Total Revenue Per Policy (TTM) | EBITDA Per MA/MS Policy (TTM) |
|---|---|---|---|---|---|
| FY 2019 | IPO Prospectus | $1,279 | $1,312 | $1,547 | $725 |
| Nine Months Ended March 31, 2020 | IPO Prospectus | $1,297 | $1,372 | 1,505 | $614 |
| 4Q 2020 | Earnings Release | $1,256 | $1,382 | N/A | $598 |
| FY 2020 | 10-K | $1,287 | $1,376 | $1,485 | $598 |
| 1Q 2021 | 10-Q | $1,168 | $1,274 | $1,282 | $577 |
| 2Q 2021 | 10-Q | $1,268 | $1,233 | $1,483 | $567 |
| 3Q 2021 | 10-Q | $1,362 | $1,345 | $1,490 | $543 |
| 4Q 2021 | Earnings Release | $1,121 | $1,323 | n/a | $498 |
| FY 2021 | 10-K | $1,260 | $1,269 | $1,489 | $498 |
| 1Q 2022 | 10-Q | $978 | $1,439 | $1,448 | $384 |

254.    As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs (*see supra* ¶¶ 146-53, 162-76, 198-22), the financial metrics referenced in ¶ 253 were materially false and misleading because: (1) for the reasons stated in ¶ 252(1)(i-v), Defendants knew that, since before the Company's May 2020 IPO, and continuing throughout the Class Period, the Company's actual persistency rates were too low to support the Company's reported LTVs per-policy EBITDA, including the LTVs and EBITDA values quoted above; (2) these stated LTVs were severely inflated by the persistency assumptions that failed to comport with the reality well understood at the Company prior to the IPO and  created the impression that the Company's business was and would remain profitable based on totally unsupported expectations around renewal rates and persistency; (3) statistical analysis reveals that the financial results (including as purportedly compliant with GAAP) were based on persistency experience that was overstated by at least 15% at all times during the Class Period (*see supra* ¶¶ 146-153); and (4) the embedded persistency assumptions were misleading for failing to disclose

that the Company's rapid and massive pre-IPO growth was fueled by a "sell at all costs" approach that would encourage rather than discourage churn and turnover, including because sales agents' compensation did not account for persistency and encouraged short term sales that may not have "matched" customer .

255.    SelectQuote also made several qualitative disclosures regarding LTV.

256.    In the FY 2Q 2021 10-Q, the Company stated:

The LTV per MA approved policy was flat and LTV per MS approved policy decreased 10% for the three months ended December 31, 2020, compared to the three months ended December 31, 2019. The MA LTV was positively impacted by higher commission rates and carrier mix offset by lower MA persistency rates. The MS LTV was negatively impacted by a carrier mix shift of policies to carriers that pay us lower commissions.

The LTV per MA approved policy was flat and LTV per MS approved policy decreased 7% for the six months ended December 31, 2020, compared to the six months ended December 31, 2019. The MA LTV was positively impacted by higher commission rates and carrier mix somewhat offset by lower MA persistency rates. The MS LTV was negatively impacted by a carrier mix shift of policies to carriers that pay us lower commissions.

257.    In the FY 3Q 2021 10-Q, the Company stated:

The LTV per MA and MS approved policy decreased 1% and 9%, respectively, for the three months ended March 31, 2021, compared to the three months ended March 31, 2020.  The MA LTV was negatively impacted by lower MA persistency rates and carrier mix somewhat offset by higher commission rates. The MS LTV was negatively impacted by a carrier mix shift of policies to a direct carrier pod that pays us lower commissions but has lower marketing costs.

The LTV per MA and MS approved policy decreased 1% and 8%, respectively, for the nine months ended March 31, 2021, compared to the nine months ended March 31, 2020.  The MA LTV was negatively impacted by lower MA persistency rates and carrier mix somewhat offset by higher commission rates. The MS LTV was negatively impacted by a carrier mix shift of policies to a direct carrier pod that pays us lower commissions but has lower marketing costs.

258.    In the FY 2021 10-K, SelectQuote stated the following:

2021 compared to 2020— The LTV per MA and MS approved policy decreased 2% and 8%, respectively, for the year ended June 30, 2021, compared to the year ended June 30, 2020. The LTV per MA approved policy was negatively impacted

by lower MA persistency rates, higher intra-year lapse rates and carrier mix somewhat offset by higher commission rates. The LTV per MS approved policy was negatively impacted by a carrier mix shift of policies to a direct carrier pod that pays us lower commissions but has lower marketing costs.

2020 compared to 2019— The LTV per MA approved policy increased 1% for the year ended June 30, 2020, compared to the year ended June 30, 2019, due to higher commission rates somewhat offset by lower MA persistency. The LTV per MS approved policy increased 5% for the year ended June 30, 2020, compared to the year ended June 30, 2019, due to a carrier mix shift of policies to carriers that pay us higher commissions.

259.    In the FY 1Q 2022 10-Q, the Company stated:

The LTV per MA approved policy decreased 16% while the LTV per MS approved policy increased 13% for the three months ended September 30, 2021, compared to the three months ended September 30, 2020.  The MA LTV was negatively impacted by the switch to policy level persistency, lower MA persistency rates, carrier mix and higher provision for first year and renewal year lapse rates, somewhat offset by higher commission ratees. The MS LTV was positively impacted by an improvement in first year lapse rates.

260.    As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs (*see supra* ¶¶ 146-53, 162-176, 198-222), the statements concerning LTV per policy referenced in ¶¶ 256-59 were materially false and misleading for the reasons stated in ¶ 252(1)(i-v).  Even to the extent that these disclosures provided some information concerning declining persistency, these quantifications were materially false and misleading because they were contradicted by Defendants' knowledge of a material decline in persistency of at least 15% at all times during the Class Period.  Thus, they failed to timely and completely reflect the true facts concerning the adverse persistency trends and experience that was known to the Exchange Act Defendants since before the Company's May 2020 IPO, and continuing throughout the Class Period.  Specifically, the Company's actual persistency rates were at least 15% too low to support the Company's reported LTVs, and, accordingly, (1) statements that LTV per MA or MS policy "remained flat," or "increased" were false; and (2) statements that LTV per MA or MS policy were negatively impacted by lower

persistency rates were materially misleading because Defendants failed to disclose the actual magnitude of the lower persistency rates its cohorts were experiencing, and the true and full effect it had on LTV.

**c.   Disclosures Concerning the Calculation of Lifetime Value (LTV)**

261.   In the Prospectus, SelectQuote indicated that it adhered to the provisions of the ASC and further made the following representations regarding determination of LTV:

> Lifetime value of commissions per approved policy represents commissions estimated to be collected over the estimated life of an approved policy based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints. The lifetime value of commissions per approved policy is equal to the sum of the commission revenue due upon the initial sale of a policy, and when applicable, an estimate of future renewal commissions. **The estimate of the future renewal commissions is determined using contracted renewal commission rates constrained by a persistency-adjusted 10-year renewal period based on a combination of our historical experience and available industry and insurance carrier historical experience to estimate renewal revenue only to the extent probable that a material reversal in revenue would not be expected to occur**.

262.   In its FY 2020 10-K, SelectQuote stated:

> **The estimate of the future renewal commissions is determined using contracted renewal commission rates constrained by a persistency-adjusted 10-year renewal period based on a combination of our historical experience and available insurance carrier historical experience to estimate renewal revenue only to the extent probable that a material reversal in revenue would not be expected to occur.** These factors may result in varying values from period to period. The lifetime value of commissions per approved policy represents commissions only from policies sold during the period. That figure excludes renewals during the period from policies originally sold in a prior period with insurance carrier partners whose contracts preclude us from recognizing variable consideration for estimated renewal commissions and updated estimates of prior period variable consideration based on actual policy renewals in the current period.

263.   In its quarterly and annual reports for FY Q1 2021, FY Q2 2021, FY Q3 2021, FY 2021, FY Q1 2022 and FY Q2 2022, SelectQuote included a disclosure that was substantively identical to the one quoted immediately above.

264. As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs for the reasons stated in ¶ 252(1)(i-v), the statements referenced in ¶¶ 261-63 were materially misleading because, by including a generic description of how the Company determined LTV, without more, investors were left with the impression that the Company was accurately using "historical experience to estimate renewal revenue" when in fact the Company was engaged in a continuous practice, throughout the Class Period, of using unsupported persistency assumptions, which were inflated by at least 15% at all times, to determine LTV.

**B.** **Additional Quantitative and Qualitative Statements Regarding Persistency**

265. On August 13, 2020, SelectQuote participated in a virtual investor update call hosted by RBC Capital Markets (the "RBC Fireside Chat"), attended by Defendants Danker and Sadun. At that meeting, Defendant Sadun addressed churn, stating "one of the things that we look at obviously is sort of the lapse rate year-over-year," "[g]enerally speaking, there's nothing fundamentally which has sort of changed in terms of the business over the last 12, 16 weeks," "our lapse rate year-to-date are roughly in line with last year on a year-over-year basis." Defendant Sadun credited the Company's initiatives of getting people in the right plan, their CCA [customer care agent] team and their retention policies.

266. At that same meeting, Defendant Danker stated that they "have always had an intense focus on the quality of our growth," and claimed that SelectQuote had a "track record of disciplined growth," while disclaiming any notion that the Company had been pursuing a "growth at all costs" strategy. When asked how their process leads SelectQuote to have better retention and reduces the potential for churn, Defendant Danker pointed to their "sophisticated marketing technology" which allows SelectQuote to "deliver the right lead to the right agent at the right time."

267.    As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs, the statements referenced in ¶¶ 265-66 were materially false and misleading because: (1) Defendants' claims that "nothing fundamentally" changed in the business gave investors the impression that persistency and lapse rates remained low "on a year-over-year basis," for the reasons stated in ¶ 252(1)(i-v), Defendants knew that, since before the Company's May 2020 IPO, and continuing throughout the Class Period, actual persistency rates were lower than represented; (2) statistical analysis reveals that SelectQuote's persistency experience was overstated by at least 15% at all times during the Class Period (*see supra* ¶¶ 146-53); (3) contrary to a "track record of disciplined growth" and Defendants' claims to have "not been a growth at all costs" Company, SelectQuote had engaged in rapid and massive pre-IPO growth that was fueled by a "sell at all costs" approach, which would encourage rather than discourage churn and turnover; and (4) rather than having "sophisticated marketing technology" to "deliver the right lead to the right agent at the right time," the Company's growth was actually driven by temporary, untrained, and poorly incentivized sales staff selling Medicare policies "at all costs."

268.    On September 9, 2020, the Company held its fiscal 4Q and full year earnings call ("FY 4Q 2020 and FY 2020 Earnings Call").  In the FY 4Q 2020 and FY 2020 Earnings Call, Defendant Sadun told investors that while the Company "experienced slightly lower overall persistency," "this lower persistency is included in our LTV calculations," and "is more than offset by the volume we are able to generate because of the special election period."  He emphasized, "[l]et me state clearly, nothing has fundamentally changed on the persistency front in the last five months and MA LTVs for the fourth quarter and full year were actually slightly ahead of our expectations."

269.    In the FY 4Q 2020 and FY 2020 Earnings Call, Defendant Sadun said the following about churn and persistency, "[t]here have been a lot of questions around churn and persistency and the impact that that has," "and I want to stress the word, if – there are additional reductions in persistency, they will take a small portion off the top of the green bar. But the overall profitability from these cohorts will still be very positive and the return very attractive."

270.    On September 10, 2020, the Company had a post-quarterly conference call with Credit Suisse (the "September 10, 2020 Call").  On the same day, Credit Suisse published a report titled "Q&A Our Way:  Dissecting a Solid FY4Q and a Better Than Expected FY21 Outlook," containing a write-up of the call.  In the September 10, 2020 Call, SelectQuote management continued to downplay any persistency concerns, stating that while first and second term persistency is down a few hundred basis points, "persistency rate is just one piece of the equation that goes into LTV," "[l]ong-term there are way more tailwinds to the drivers of LTV than there are headwinds.  Persistency is just one of the inputs."

271.    As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs, the statements referenced in ¶¶ 268-70, including those purportedly disclosing modest declines in persistency, were materially false and misleading because: (1) the persistency rate was not merely "one piece of the equation that goes into LTV" or "just one of the inputs," rather, the persistency rate was the lynchpin of the LTV calculus, and when applied to renewal year revenue would determine the vast majority of revenues SelectQuote earned on each policy; (2) Defendants knew, for the reasons stated in ¶ 252(1)(i-v), that, since before the Company's May 2020 IPO, and continuing throughout the Class Period, overall profitability from the cohorts would turn out to not be profitable at all, driven by plummeting persistency, nor would lower persistency be offset by higher volume; (3) statistical

analysis reveals that SelectQuote's persistency experience was overstated by at least 15% at all times during the Class Period (*see supra* ¶¶ 146-53); and (4), as was later revealed in the Company's admissions, LTV had already declined and experienced significant "headwinds."

272.    On November 5, 2020, the Company held its FY 1Q 2021 earnings call (the "FY 1Q 2021 Earnings Call").  In the FY 1Q 2021 Earnings Call, Defendant Danker reassured investors on lapses, stating, "we are witnessing some promising signs on intra-year lapse rates versus last year's cohort," "we're encouraged that we are seeing lower first year lapse rates calendar year-to-date compared to last year, and those trends have improved throughout the year."

273.    On the same call, Defendant Sadun also continued to reassure investors on lapses and persistency.  While acknowledging "slightly lower persistency," he added that "the lower persistency is included in our LTV calculations," and claimed that "[n]othing has changed on the persistency front since we discussed this last quarter."

274.    During the Q&A session of the FY 1Q 2021 Earnings Call, when specifically asked about the impact of OEP on persistency Defendant Sadun replied, "[s]o I think we saw lower persistency based off of last year's OEP. Having said that, I think one positive trend that we are seeing is that the lapse rates throughout the course of the year have gotten better on a year-over-year basis."

275.    On December 2, 2020, SelectQuote attended the Credit Suisse Technology Conference.  In the conference, Defendant Sadun was upbeat on lapses and LTVs, stating that "first year lapse rates throughout the course of the year, year-to-date, are better than they were last year," and "[l]ong-term, there are way more tailwinds to the drivers that impact LTV than headwinds."  A day later, SelectQuote attended the Piper Sandler Health Care Conference where Defendant Danker boasted that "any way you slice it, SelectQuote earns significantly higher LTV

per policy than our peers, which is primarily due to our industry-leading persistency and all of that is really driven by the things that Tim talked about in how we run the business."

276.    As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs, the statements referenced in ¶¶ 272-75 were materially false and misleading because Defendants knew, for the reasons stated in ¶ 252(1)(i-v), that, since before the Company's May 2020 IPO, and continuing throughout the Class Period, the Company was not experiencing "promising signs" on lapses, lapses were ultimately revealed to be elevated, and persistency continued to fall even beyond the OEP.  Further, statistical analysis reveals that SelectQuote's persistency experience was overstated by at least 15% at all times during the Class Period (*see supra* ¶¶ 146-53).

277.    On February 8, 2021, the Company held its FY 2Q 2021 earnings call (the "FY 2Q 2021 Earnings Call").  In the FY 2Q 2021 Earnings Call, SelectQuote continued to tout that its business was performing better than its peers.  For example, Defendant Danker stated, "[o]ur MA LTVs were flat compared to a year ago at $1,268, which stands out compared to peer LTVs, which are roughly 25% lower and have exhibited more volatility than ours," adding, "the stability of our LTVs in a period of rapid growth is a proof point to the solid foundation we've built in our model." He credited SelectQuote's outperformance of competitors to their agents and technology.

278.    On February 8, 2021, the Company also published a presentation ("FY 2Q 2021 Earnings Call Presentation") in connection with its FY 2Q 2021 Earnings Call.  In the presentation, the Company boasted of having "[i]ndustry leading LTVs," and added, "[o]ur market-leading and stable LTVs serve as a strong proof point to the sustainability and strategic advantages of our model."

279.    As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs, the statements referenced in ¶¶ 277-78 were materially false and misleading because (1) Defendants knew, for the reasons stated in ¶ 252(1)(i-v), that, since before the Company's May 2020 IPO, and continuing throughout the Class Period, the Company's cohorts experienced lower persistency than assumed by the Company in calculating its LTVs, and its LTVs were not stable; and (2) statistical analysis reveals that persistency numbers were overstated by at least 15% at all times during the Class Period (*see supra* ¶¶ 146-53).

280.    On May 18, 2021, SelectQuote attended the RBC Capital Markets Healthcare Conference.  At the conference, Defendant Sadun represented that lower persistency was "isolated to the 2019 cohort," that they were "not seeing the same dynamic with later cohorts than we are with 2019 cohorts" and that "the 2019 cohort had persistency assumptions from prior years that didn't include that type of switching activity."

281.    As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs, the statements referenced in ¶ 280 were materially false and misleading because, Defendants knew, for the reasons stated in ¶ 252(1)(i-v), that, since before the Company's May 2020 IPO, and continuing throughout the Class Period: (1) the Company's cohorts experienced lower persistency than assumed; (2) by May 2021, the 2021 OEP had concluded and SelectQuote knew at this point the same truth that they would disclose just three months later—that the lack of policy renewals and falling persistency affected not just the 2019 cohort, but also the 2020 cohort; and (3) statistical analysis reveals that lower persistency numbers were not "isolated to the 2019 cohort," but rather were overstated by at least 15% at all

times during the Class Period across the 2018, 2019, 2020 and 2021 cohorts (*see supra* ¶¶ 146-53).

282.    On September 6, 2021, Credit Suisse published a report titled "Q&A Out Way: Discussion Around Persistency Trends, FY22 Outlook, & LT Expectations," which contained a write-up of a question-and-answer session with SelectQuote management where analysts from Credit Suisse raised that SelectQuote's disclosures were at odds with its previous statements.  For example, an analyst asked "Last quarter when we asked about persistency trends, the response was that the company was not seeing anything unusual with respect to either 2020 or 2021 cohort. The issue was primarily concentrated with 2019 cohort. How come the company did not see this coming?"  In response to the analyst's query, Defendant Sadun claimed that SelectQuote was, in truth, missing information from some of its carriers at the time of the May disclosure and had only received it recently. Defendant Sadun asserted that because of the missing information and an unusually high spike in lapse rate, SelectQuote had been unable to predict the poor persistency of the 2020 cohort until well past May 2021.

283.    As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs, the statements referenced in ¶ 282 were materially false and misleading because: (1) Defendants knew, for the reasons stated in ¶ 252(1)(i-v), that, since before the Company's May 2020 IPO, and continuing throughout the Class Period, the Company was experiencing lower persistency with its cohorts; (2) the reason for the lower persistency with the 2020 and 2021 cohorts was a result of the Company's "sell at all costs" growth model, which proved unsustainable and relied on totally unsupported expectations around renewal rates and persistency; and (3) statistical analysis reveals that the Company did "see [the persistency trends] coming—persistency numbers were overstated by at least 15% at all times during the Class

Period (*see supra* ¶¶ 146-53).  Moreover, as reflected in ¶¶ 179-84 above, at no time during the Class Period did SelectQuote experience a delay in receipt of customer policy status data from carriers.

284.    An Evercore ISI report, dated November 4, 2021, titled "Notes from the Top:  All Eyes on AEP," contained a write-up from a conversation with management post the FY Q1 2022 Earnings Call.  The analyst stated, with respect to LTVs, they were trying to further understand the two-thirds which was related to lower overall persistency on 3-year weighted average and increased provision rate for lapses.  The analyst asked, "the increased commission rates were a partial offset, correct? Are there other nuances to consider here?" SelectQuote responded reassuringly, stating, that **"**the increased commission rates partially offset lower overall persistency and the increased provision for lapses, as well as the other component which was from the move to policy level persistency, which was [one-third] of the overall impact."

285.    As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs, the statements referenced in ¶ 284 were materially false and misleading because: (1) Defendants knew, for the reasons stated in ¶ 252(1)(i-v), that, since before the Company's May 2020 IPO, and continuing throughout the Class Period the Company was experiencing a pattern of lower persistency with its cohorts; (2) statistical analysis reveals that persistency numbers were overstated by at least 15% at all times during the Class Period (*see supra* ¶¶ 146-53); and (3) Defendants knew that the statement that "increased commission rates partially offset lower overall persistency," was false because the policies that formed the 2018, 2019, 2020 and 2021 cohorts were a result of the Company's "sell at all costs" growth model and relied on totally unsupported expectations around renewal rates and persistency, which could not be offset.

286.    A Credit Suisse report dated November 7, 2021, titled "Q&A Our Way: Discussion Around Agent Hiring Challenges, Persistency Trends & FY22 Outlook," (the "November 7, 2021 Report") also contained a write-up from a post-quarterly discussion with SelectQuote management. The analyst asked, concerning the expected reduction to FY 2Q 2022 revenues by ~$50 - $60 million, whether it was "surpris[ing] that the company had that much revenue tied to the productivity of the agents who were not even on-board in late Aug." SelectQuote responded, "SLQT started offers in March and April. However, the first class didn't begin until July. The internal math plays out if they would have come in during that July/August timeframe. A significant amount of production comes from productive agents with 2Q21 historically the biggest and most efficient quarter. Thus, having a slower ramp of a significant portion of that fluctuation group is impactful."

287.    As set forth in ¶ 252(1)(i-v) above, SelectQuote's explanation regarding a falloff in revenue based on adverse hiring trends was materially misleading as the true reason for the decline in revenue guidance was the decline in persistency experienced by the Company beginning prior to the IPO.

### C.    Statements Concerning Hiring and Training of SelectQuote Employees

288.    The IPO Prospectus made the following representations about the training SelectQuote provided its agents, and substantively identical versions of this statement were also included in the Company's annual reports for FY 2020 and FY 2021:

> **Our highly trained and licensed agents are subject matter experts** in the products they sell, and this, in combination with our purpose-built software and business process, differentiates the service we provide to consumers relative to other insurance distributors or "online only" offerings. We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. Our agents on the SelectQuote platform **are trained to offer**

**unbiased advice in order to be more aligned to the specific needs of each customer.**

* * *

**We provide each new agent with up to 10 weeks of proprietary in-house training**, which is later supplemented by ongoing training during the agents' full-time employment. Our training is designed to ensure that every agent is well-equipped with a deep understanding of the products he or she sells and the customer service and sales skills necessary to best service the customer. A goal of ours is that every agent in whom we invest will build a long and rewarding career with us.

* * *

**Our flex agents undergo up to 10 weeks of proprietary in-house training**, further supplemented by additional training. We continuously assess flex agent performance throughout AEP and OEP.

289.    During the August 13, 2020 RBC Fireside Chat, Defendant Danker touted SelectQuote's "highly skilled agents" and their philosophy of "building a permanent career-focused agent force."  Defendant Danker made clear that the Company does not engage in hiring for "part-time role[s]" and are focused on "hiring for career opportunity."

290.    In the FY 2020 10-K , the Company described its agents as "highly trained licensed agents," who "are subject matter experts in the products they sell."  SelectQuote's 4Q 2020 and FY 2020 Earnings Call Presentation, published on September 9, 2020, further claimed that its agents "[c]onduct personalized, needs-based analysis," are "[i]ncented to place customer in the best policy," and undergo "[p]re-hire assessment through seasonal Flex program."  The Company also stated, "[o]ur choice model paired with highly trained, in- house agents and dedicated customer care teams was purpose-built to ensure customers buy the right plan for their specific needs which leads to high retention rates."

291.    On October 5, 2020, SelectQuote published a press released titled, "SelectQuote Achieves Hiring Goals in Advance of Medicare Annual Enrollment Period" (the "October 5, 2020 Press Release").  The October 2020 Press Release contained the following statements:

101

Many of these new associates are licensed sales agents who will help customers navigate the complex choices involved in selecting health insurance. SelectQuote also hired licensed Enrollment Specialists and Customer Care Associates **who ensure customers understand the features and benefits of their plans and focus on customer service and retention, respectively.** The Customer Care group has more than 250 associates and is a **key contributor to SelectQuote's industry-leading persistency rate, customer recapture rate and unit economics.**

"Customer service is at the center of everything we do," said Robert Grant, President of SelectQuote Senior. "Our technology is the best in the industry but there is no substitute for a conversation with one of our **highly-skilled agents who understands the customer's needs and concerns, particularly when it comes to something as important as their healthcare. Our agents undergo rigorous training** so that they are prepared to present customers with the best options for their budget and their health."

292.    In the FY 1Q 2021 Earnings Call, Defendant Sadun described the Company's onboarding process as "robust" and including "rigorous training, licensing, and carrier appointment." Sadun reassured investors that "our process makes sure that when they hit the phones in the second quarter that our agents are highly productive and [place] high-quality policies driving significant revenue during AEP and OEP."

293.    In the IPO Prospectus, the Company made the following representations concerning SelectQuote's ability to use its technology to obtain better matches of consumers with insurance carriers and policies:

Our proprietary technology allows us to take a broad funnel approach to marketing by **analyzing and identifying high quality consumer leads sourced from a wide variety of online and offline marketing channels.** Our primary sources of leads include search engine marketing, radio, television, and third-party marketing partners. We monitor our acquisition costs to dynamically allocate our marketing spend to the most attractive channel, benefiting from over thirty years of data accumulated through our proprietary, purpose-built technologies. **Our advanced workflow processing system scores each acquired lead in real-time, matching it with an agent whom we determine is best suited to meet the consumer's need.** Our platform then captures and utilizes our experience to further build upon the millions of data points that feed our marketing algorithms, which further enhances our ability to deploy subsequent marketing dollars efficiently and target more high-quality consumer leads. We have built our business model to maximize commissions collected over the life of an approved policy less the cost of acquiring

the business, a metric we refer to as policyholder lifetime value and which is a key component to our overall profitability.

294.    A statement substantively identical to the foregoing also was included in the Company's quarterly reports for FY 1Q 2021, FY 2Q 2021, FY 3Q 2021 and FY 1Q 2022.

295.    The statement above in ¶ 293 was also included in the Company's annual reports on Form 10-K for FY 2020 and FY 2021.

296.    In the FY 1Q 2021 Earnings Call, Defendant Sadun described the Company's onboarding process as "robust" and including "rigorous training, licensing, and carrier appointment." Sadun reassured investors that "our process makes sure that when they hit the phones in the second quarter that our agents are highly productive and [place] high-quality policies driving significant revenue during AEP and OEP."  In investor presentations on December 10, 2020 and February 23, 2021, SelectQuote stated, "[o]ur choice model paired with highly trained, in- house agents and dedicated customer care teams was purpose-built to ensure customers buy the right plan for their specific needs which leads to high retention rates."

297.    On February 8, 2021, the Company held its FY 2Q 2021 Earnings Call. On that call, Defendant Danker stated that the Company's "most important differentiator" is "our agents." Danker told investors that "each agent is hired through a rigorous onboarding process" and they "undergo an extensive 10-week training program to ensure that they are subject-matter experts the day they begin speaking with customers."

298.    In the FY 2Q 2021 Earnings Call Presentation, the Company stated that its "[d]ifferentiated agent model" consisted of a "Onboarding" which includes, "Training:  10-week program with robust coaching," and "Testing:  Rigorous testing driven comp, leveling & standing."  It also represented that its model was "[e]fficien[t]" and consisted of "Purpose-Built

tech:  Proprietary lead scoring algorithm," "Agent leveling:  Streamlines lead generation and routing," and "Enrollers: Licensed professionals drive higher productivity."

299.    In the November 7, 2021 Report, the Company stated that its training period included "six weeks of classroom training[, t]hen 4-6 weeks of ongoing training on the phone until someone is ramped up."

300.    On November 4, 2021, SelectQuote published an Earnings Presentation in connection with its FY 1Q 2022 Earnings Call.  In the presentation, SelectQuote continued to tout its Senior business, stating, "Core Senior Business, SelectQuote's differentiated, tech-enabled, agent-led model is well positioned to capitalize on the long-term growth trends driven by the aging demographic and the shift away from a field agent distribution model."

301.    As detailed above and corroborated by both the Defendants' belated admissions about persistency and the accounts provided by FEs, the statements referenced in ¶¶ 288-300 were materially false and misleading because:  (1) SelectQuote hired indiscriminately in order to fuel growth at all costs emphasizing volume sales over quality of sales;  (2) SelectQuote misrepresented the duration of training provided to the Company's agents, which was in reality only four weeks and far from "rigorous"; (3) SelectQuote hired "anyone with a pulse" and "said yes to everyone who came through the door"; (4) the training that was provided to the agents did not give them the ability to conduct the assessment that would have enabled the agents to match customers with a policy well-suited to the customer's needs, which would then encourage customers to serially renew those policies; (5) SelectQuote's hiring mode focused on bringing on vast numbers of low-paid, undertrained employees, who were often ineffective in selling complex Medicare-based insurance policies; and (6) SelectQuote openly, routinely and systematically encouraged and enabled sales agents to cheat on required AHIP and carrier-specific certification exams that agents

were required to pass as a prerequisite for selling Medicare Policies. These allegations are further corroborated by Defendants' admission on February 7, 2022 that SelectQuote would re-size its business to grow "modestly" due to issues with the training and effectiveness of its agents (¶220).

### D. Statements Treating Already-Materialized Risks as Hypothetical

302. In the IPO Prospectus, the Company made the following risk disclosures regarding the potential negative effect of an increase in lapse rates:

> Our operating results will be impacted by factors that impact our estimate of the constrained lifetime value of commissions per policyholder. Effective July 1, 2018, we elected to early adopt Accounting Standards Update ("ASU") 2014-09, *Revenue from Contracts with Customers* ("ASC 606"), using the full retrospective method, which required us to revise our historical financial information for fiscal 2018 to be consistent with the new standard. The adoption had a material impact on our historical financial statements, including the method by which we recognize commission revenue. We now recognize revenue based on the expected value approach. This approach utilizes a number of assumptions, which include, but are not limited to, legal and enforceable rights to renewal commissions upon contract termination when determining variable consideration, renewal commission rates, historical lapse data and premium increase data. **These assumptions are based on historical trends and any changes in those historical trends will affect our estimated lifetime value estimates in future periods and therefore could adversely affect our revenue and financial results in those future periods. As a result, adverse changes in the assumptions we make in computing expected values, such as increased lapse rates, would harm our business, operating results, financial condition and prospects**.
>
> **In particular, if customer lapse rates exceed our expectations, we may not receive the revenues we have projected to receive over time**, despite our having incurred and recorded any related customer acquisition costs up front. Any adverse impact on customer lapse rates could lead to our receipt of commission payments that are less than the amount we estimated when we recognized commission revenue. Under such circumstances, we would need to write-off the remaining commission receivable balance, which would result in a change to earnings in the period of the write-off.

303. On September 10, 2020, in the FY 2020 10-K, and on August 26, 2021, in the FY 2021 10-K, the Company made the same risk disclosures regarding the potential negative effect of an increase in lapse rates as stated in ¶ 302.

304.    The above purported "risk disclosure", in ¶¶ 302-03, contains false and misleading statements of material fact because:    (1) "changes in [] historical trends [] affect[ing] [SelectQuote's] estimated lifetime value estimates  . . . [that] could adversely affect [SelectQuote's] revenue and financial results in those future periods," and (2) "risk" of "customer lapse rates exceed[ing] [SelectQuote's] expectations," which in turn meant that "[SelectQuote] may not receive the revenues [the Company] [] projected to receive over time,"—were risks that had already materialized because Defendants knew, for the reasons stated in ¶ 252(1)(i-v), that since before the Company's May 2020 IPO, and continuing throughout the Class Period, its cohorts were already experiencing lower persistency and high lapse rates.  Furthermore, the lower persistency experienced by the Company at the time of the IPO is corroborated by the statistical analysis above (¶¶146-53), Defendants' belated admissions about persistency and the accounts provided by FEs.

305.    In the IPO Prospectus, the Company made the following risk disclosure regarding compliance with state laws and regulations:

> We also may lose the ability to market and sell Medicare plans for our Medicare plan insurance carrier partners. The regulations for selling senior health insurance are complex and can change. **If we or our agents violate any of the requirements imposed by the CMS, state laws or regulations, an insurance carrier may terminate our relationship or CMS may penalize an insurance carrier by suspending or terminating that carrier's ability to market and sell Medicare plans.** Because the Medicare products we sell are sourced from a small number of insurance carriers, if we lose the ability to market one of those insurance carriers' Medicare plans, even temporarily, or if one of those insurance carriers loses its Medicare product membership, our business, operating results, financial condition and prospects could be harmed.

306.    On September 10, 2020, in the FY 2020 10-K, and on August 26, 2021, in the FY 2020 10-K, the Company made the same risk disclosure regarding compliance with state laws and regulations as stated ¶ 305.

307. The above purported "risk disclosure," stated in ¶¶ 305-06, contains untrue statements of material fact and omitted other facts necessary to make it not misleading because, when disclosing that if the Company or its agents "violate any of the requirements imposed by the CMS, state laws or regulations, an insurance carrier may terminate [its] relationship or CMS may penalize" them, the Company failed to disclose that it was already engaging in violations of requirements imposed by CMS, state laws and the carriers that could cause the carriers to terminate their relationship with SelectQuote. Namely, several former SelectQuote employees have confirmed the existence of systematic cheating by SelectQuote agents on certification tests required under the AHIP certification guidelines necessary to sell Medicare Policies and certification tests similarly required by SelectQuote's insurance carrier partners. Passing these tests was a prerequisite for agents to complete before being allowed to sell policies on behalf of SelectQuote's insurance carrier partners.

## XI.    ADDITIONAL ALLEGATIONS OF SCIENTER

308. Numerous facts, including those detailed above, considered collectively, demonstrate that SelectQuote and the Officer Defendants had both the motive and opportunity to make, and knew they were making, the above-detailed materially false and misleading statements and omission of material fact, or, at minimum, acted recklessly in making those statements and omissions. Certain allegations reflecting SelectQuote and the Officer Defendants' scienter are summarized below.

309. ***First,*** Defendants have admitted multiple times that they knew of declines in SelectQuote's Senior division persistency rates well prior to the beginning of the Class Period, but still concealed those facts from investors until February 2022:

- On August 20, 2020 Sadun misleadingly discussed the low magnitude of the decline, but admitted that the Company knew about a "slight uptick in

second term lapses," referring to the second renewal cycle for the 2018 cohort, which was known no later than March 2020 (before the IPO);

- In a September 6, 2021 Credit Suisse analyst report, it was disclosed that SelectQuote told analysts that "at the time of the IPO, [it] did highlight lower first time persistency for the 2019 cohort" and that before the IPO in early 2020 SelectQuote "saw higher intra-year lapse rates."

- In September 10, 2021 reports, analysts indicated that SelectQuote told them that the Company had been aware of "lower persistency" in the "last couple of years" (i.e., in 2019 and 2020), and further admitted that both "first and second term persistency was down," referring to the first and second renewal cycles for the 2019 cohort, completed in March 2020 (pre-IPO) and March 2021, and the second renewal cycle for the 2018 cohort, which was also completed in March 2020, before the IPO.

- On February 7, 2022, in disclosing the $210 million reduction in LTV, Sadun admitted that this reduction was driven by persistency declines "over the last three years," or since February 2019.

310.    As noted above, certain of these admissions of knowledge in declining persistency were accompanied by misleading statements concerning the magnitude of the decline, but make clear that the persistency rates underlying SelectQuote's financial results had departed materially from historical rates and its pre-2019 rates could no longer be used reliably as the basis for its LTV accounting and disclosures.

311.    ***Second***, Defendants' insider sales are probative of their scienter and are part of Defendants' scheme, artifice to defraud or acts, practices, or course of business in violation of §10(b) and Rule 10b-5.  Defendants accelerated SelectQuote's growth—particularly in the Senior segment—in the run-up to the IPO, which had the effect of increasing the IPO price at which the Exchange Act Defendants and other large shareholders could sell their shares.  At this time, as SelectQuote and the Officer Defendants were issuing materially false and misleading statements about the Company's business and concealing negative information and trends, Defendants had access to confidential information and were aware of the truth about the Company and its business. Defendants benefitted from this illegal course of conduct by selling large blocks of Company stock

at artificially inflated prices, without disclosing the materially adverse facts about the Company they were privy to.

312.    On May 26, 2020, upon the closing of the IPO, Defendant Danker sold 223,257 shares for proceeds of $4,219,557.  Defendant Sadun also sold 136,688 shares upon the closing of the IPO, for proceeds of $2,583,403.

313.    Defendants Danker and Sadun also planned sales of their SelectQuote holdings beginning in January 2021, well after they had engaged in the fraudulent acts discussed in this Complaint.  From January 20, 2021 to February 25, 2021, Danker sold 345,000 shares, netting proceeds of $9,505,836. Danker's fraudulent planned sales are depicted below:

| Date Traded | Shares | Price | Value |
|---|---|---|---|
| 1/20/2021 | 12,900 | $25.01 | $322,629 |
| 1/21/2021 | 28,759 | $25.28 | $727,028 |
| 1/22/2021 | 8,230 | $25.02 | $205,915 |
| 1/25/2021 | 21,642 | $25.12 | $543,647 |
| 1/26/2021 | 10,200 | $25.20 | $257,040 |
| 2/5/2021 | 23,269 | $25.12 | $584,517 |
| 2/9/2021 | 54,827 | $27.05 | $1,483,070 |
| 2/10/2021 | 33,465 | $27.10 | $906,902 |
| 2/11/2021 | 51,708 | $27.10 | $1,401,287 |
| 2/22/2021 | 11,100 | $30.01 | $333,095 |
| 2/23/2021 | 1,700 | $30.02 | $51,042 |
| 2/24/2021 | 73,596 | $30.90 | $2,273,888 |
| 2/25/2021 | 13,604 | $30.56 | $415,776 |
| **TOTAL:** | **345,000** | | **$9,505,836** |

314.    From January 20, 2021 to February 16, 2021, Sadun sold 250,000 shares, netting proceeds of $6,438,453. Sadun's fraudulent planned sales are depicted below:

| Date Traded | Shares | Price | Value |
|---|---|---|---|
| 1/20/2021 | 12,791 | $25.01 | $319,903 |
| 1/21/2021 | 28,674 | $25.28 | $724,879 |
| 1/22/2021 | 8,259 | $25.02 | $206,640 |

| | | | |
|---|---|---|---|
| 1/25/2021 | 21,677 | $25.13 | $544,743 |
| 1/26/2021 | 10,296 | $25.19 | $259,356 |
| 2/5/2021 | 81,744 | $25.06 | $2,048,505 |
| 2/8/2021 | 21,559 | $25.10 | $541,131 |
| 2/9/2021 | 500 | $27.50 | $13,750 |
| 2/12/2021 | 100 | $27.50 | $2,750 |
| 2/16/2021 | 64,400 | $27.59 | $1,776,796 |
| **TOTAL:** | **250,000** | | **$6,438,453** |

315.    Taken together, by the end of February 2021, Danker and Sadun had sold 29% and 32% of the shares they held prior to the IPO, respectively. Including both the IPO and Class Period sales, Danker and Sadun, received proceeds exceeding $13.7 million and $9 million, respectively.

316.    In addition to the sales outlined above, numerous other directors and employees also engaged in large-scale sales of their SelectQuote shares, reflecting a Company-wide lack of confidence in the publicly stated optimism and highly positive remarks and expectations.

317.    This includes two directors appointed by Defendant Brookside, including SelectQuote's chairman, Defendant Hawks. Brookside, through Hawks and Defendant Weldon, exercised material control of SelectQuote prior to the IPO, and directed the Company's all-out growth strategy. Brookside, Hawks, and Weldon were motivated to maximize the value of their stakes in SelectQuote, and to ensure that any disclosed increases in churn were minimized.

318.    **Third,** Defendants had the opportunity to manipulate SelectQuote's financial reporting, in particular its LTV accounting, at the time of the IPO to increase the value of its shares.

319.    As SelectQuote readily admits in its Prospectus, "[t]he most significant items involving management estimates include estimates of revenue recognition [and] commissions receivable." ASC accounting allows the Company to "utilize a number of assumptions" and to recognize revenue under the "expected value approach." ASC 606 accounting for LTV allows SelectQuote to *assume* the duration of its commission stream in order to recognize all of the commission (including renewal payments) as revenue upon application approval. The amount of

revenue booked upfront is based on SelectQuote's own *assumption* (of member policy's lifetime value), which makes the calculation susceptible to abuse or manipulation. The Officer Defendants' ability to manipulate SelectQuote's use of the persistency assumptions in SelectQuote's LTV accounting was furthered by the fact that Company, at their direction, chose not to disclose any details concerning its actual persistency rates, and in fact, refused to provide such details even in response to investor and analyst inquiries. By creating a veritable "black box" for the most important financial metric the Company reported, Danker and Sadun had massive opportunity to commit the fraud set forth herein.

320.    As an example of how manipulable LTV accounting is, we now know that, in August 2021, the Company announced it was switching to policy level persistency. Previously, when a SelectQuote customer switched policies but maintained the same carrier, the Company tied the cash from the new policy to the original policy, and therefore there was no effect on persistency. With policy level persistency, persistency rates would be negatively affected by customers changing policies, and the Company estimated that MA LTV per policy would drop approximately 6% as a result.

321.    ***Fourth***, the Officer Defendants had access to real-time information that would have given them knowledge of forecasts, outcomes, and trends relating to persistency. In its IPO Prospectus, the Company described its "SelectQuote Revenue Tracking System," or "SRTS." SelectQuote boasted that this tracking system is a "***[f]ully integrated, proprietary revenue tracking and financial reporting tool*** that also supports financial and customer falloff / retention prediction algorithms, ***allowing for real-time workflow*** and actions with our customer service teams." SelectQuote also claimed to stand apart from its competitors in its use of proprietary data:

> We believe what sets us apart from our competitors is our ***more than 30 years of proprietary data*** that our data scientists use as part of our bidding strategy for

purchased leads, grouping phone and web leads by likelihood to purchase specific products, scoring phone and web leads using historical performance of similar leads based on demographics, tiering leads for routing to the corresponding agent levels, **and performing predictive analysis of current customers retention rates or "persistency."**

322.    Defendants made repeated references throughout the Class Period, as referenced above.  For example, at a December 2, 2020 Credit Suisse Technology Conference, Defendant Danker directly touted SelectQuote's technology as a "really important part of the business," and told analysts, "We even use [this technology] *for revenue tracking*, which doesn't sound very sexy, but it's *a really important part of the business.*"  At that same conference, SelectQuote shared an investor presentation that echoed this, calling SRTS a "[p]roprietary revenue tracking and ASC 606 financial reporting tool."

323.    Defendants repeatedly touted SRTS and its ability to have real-time data on policy activity and status.  Defendants' access to SRTS, and the ingestion of policy-level data from carriers on a daily or at least weekly basis, which reflected the current status and condition of those policies, is further confirmed by FE 10.

324.    *Fifth*, the Officer Defendants had knowledge of facts critical to SelectQuote's core operations, particularly its Senior segment.

325.    Defendants Danker and Sadun have been CEO and CFO, respectively, of SelectQuote for many years.  They were well informed of integral business issues, such as customer renewal rates/persistency and LTV accounting.  They were responsible for and directed the Company's "growth at all costs" business model, initiated prior to the Class Period, and frequently discussed, in minute detail, the growth and operations of SelectQuote's Senior business. Consequently, their experience and responsibilities necessarily informed them that the aforementioned statements made during the Class Period were materially false and misleading.

326.    Defendant Danker has served as CEO of SelectQuote since 2017, and on its board since its IPO in May 2020.  Prior to becoming CEO, he served as President of the Company's Life segment from 2016 to 2019, as the Executive Vice President of the Life segment from 2015 to 2016, and as the President of the Auto & Home segment from 2012 to 2015.  Danker received his undergraduate degree in business administration from the University of Missouri and his Masters of Business Administration from the University of Kansas.

327.    Defendant Sadun served as the Chief Financial Officer of the Company from 2017 until his resignation in May 2022.  Sadun previously served as the Chief Financial Officer of The Mutual Fund Store from 2014 to 2016 until it was sold to Financial Engines, an independent investment advisor, where he served as Senior Vice President of Finance from 2016 to 2017. Sadun graduated with a degree in Management from The London School of Economics.

328.    Indeed, SelectQuote touted the experience that its management brought to the table. According to the IPO Prospectus:

> Strong company culture developed by an experienced management team. We maintain a unique sales and consumer service-oriented culture. We are a diverse group of women and men who are united in our mission to provide solutions that help consumers with their overall financial wellbeing and protect their most valued assets. Through our recruiting processes, we are able to identify people who enjoy being a part of, and are motivated by, a performance-based, meritocratic organization. This allows us to assemble a world-class team of people who envision building their careers at SelectQuote. Our company culture is promoted by a ***highly experienced management team with deep industry experience*** and a track record of industry innovation. The ***key members of our management team have over 60 total years of industry experience and several members of our management team have worked together to build our business*** over the last eight years.

329.    SelectQuote is divided into three segments: Senior, Life, and Auto & Home.  In 2020, Senior represented 68% of SelectQuote's revenue, and 95% of SelectQuote's EBITDA, making it by far the larger segment in the Company's business.

330.    SelectQuote considers the Senior segment as the most important part of its business. In its Prospectus, the Company acknowledged that its "overall operating results are substantially dependent upon our success in our Senior segment."

331.    Throughout the Class Period, the Officer Defendants spoke in detail about the Senior segment, about accounting (including LTV accounting), about persistency, and more. Defendants Danker and Sadun had to have knowledge of, and informed themselves of, the true facts they discussed concerning the subject matters set forth herein, or were reckless in failing to do so.

332.    As detailed above, Defendants Danker and Sadun made many detailed statements about the very issues at the core of this case:  persistency in the Senior segment and the importance of a high-quality sales process.

333.    Defendants' false public statements repeatedly emphasizing the purported positive state of persistency and LTV calculations—and the market's heavy focus and reliance upon those statements throughout the Class Period—is strongly probative of Defendants' scienter.

334.    **Sixth**, as discussed *supra* ¶¶ 194-95, pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303, SelectQuote and the Officer Defendants had an affirmative, independent duty to disclose the ongoing trend, since the time of the IPO, that SelectQuote's renewal commissions were falling far below the estimated commission the Company had already recognized as revenue. Both conscious misbehavior and recklessness may be inferred when the duty to disclose is clear and no disclosure is made

335.    **Seventh**, the Officer Defendants, and Brookside, through its own control over the Company, were all highly motivated to conceal the Company's problems in order to enable Brookside, the Company's controlling shareholder, to liquidate its own holdings at massively

inflated prices. Brookside sold approximately 5.9 million SelectQuote shares in the IPO at $20 per share (before underwriting fees), reaping gross proceeds of approximately $120 million. In the Secondary conducted on March 8, 2021 Brookside sold another 4,991,304 SelectQuote shares at $27.50 per share (before underwriting fees), receiving gross proceeds of over $137 million. In total, Brookside received over $257 million on its Class Period sales of SelectQuote stock.

336. Critically, the SPO also took place on March 8, 2021, a mere two months before the May 2021 corrective disclosure, enabling Brookside to unload millions of shares at an artificially inflated price before the extent of the problems with SelectQuote's persistency issues began to be revealed to investors. Prior to the SPO, Defendants went out of their way to issue a series of misstatements designed to strongly assure investors regarding lower persistency. For example, a mere 12 days before the SPO, the Officer Defendants represented at a February 24, 2021 Citigroup conference that lower persistency would be "offset" in FY 2021, and that for FY 2022 "we are seeing slightly higher first term persistency." Defendants' strong false reassurances about the Company's persistency rates leading up to the SPO are highly probative of scienter. In total, Brookside received more than $257 million through its Class Period sales of SelectQuote stock. Had those shares been sold at the $3.44 price of shares following Defendants' last corrective disclosure, Brookside would have received $220 million less in proceeds.

337. **Eighth**, the detailed information provided by several former employees demonstrates that SelectQuote and the Officer Defendants knew that their claims regarding the hiring and training of sales agents were materially false and misleading. This information revealed that it was widely known that SelectQuote agents systematically cheated on certification tests required to sell Medicare Policies and other certification tests required by SelectQuote's insurance carrier partners. It was further revealed that the Company's senior managers facilitated this

cheating, which was openly discussed and widely known. The overwhelming evidence of this systematic impropriety was directly contrary to SelectQuote's claims of hiring "highly trained and licensed agents" who were "subject matter experts in the products they sell," and the information strongly suggests that the leadership of SelectQuote, including the Officer Defendants, would have possessed knowledge of these widely known facts.

338. *Ninth*, on May 19, 2022, SelectQuote announced the departure of Defendant Sadun, who took a job outside of the insurance industry entirely. This departure occurred less than three months after the end of the Class Period, when Defendants disclosed the full extent of the truth as the Company revealed the $205 million decline in LTV and creates a strong inference that Sadun's departure was associated with the alleged misconduct described in this Complaint.

## XII.  LOSS CAUSATION

339. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of SelectQuote shares and operated as a fraud or deceit on Plaintiffs and the Class. Later, Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, including through revelations concerning the Company's actual persistency rates, financial results and growth, the price of SelectQuote's shares fell precipitously, as the prior artificial inflation came out of the price over time. These revelations were connected to and revealed underlying problems with the Company's LTVs, persistency, growth, hiring and training practices. The corrective disclosures discussed above also reflected the materialization of previously undisclosed or misrepresented risks. As a result of their purchases of SelectQuote's shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## XIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR

340.  SelectQuote's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Importantly, under applicable SEC Regulations, SelectQuote's financial disclosures issued purportedly in compliance with GAAP are not subject to the Safe Harbor and are not forward-looking statements subject to the "bespeaks caution" doctrine.  15 U.S.C. § 78u–5(b)(2)(A).

341.  Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of SelectQuote who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XIV.  PRESUMPTION OF RELIANCE

342.  At all relevant times, the market for SelectQuote's common stock was an efficient market for the following reasons, among others:

(a)  SelectQuote's shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)  As a regulated issuer, SelectQuote filed periodic public reports with the SEC and NYSE;

(c)  SelectQuote regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations

of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    SelectQuote was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

343.    As a result of the foregoing, the market for SelectQuote's shares promptly digested current information regarding SelectQuote from all publicly available sources and reflected such information in the price of SelectQuote common stock.  Under these circumstances, all purchasers of SelectQuote common stock during the Class Period suffered similar injury through their purchase of SelectQuote common stock at artificially inflated prices and the presumption of reliance applies.

344.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's reported revenues, earnings, and accounts receivable figures – information that Defendants were obligated to correct – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of each cohort's persistency and the impact those figures had on SelectQuote's recognized revenue, that requirement is satisfied here.

## XV.    EXCHANGE ACT COUNTS

### COUNT I

**For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against SelectQuote And The Officer Defendants**

345.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

346.    During the Class Period, SelectQuote and the Officer Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (b) cause Plaintiffs and other members of the Class to purchase SelectQuote's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, SelectQuote and the Officer Defendants, and each defendant, took the actions set forth herein.

347.    SelectQuote and the Officer Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SelectQuote's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  SelectQuote and the Officer Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

348.    SelectQuote and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SelectQuote's financial well-being and prospects, as specified herein.

349.    During the Class Period, SelectQuote and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

350.    The Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  The Officer Defendants engaged in this misconduct to conceal SelectQuote's true condition from the investing public and to support the artificially inflated prices of the Company's shares.  The Officer Defendants' state of mind is imputed on SelectQuote.

351.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SelectQuote's shares.  Plaintiffs and the Class would not have purchased the Company's shares at the prices they paid, or at all, had they been aware that the market prices for SelectQuote shares had been artificially inflated by these Defendants' fraudulent course of conduct.

352.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their representative purchases of the Company's shares during the Class Period.

353.    By virtue of the foregoing, SelectQuote and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violations Of Section 20(a) Of The Exchange Act
Against The Officer Defendants And The Brookside Defendants**

354.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

355.    The Officer Defendants acted as controlling persons of SelectQuote within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Officer Defendants and Brookside Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

356.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

357.    In addition, by virtue of its ownership stake and power to appoint two members of the SelectQuote Board, Brookside and both Hawks and Weldon, individually, had the power to control or influence SelectQuote and the particular transactions giving rise to the securities

violations, as alleged herein, and exercised the same. By virtue of their position as a controlling person, Brookside, Hawks and Weldon are liable pursuant to Section 20(a) of the Exchange Act.

358.    As set forth above, SelectQuote and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

359.    By virtue of their position as controlling persons, the Officer Defendants and Brookside Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## SECURITIES ACT CLAIMS

## XVI.  VIOLATIONS OF THE SECURITIES ACT

360.    Lead Plaintiffs specifically disavow any allegations or averments of fraud in connection with the claims pleaded under the Securities Act.

361.    As set forth in the Certifications previously filed with the Court, Lead Plaintiffs West Palm Beach Police and Fort Lauderdale P&F purchased SelectQuote shares both directly in the IPO and traceable thereto, and were damaged as result of those purchases.

### A.    The Securities Act Defendants

362.    The following Defendants are liable to Lead Plaintiffs and the Class under the Securities Act for the material misstatements and omissions in the Offering Materials for the IPO.

### 1.    Officer Defendants

363.    Defendant Timothy Danker ("Danker") is, and was at all relevant times, the Chief Executive Officer ("CEO") of SelectQuote. Defendant Danker signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

364.    Defendant Raffaele Sadun ("Sadun") was at all relevant times, the Chief Financial Officer ("CFO") of SelectQuote.  Defendant Sadun signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.  Sadun resigned from SelectQuote in May 2022, shortly after the end of the Class Period.

### 2.    Director Defendants

365.    Defendant Donald L. Hawks, III ("Hawks") is, and was at all relevant times, Chairman of the Board of Directors of SelectQuote.  Defendant Hawks served as a Managing Director and President of Brookside Equity Partners LLC, SelectQuote's largest shareholder at the time of the IPO, since its founding in 2012.  Defendant Hawks signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

366.    Defendant William T. Grant, II ("Grant") is, and was at all relevant times, the Vice Chairman of the Board of Directors of SelectQuote.  Defendant Grant signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

367.    Defendant Donald Britton ("Britton") was appointed as a member of SelectQuote's Board of Directors in 2014 and served in that capacity until September 23, 2020.  Defendant Britton signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

368.    Defendant Earl Devanny III ("Devanny") was appointed as a member of SelectQuote's Board of Directors in February 2020.  Defendant Devanny signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

369.     Defendant Denise Devine ("Devine") was appointed as a member of SelectQuote's Board of Directors in February 2020.  Defendant Devine signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

370.     Defendant Raymond L. Weldon ("Weldon") was appointed as a member of SelectQuote's Board of Directors in 2014.  Weldon is a Managing Director and co-founder of Brookside. Defendant Weldon signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

371.     Defendants Danker, Sadun, Hawks, Grant, Britton, Devanny, Devine, and Weldon are collectively referred to hereinafter as the "Offering Defendants."  Each of the Offering Defendants signed the Registration Statement.  The Offering Defendants, because of their positions with SelectQuote, possessed the power and authority to control the contents of the Offering Materials.

### 3.     The Underwriter Defendants

372.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as a joint bookrunner underwriter for the Offering and sold millions of SelectQuote shares in the Offering. As an underwriter of the Offering, Credit Suisse was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

373.     Defendant Evercore Group L.L.C. ("Evercore ISI") served as a joint bookrunner underwriter for the Offering and sold millions of SelectQuote shares in the Offering.  As an underwriter of the Offering, Evercore ISI was responsible for ensuring the truthfulness and

accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

374.    Defendant Barclays Capital Inc. ("Barclays") served as a joint bookrunner underwriter for the Offering and sold over one million of SelectQuote shares in the Offering.  As an underwriter of the Offering, Barclays was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

375.    Defendant Citigroup Global Markets Inc. ("Citigroup") served as a joint bookrunner underwriter for the Offering and sold over one million of SelectQuote shares in the Offering.   As an underwriter of the Offering, Citigroup was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

376.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as a joint bookrunner underwriter for the Offering and sold millions of SelectQuote shares in the Offering. As an underwriter of the Offering, Morgan Stanley was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

377.    Defendant RBC Capital Markets, LLC ("RBC Capital Markets") served as a joint bookrunner underwriter for the Offering and sold millions of SelectQuote shares in the Offering. As an underwriter of the Offering, RBC Capital Markets was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

378.    Defendant Jefferies LLC ("Jefferies") served as a joint bookrunner underwriter for the Offering and sold over one million of SelectQuote shares in the Offering.  As an underwriter

of the Offering, Jefferies was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

379.    Defendant Cantor Fitzgerald & Co. ("Cantor") served as a co-manager underwriter for the Offering and sold hundreds of thousands of SelectQuote shares in the Offering.  As an underwriter of the Offering, Cantor was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

380.    Defendant Keefe, Bruyette & Woods, Inc. ("Keefe Bruyette & Woods") served as a co-manager underwriter for the Offering and sold hundreds of thousands of SelectQuote shares in the Offering.  As an underwriter of the Offering, Keefe Bruyette & Woods was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

381.    Defendant Piper Sandler & Co. ("Piper Sandler") served as a co-manager underwriter for the Offering and hundreds of thousands of SelectQuote shares in the Offering.  As an underwriter of the Offering, Piper Sandler was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

382.    Defendant Drexel Hamilton, LLC ("Drexel Hamilton") served as a co-manager underwriter for the Offering and sold over one hundred thousand of SelectQuote shares in the Offering.  As an underwriter of the Offering, Drexel Hamilton was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

383.    Defendants Credit Suisse, Evercore ISI, Barclays, Citigroup, Morgan Stanley, RBC Capital Markets, Jefferies, Cantor, Keefe Bruyette & Woods, Piper Sandler, and Drexel Hamilton are collectively referred to hereinafter as the "Underwriter Defendants."

**B.    SelectQuote and the IPO**

384.    SelectQuote was founded in 1985.  SelectQuote is a direct-to-consumer brokerage business that sell various insurance products on behalf of several insurance carriers.  The vast majority of the policies the Company sells are Medicare Advantage and Medicare Supplement plans, which accounted for 74% of the Company's policies written in 2019.  SelectQuote merely acts as an agent or broker for insurance companies, it does not underwrite, insure or provide related services.

385.    On May 20, 2020, SelectQuote conducted the IPO, through which more than 18 million shares of SelectQuote common stock were sold at $20 per share, with SelectQuote reaping over $360 million in gross proceeds, and the Selling Shareholders receiving over $200 million in proceeds.  This included the underwriters' exercise in full of their option to purchase an additional 4.275 million shares of common stock.

**C.    The Offering Materials Contain Untrue Statements Of Material Fact And Omitted Other Facts Necessary To Make The Statements Made Not Misleading**

386.    On May 22, 2020, SelectQuote filed a prospectus for the Offering on Form 424B4 (the "Prospectus"), which formed part of the Registration Statement (collectively, the "Offering Materials").  The Registration Statement was signed by the Offering Defendants.

387.    In the Prospectus, SelectQuote reported the following financial results for fiscal year 2019 (period ended June 30, 2019) and for the nine months ended March 31, 2020, which purported to comply with GAAP:

|  | FY 2019 (millions) | % Growth from FY 2018 | Nine-months, ended March 31, 2020 (millions) | % Growth from Nine-months, ended March 31, 2019 |
|---|---|---|---|---|
| Total Revenue | $337.5 | 44% | $390.1 | 48% |
| Commission Revenue | $296 | 43% | $353.9 | 53% |
| Senior Division Revenue | $192.3 | 88% | $273.8 | 73% |
| Commissions Receivable, current | $36.1 | 30% | $46.7 | n/a |
| Commissions Receivable, net | $279.5 | 43% | $411.35 | n/a |

388.    SelectQuote, Danker and Sadun's belated admissions about persistency have revealed that the financial results repeated in the foregoing paragraph were untrue because:  (1) prior to the Company's May 2020 IPO the Company's actual persistency rates were too low to support the above reported financial results because: (i) by the time of the IPO the Company's 2018 and 2019 cohorts had experienced lower rates of persistency than the Company had seen historically; (ii) by the time of the IPO the Company was experiencing lower first-term persistency for the 2019 cohort; (iii) the introduction of the OEP in connection with the 2019 cohort has been cited repeatedly by the Company in explaining the drop off in persistency; and (iv) SelectQuote had two cohorts of OEP experience by the time of the May 2020 IPO and knew and should have incorporated the lower persistency experienced as a result of the OEP into its LTV assumptions; (2) these financial results were clearly misleading by creating the impression that the Company's business was and would remain profitable based on totally unsupported expectations around renewal rates and persistency; (3) statistical analysis reveals that the GAAP-reported financial results were based on persistency experience that was overstated by at least 15% as reflected in the Company's announcements on February 7, 2022, which revealed an overall reduction of $205 million to the Company's Senior-segment LTV as a result of "*a pretty significant decline in*

*persistency over the last three years*" (i.e., from at least February 2019); and (4) the embedded persistency assumptions were misleading for failing to disclose that the Company's rapid and massive pre-IPO growth was fueled by a "sell at all costs" approach that would encourage rather than discourage churn and turnover, including because Sales Agents' compensation did not account for persistency and encouraged short term sales that may not have "matched" customer needs, while adversely affecting historical persistency trends.

389.     In connection with the IPO, SelectQuote included disclosure of the LTV of revenue from its sales of Medicare Policies on a per-policy basis, including for both Medicare Advantage (MA) and Medicare Supplement (MS) policies.  SelectQuote also disclosed, on a per-policy basis, the expected LTV of revenues (Total Revenue Per Policy (TTM)) and expected EBITDA (effectively operating profit, or Earnings Before Interest Depreciation and Amortization) from its sales of all policies in the Senior division.  Each of these "per policy" figures, set forth in the table below, were reported on a "trailing twelve month basis" (TTM) in the Company's Prospectus, and, except for EBITDA per policy, which purported to comply with GAAP. The reported figures were materially untrue:

| Reporting Period | LTV – MA | LTV – MS | Total Revenue Per Policy (TTM) | EBITDA Per MA/MS Policy (TTM) |
|---|---|---|---|---|
| FY 2019 | $1,279 | $1,312 | $1,547 | $725 |
| Nine Months Ended March 31, 2020 | $1,297 | $1,372 | $1,505 | n/a |

390.     SelectQuote, Danker and Sadun's belated admissions about persistency have revealed that the per-policy financial figures in the foregoing paragraph were untrue because prior to the Company's May 2020 IPO SelectQuote's actual persistency rates were too low to support

the above reported financial results: (1) for the reasons stated in ¶ 388(1)(i-iv), the Company's actual persistency rates were too low to support the above reported LTVs and EBITDA; (2) these stated LTVs were severely inflated by the persistency assumptions that failed to comport with the reality well understood at the Company prior to the IPO and created the impression that the Company's business was and would remain profitable based on totally unsupported expectations around renewal rates and persistency; (3) statistical analysis reveals that the GAAP-reported financial results were based on persistency experience that was overstated by at least 15% as reflected in the Company's announcements on February 7, 2022, which revealed an overall reduction of $205 million to the Company's Senior-segment LTV as a result of "*a pretty significant decline in persistency over the last three years*" (i.e., from at least February 2019); and (4) the embedded persistency assumptions were misleading for failing to disclose that the Company's rapid and massive pre-IPO growth was fueled by a "sell at all costs" approach that would encourage rather than discourage churn and turnover, including because sales agents' compensation did not account for persistency and encouraged short term sales that may not have "matched" customer needs, while adversely affecting historical persistency trends.

391.    In the Prospectus, SelectQuote indicated that it adhered to the provisions of the ASC and further made the following representations regarding determination of LTV:

> Lifetime value of commissions per approved policy represents commissions estimated to be collected over the estimated life of an approved policy based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints. The lifetime value of commissions per approved policy is equal to the sum of the commission revenue due upon the initial sale of a policy, and when applicable, an estimate of future renewal commissions. **The estimate of the future renewal commissions is determined using contracted renewal commission rates constrained by a persistency-adjusted 10-year renewal period based on a combination of our historical experience and available industry and insurance carrier historical experience to estimate renewal revenue only to the extent probable that a material reversal in revenue would not be expected to occur**.

392.    The statements referenced in the preceding paragraph were untrue because: (1) Defendants' blanket, generic representation of how LTV is calculated, without more, gave investors the impression that SelectQuote calculated LTV with the correct assumptions regarding persistency; and (2) since before the Company's IPO, the Company's actual persistency rates were inflated by at least 15%, based on statistical analysis and the Company's announcements on February 7, 2022, which revealed an overall reduction of $205 million to the Company's Senior-segment LTV as a result of "*a pretty significant decline in persistency over the last three years*" (i.e., from at least February 2019).  This statement was also materially false and misleading for failure to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303, which required the disclosure of the known trend in declining persistency.

393.    The Prospectus made the following representations about the training SelectQuote provided its agents:

**Our highly trained and licensed agents are subject matter experts** in the products they sell, and this, in combination with our purpose-built software and business process, differentiates the service we provide to consumers relative to other insurance distributors or "online only" offerings. We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. Our agents on the SelectQuote platform **are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.**

\*\*\*

**We provide each new agent with up to 10 weeks of proprietary in-house training**, which is later supplemented by ongoing training during the agents' full-time employment. Our training is designed to ensure that every agent is well-equipped with a deep understanding of the products he or she sells and the customer service and sales skills necessary to best service the customer. A goal of ours is that every agent in whom we invest will build a long and rewarding career with us.

\*\*\*

**Our flex agents undergo up to 10 weeks of proprietary in-house training**, further supplemented by additional training. We continuously assess flex agent performance throughout AEP and OEP.

394.    The Prospectus made the following representations concerning SelectQuote's ability to use its technology to obtain better matches of consumers with insurance carriers and policies:

> Our proprietary technology allows us to take a broad funnel approach to marketing by **analyzing and identifying high quality consumer leads sourced from a wide variety of online and offline marketing channels.** Our primary sources of leads include search engine marketing, radio, television, and third-party marketing partners. We monitor our acquisition costs to dynamically allocate our marketing spend to the most attractive channel, benefitting from over thirty years of data accumulated through our proprietary, purpose-built technologies. **Our advanced workflow processing system scores each acquired lead in real-time, matching it with an agent whom we determine is best suited to meet the consumer's need.** Our platform then captures and utilizes our experience to further build upon the millions of data points that feed our marketing algorithms, which further enhances our ability to deploy subsequent marketing dollars efficiently and target more high-quality consumer leads.

***

> *Sales:* **Once assigned a lead, our highly skilled, licensed agents utilize their training, experience and our proprietary software and systems to rapidly conduct a bespoke needs-based analysis for each consumer**. This coupling of our technology with our skilled agents provides the consumer with greater transparency in pricing terms and choice, and an overall better consumer experience that maximizes sales, enhances customer retention and, ultimately, maximizes our policyholder lifetime revenues.

395.    The statements referenced in ¶¶ 393-94 were materially false and misleading because:  (1) SelectQuote hired indiscriminately in order to fuel growth at all costs emphasizing volume sales over quality of sales; (2) SelectQuote misrepresented the duration of training provided to the Company's agents, which was in reality only four weeks and far from "rigorous"; (3) SelectQuote hired "anyone with a pulse" and "said yes to everyone who came through the door"; (4) the training that was provided to the agents did not give them the ability to conduct the assessment that would have enabled the agents to match customers with the a policy well-suited

132

to the customer's needs, which would then encourage customers to serially renew those policies;
(5) SelectQuote's hiring mode focused on bringing on vast numbers of low-paid, undertrained
employees, who were often ineffective in selling complex Medicare-based insurance policies; and
(6) SelectQuote openly, routinely and systematically encouraged and enabled sales agents to cheat
on required AHIP and carrier-specific certification exams that agents were required to pass as a
prerequisite for selling Medicare Policies.

396.    In the Prospectus, the Company made the following risk disclosure regarding the
potential negative effect of an increase in lapse rates:

> Our operating results will be impacted by factors that impact our estimate of the
> constrained lifetime value of commissions per policyholder. Effective July 1, 2018,
> we elected to early adopt Accounting Standards Update ("ASU") 2014-09, *Revenue*
> *from Contracts with Customers* ("ASC 606"), using the full retrospective method,
> which required us to revise our historical financial information for fiscal 2018 to be
> consistent with the new standard. The adoption had a material impact on our
> historical financial statements, including the method by which we recognize
> commission revenue. We now recognize revenue based on the expected value
> approach. This approach utilizes a number of assumptions, which include, but are
> not limited to, legal and enforceable rights to renewal commissions upon contract
> termination when determining variable consideration, renewal commission rates,
> historical lapse data and premium increase data. **These assumptions are based on**
> **historical trends and any changes in those historical trends will affect our**
> **estimated lifetime value estimates in future periods and therefore could**
> **adversely affect our revenue and financial results in those future periods. As a**
> **result, adverse changes in the assumptions we make in computing expected**
> **values, such as increased lapse rates, would harm our business, operating**
> **results, financial condition and prospects**.
>
> **In particular, if customer lapse rates exceed our expectations, we may not**
> **receive the revenues we have projected to receive over time**, despite our having
> incurred and recorded any related customer acquisition costs up front. Any adverse
> impact on customer lapse rates could lead to our receipt of commission payments
> that are less than the amount we estimated when we recognized commission
> revenue. Under such circumstances, we would need to write-off the remaining
> commission receivable balance, which would result in a change to earnings in the
> period of the write-off.

397.    The purported "risk disclosure," in the preceding paragraph contains untrue
statements of material fact and omitted other facts necessary to make it not misleading because:

(1) "changes in [] historical trends [] affect[ing] [SelectQuote's] estimated lifetime value estimates . . .[that] could adversely affect [SelectQuote's] revenue and financial results in those future periods," and (2) "risk" of "customer lapse rates exceed[ing] [SelectQuote's] expectations," which in turn meant that "[SelectQuote] may not receive the revenues [the Company] [] projected to receive over time,"—were risks that had already materialized for the reasons stated in ¶ 388(1)(i-iv). Defendants knew that, before the Company's May 2020 IPO, its cohorts were already experiencing lower persistency and high lapse rates.

398.    In the Prospectus, the Company made the following risk disclosure regarding compliance with state laws and regulations:

> We also may lose the ability to market and sell Medicare plans for our Medicare plan insurance carrier partners. The regulations for selling senior health insurance are complex and can change. **If we or our agents violate any of the requirements imposed by the CMS, state laws or regulations, an insurance carrier may terminate our relationship or CMS may penalize an insurance carrier by suspending or terminating that carrier's ability to market and sell Medicare plans.** Because the Medicare products we sell are sourced from a small number of insurance carriers, if we lose the ability to market one of those insurance carriers' Medicare plans, even temporarily, or if one of those insurance carriers loses its Medicare product membership, our business, operating results, financial condition and prospects could be harmed.

399.    The purported "risk disclosure," in the preceding paragraph contains untrue statements of material fact and omitted other facts because, when disclosing that if the Company or its agents "violate any of the requirements imposed by the CMS, state laws or regulations, an insurance carrier may terminate [its] relationship or CMS may penalize" them, the Company failed to disclose that it was already engaging in violations of requirements imposed by CMS, state laws and the carriers that could cause the carriers to terminate their relationship with SelectQuote. Namely, several former SelectQuote employees have confirmed the existence of systematic cheating by SelectQuote agents on certification tests required under the AHIP certification guidelines necessary to sell Medicare Policies and certification tests similarly required by

SelectQuote's insurance carrier partners.  Passing these tests was a prerequisite for agents to complete before being allowed to sell policies on behalf of SelectQuote's insurance carrier partners.

### D.    Defendants Had An Affirmative Duty To Disclose The Trend Of  Lower Renewal Commissions

400.    The Offering Materials, and all filings incorporated by reference therein, failed to disclose information required to be disclosed therein by Item 303 of Regulation S-K (17 C.F.R. § 229.303).

401.    Item 303 specifically highlights commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's liquidity as one of the key items requiring comprehensive disclosure. Specifically, Item 303 requires the disclosure of "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."

402.    Item 303 also requires disclosure of trends or uncertainties specifically affecting revenue and income.  Specifically, Item 303 requires disclosure of "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected."  Item 303 further requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

403.    Importantly, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future."  *Management's Discussion and Analysis of Financial Condition and*

*Results of Operation*, Securities Act Release No. 6835, 1989 WL 1092885, at \*3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation*, Securities Act Release No. 8350, 2003 WL 22996757, at \*11 (Dec. 29, 2003).

404.    Therefore, Item 303 required disclosure of: (i) SelectQuote's lower overall persistency, the rates for which, as stated above in this section, were inflated by at least 15% prior to the IPO; (ii) the effect of this lower overall persistency of SelectQuote's financial results; and (iii) the effect of this lower overall persistency on LTV.  Each of these issues represented known trends or uncertainties that were reasonably expected to have a material unfavorable impact on the Company's financial performance.    SelectQuote's IPO Prospectus failed to disclose this information and thus failed to comply with Item 303.

## XVII.  <u>SECURITIES ACT COUNTS</u>

### <u>COUNT III</u>

#### For Violations Of Section 11 Of The Securities Act
#### Against SelectQuote, The Offering Defendants And The Underwriter Defendants

405.    Plaintiffs repeat, incorporate, and reallege the allegations set forth above under the heading "Securities Act Claims" and Section XV only, as if fully stated in this Count.  This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and negligence under the Securities Act.  For purposes of asserting this Count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

406.     This Count is brought under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired SelectQuote common stock sold pursuant or traceable to the IPO, and who were damaged thereby.

407.     SelectQuote is the registrant for the IPO.  The Defendants named in this Count were responsible for the contents and dissemination of the Offering Materials.

408.     As the issuer of the shares, SelectQuote is strictly liable to Plaintiffs and the Class for the misstatements and omissions contained in the Offering Materials.

409.     Liability on this Count is predicated on the Offering Defendants' signing of the Registration Statement for the IPO, and the Underwriter Defendants' participation in underwriting the IPO, which was conducted pursuant to the Offering Materials.  The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated in the Offering Materials.

410.     Plaintiffs West Palm Beach Police and Fort Lauderdale P&F purchased shares in and traceable to the IPO.

411.     The value of SelectQuote common stock has declined substantially as a result of Defendants' violations, causing damage to those members of the Class that purchased or otherwise acquired SelectQuote common stock in and/or traceable to the IPO.

412.     Less than one year has elapsed since the time that Plaintiffs first asserted, discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Complaint were *bona fide* offered to the public.

413.    By reason of the foregoing, the Defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class under Section 11(e).

## COUNT IV

### For Violations Of Section 12(A)(2) Of The Securities Act
### Against The Underwriter Defendants

414.    Plaintiffs repeat, incorporate, and reallege the allegations set forth above under the heading "Securities Act Claims" and Section XV only, as if fully stated in this Count. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

415.    This Count is brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired SelectQuote common stock in and/or traceable to the IPO, and who were damaged thereby.

416.    The Underwriter Defendants were statutory sellers of SelectQuote shares that were registered in the IPO pursuant to the Registration Statement and sold by means of the Offering Materials.  By means of the Offering Materials, the Underwriter Defendants sold millions of SelectQuote shares through the IPO to West Palm Beach Police and Fort Lauderdale P&F and members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the stock that was sold in the IPO by means of the materially false and misleading Offering Materials.

417. The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts, as alleged above.

418. Less than one year has elapsed since the time that Plaintiffs first asserted or discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Amended Complaint were *bona fide* offered to the public.

419. By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired SelectQuote common stock in and/or traceable to the IPO, and who were damaged thereby.

## COUNT V

### For Violations Of Section 15 Of The Securities Act
### Against The Offering Defendants

420. Plaintiffs repeat, incorporate, and reallege the allegations set forth above under the heading "Securities Act Claims" and Section XV only, as if fully stated in this Count. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

421. This Count is brought under Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired SelectQuote common stock in and/or traceable to the IPO, and who were damaged thereby.

422. As alleged in Count Three (III) above, SelectQuote is strictly liable under Section 11 of the Securities Act for untrue statements and omissions of material fact in the Offering Materials.

423. The Offering Defendants, by virtue of their positions, voting power, ownership, rights as against SelectQuote, and/or specific acts were, at the time of the wrongs alleged in this Complaint and as alleged in this Count, controlling persons of SelectQuote within the meaning of Section 15 of the Securities Act. These Defendants also had the power and influence, and exercised the same, to cause SelectQuote to engage in the acts described in this Complaint, including by causing SelectQuote to conduct the IPO pursuant to the Offering Materials.

424. By reason of the foregoing, the Defendants named in this Count each were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged in Counts Three (III) and Four (IV) above, based on their having signed or authorized the signing of the Registration Statement and/or having otherwise participated in the process that allowed the IPO to be successfully completed. The Defendants named in this Count are liable for the aforesaid wrongful conduct and are liable, to the same extent SelectQuote is liable under Section 11 of the Securities Act, to members of the Class who purchased or otherwise acquired SelectQuote common stock sold pursuant or traceable to the IPO, and who were damaged thereby.

## XVIII. CLASS ACTION ALLEGATIONS

### (Both Exchange Act and Securities Act Claims)

425. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired; (a) the publicly traded common stock of SelectQuote during the Class Period; or (b) SelectQuote common stock in or traceable to the Company's Offering.

Excluded from the Class are Defendants and their families, Directors, and officers of SelectQuote and their families and affiliates.

426.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of August 26, 2021, SelectQuote had over 163 million shares of common stock outstanding, owned by hundreds or thousands of investors.

427.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Securities Act and/or the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether the Officer Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)    Whether Defendants' conduct impacted the price of SelectQuote common stock;

(g)    Whether Defendants' conduct caused the members of the Class to sustain damages;

(h)    The extent of damage sustained by Class members and the appropriate measure of damages.

428.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

429.    Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

430.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

431.    All other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIX.  **PRAYER FOR RELIEF**

### (Both Exchange Act and Securities Act Claims)

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     As to the claims set forth under the Securities Act, awarding rescission or a recessionary measure of damages; and

(e)     Awarding such equitable/injunctive or other and further relief as the Court may deem just and proper.

## XX.  <u>JURY TRIAL DEMANDED</u>

### (Both Exchange Act and Securities Act Claims)

Lead Plaintiffs hereby demand a trial by jury.

Dated:  May 31, 2024                         */s/ James A. Harrod*_____

Hannah Ross
James A. Harrod
Veronica V. Montenegro
William E. Freeland
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
jim.harrod@blbglaw.com
veronica.montenegro@blbglaw.com
billy.freeland@blbglaw.com

*Counsel for Lead Plaintiffs and Lead Counsel
for the Class*

Robert D. Klausner
Bonni S. Jensen
**KLAUSNER KAUFMAN JENSEN
   & LEVINSON**
7080 Northwest 4th Street
Plantation, FL 33315
Telephone: (954) 916-1202
bob@robertdklausner.com
bonni@robertdklausner.com

*Additional Counsel for Lead Plaintiff*

**Appendix A**
**Glossary of Key Terms in the Consolidated Class Action Complaint**

| Term | Description/Definition |
|------|------------------------|
| Accounting Standards Codification ("ASC") Topic 606 | Accounting Standards Codification Topic 606, Revenue from Contracts with Customers ("ASC 606"), prescribes the relevant guidance, that insurance brokers must utilize to record revenue from commissions. |
| Annual Enrollment Period ("AEP") | The Medicare Annual Enrollment Period that takes place from October 15 through December 7 of each year. During this period, an eligible enrollee may enroll in or make changes to their Medicare Advantage plans. |
| Association of Health Insurance Providers ("AHIP") | AHIP is a trade association of health insurance companies that offer coverage through the employer-provided, Medicare Advantage, Medicaid managed care, and individual markets. AHIP has established testing of member businesses to ensure that sales agents have a baseline of knowledge concerning health insurance and industry recognized methods for selling Medicare Policies in a manner that is compliant with the Centers for Medicare & Medicaid Services' (CMS) policies and guidelines. |
| Barclays ("Barclays") | Barclays Capital Inc. is a named Defendant. Barclays served as a joint bookrunner and underwriter for the Offering and sold over one million SelectQuote shares in the Offering. |
| Board of Directors ("Board") | SelectQuote's Board of Directors. |
| Britton, Donald ("Britton") | Donald Britton is a named Defendant. Britton was appointed to the Board in 2014 and served in that capacity until September 23, 2020. |
| Brookside Defendants | Brookside Defendants refers to Brookside, Hawks, and Weldon. |
| Brookside Equity Partners LLC ("Brookside") | Brookside Equity Partners LLC ("Brookside") is a named Defendant. Brookside is a private equity fund founded in 2012. At the time of the IPO, Brookside was the largest shareholder in SelectQuote with a 22.25% equity interest in the Company. |
| Cantor ("Cantor") | Cantor Fitzgerald & Co. is a named Defendant. Cantor served as a co-manager and underwriter for the Offering and sold hundreds of thousands of SelectQuote shares in the Offering. |

| Term | Description/Definition |
|------|------------------------|
| Churn | Churn occurs when a Medicare enrollee exits their health plan early in favor of another Medicare product. Churn drives down persistency. |
| Citigroup ("Citigroup") | Citigroup Global Markets Inc. is a named Defendant. Citigroup served as a joint bookrunner and underwriter for the Offering and sold over one million of SelectQuote shares in the Offering. |
| Class Period | May 20, 2020 through February 7, 2022, inclusive. |
| CMS | Centers for Medicare & Medicaid Services, the government entity providing health care coverage through Medicare, Medicaid, the Children's Health Insurance Program, and the Health Insurance Marketplace. CMS also acts in a regulatory capacity related to certain aspects of privately offered MA and MS policies, such as by setting "caps" on commissions. |
| Cohort | Cohort refers to a group of Medicare enrollees whose policy started in a given year. |
| COVID-19 Special Enrollment Period ("COVID SEP") | The COVID-19 Special Enrollment Period was effective from March 1 through June 30, 2020. During this period, a Medicare enrollee may make changes to their Medicare plans if they qualified for a Special Enrollment Period but missed the deadline because they were impacted by COVID-19. |
| Credit Suisse ("Credit Suisse") | Credit Suisse Securities (USA) LLC is a named Defendant. Credit Suisse served as a joint bookrunner and underwriter for the Offering and sold millions of SelectQuote shares in the Offering. |
| Danker, Timothy ("Danker") | Timothy Danker is a named Defendant. Danker is the Chief Executive Officer of SelectQuote since 2017 and continues to serve on the Board of SelectQuote. |
| Devanny, Earl ("Devanny") | Earl Devanny III is a named Defendant. Devanny was appointed to the Board in February 2020. |
| Devine, Denise ("Devine") | Denise Devine is a named Defendant. Devine was appointed to the Board in February 2020. |
| Disenrollment | Disenrollment occurs when a Medicare enrollee makes a plan change. It is typically used in the context of the phrase "rapid disenrollment," which occurs when a beneficiary disenrolls from a plan within the first three months of enrollments. |

| Term | Description/Definition |
|------|------------------------|
| Drexel Hamilton ("Drexel Hamilton") | Drexel Hamilton, LLC is a named Defendant.  Drexel Hamilton served as a co-manager  and underwriter for the Offering and sold over one hundred thousand of SelectQuote shares in the Offering. |
| Entire Estimated Lifetime Value ("LTV") | The entire estimated lifetime value ("LTV") is the total revenue SelectQuote expects to earn over the lifetime of a relationship with a Medicare enrollee. |
| Evercore ISI ("Evercore ISI") | Evercore Group L.L.C. is a named Defendant.  Evercore ISI served as a joint bookrunner and underwriter for the Offering and sold millions of SelectQuote shares in the Offering. |
| Exchange Act Defendants | Exchange Act Defendants refers to SelectQuote, the Officer Defendants, and the Brookside Defendants. |
| Financial Accounting Standards Board ("FASB") | An independent, private-sector, not-for-profit organization that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow Generally Accepted Accounting Principles ("GAAP"). |
| FE | FEs are Former SelectQuote employees. |
| FE 1 | FE 1 joined SelectQuote in 2014 as an Assistant Sales Trainer in the Senior business, was promoted to Trainer and then Manager before leaving the Company in 2022. |
| FE 2 | FE 2 was a Senior Sales Agent in SelectQuote's Senior Division from January 2021 through August 2022. |
| FE 3 | FE 3 was a Sales Agent in SelectQuote's Senior division from August 2017 through May 2021. |
| FE 4 | FE 4 worked at SelectQuote from February 2020 until separating from the Company in July 2022.  FE 4 was a Senior Sales Agent and then an Assistant Sales Manager in the Senior segment. |
| FE 5 | FE 5 was a Sales Agent and then a Senior Sales Agent in the Company's Senior Division from June 2013 until January 2019. |
| FE 6 | FE 6 was a Sales Agent in the Senior and Life divisions at SelectQuote from May 2020 through January 2021. |
| FE 7 | FE 7 was employed at SelectQuote from July 2019 until October 2021, first as a Customer Care/Cross Sales Agent, from July 2019 to 2020.  In 2020, she became a Sales Agent in the Senior division. |

| Term | Description/Definition |
|------|------------------------|
|  | Thereafter, she was an Assistant Sales Manager in the Senior segment, from April 2021 to October 2021. |
| FE 8 | FE 8 joined SelectQuote in September 2019 as a customer care agent ("CCA") in the Senior division, was promoted to Supervisor in November 2020, and served as Manager of CCA training from February 2021 through November 2021, at which time she left the Company. |
| FE 9 | FE 9 worked at SelectQuote as Quality Assurance Specialist from September 2020 through July 2021. |
| FE 10 | FE 10 worked at SelectQuote as a Sr. Auditing Specialist from October 2018 through March 2022. |
| Generally Accepted Accounting Principles ("GAAP") | Generally Accepted Accounting Principles include those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. |
| Grant, II, William T. ("Grant II") | William T. Grant, II is a named Defendant.  Grant has served as a Director since 2014 and was appointed the Vice Chairman of the Board since 2017. |
| Grant, III, William ("Grant III") | William Grant, III has served as the Chief Operating Officer of SelectQuote since 2019. |
| Hawks, III, Donald ("Hawks") | Donald L. Hawks, III is a named Defendant.  Hawks is a Managing Director and President of Brookside since it was founded in 2012. Hawks was appointed to SelectQuote's Board of Directors (the "Board") in 2014 in conjunction with the Stockholders Agreement. In February 2020, Hawks was appointed to serve as Chairman of the Board and continues to serve in that capacity.  Hawks signed the Registration Statement for the Offering. |
| Initial Public Offering ("IPO" or "Offering") | SelectQuote's initial public offering conducted on or around May 2020. |
| IPO Prospectus ("Prospectus") | The May 22, 2020 prospectus filed in connection with SelectQuote's May 2020 initial public offering. |
| Internal Rate of Return ("IRR") | Internal rate of return is a metric used in financial analysis to estimate the profitability of potential investments. |

| Term | Description/Definition |
|------|------------------------|
| Jefferies ("Jefferies") | Jefferies LLC is a named Defendant. Jefferies served as a joint bookrunner and underwriter for the Offering and sold over one million of SelectQuote shares in the Offering. |
| Keefe Bruyette & Woods ("Keefe Bruyette & Woods") | Keefe, Bruyette & Woods, Inc. is a named Defendant. Keefe Bruyette & Woods served as a co-manager and underwriter for the Offering and sold hundreds of thousands of SelectQuote shares in the Offering. |
| Lapse | Lapse is the rate at which a Medicare enrollee disenrolls, churns, or does not renew a policy. Lapses drive down persistency. |
| Lifetime Value ("LTV") | The current value of commissions collected over the life of an approved policy. LTV is a function of a beneficiary's "persistency," or their likelihood to stay with the plan originally sold to them by SelectQuote. |
| Medicare ("Medicare" or "Original Medicare") | Medicare refers to federal health insurance coverage that is generally available to Americans beginning at the age of 65. |
| Medicare Advantage ("MA") | Medicare Advantage, an alternative coverage to Original Medicare, is offered to Medicare-eligible patients by private health insurance companies, and includes the same benefits as Original Medicare, but often includes additional coverage such as prescription drugs or vision and dental benefits. |
| Medicare Supplement ("MS") | Medicare Supplement plans supplement Original Medicare to provide patients with additional coverage. |
| Morgan Stanley ("Morgan Stanley") | Morgan Stanley & Co. LLC is a named Defendant. Morgan Stanley served as a joint bookrunner and underwriter for the Offering and sold millions of SelectQuote shares in the Offering. |
| Offering Defendants | Offering Defendants refers to Danker, Sadun, Hawks, Grant, Britton, Devanny, Devine, and Weldon. Each of the Offering Defendants signed the Registration Statement. |
| Offering Materials | Offering Materials refers to the Prospectus, and the Registration Statement (which includes the Prospectus), filed in connection with the IPO, and pursuant to which SelectQuote offered and sold 18 million shares of common stock at $20 per share, resulting in $360 million in gross proceeds |
| Officer Defendants | Officer Defendants refers to Danker and Sadun. |

| Term | Description/Definition |
|---|---|
| Open Enrollment Period ("OEP") | The Open Enrollment Period takes place from January 1 through March 31 of each year. During this period, a Medicare enrollee may make changes to their Medicare plans. |
| Persistency | Persistency refers to the rate at which a policy has renewed or will renew or the overall set of renewal assumptions. |
| Piper Sandler ("Piper Sandler") | Piper Sandler & Co. is a named Defendant. Piper Sandler served as a co-manager and underwriter for the Offering and sold hundreds of thousands of SelectQuote shares in the Offering. |
| RBC Capital Markets ("RBC Capital Markets") | RBC Capital Markets, LLC is a named Defendant. RBC Capital Markets served as a joint bookrunner and underwriter for the Offering and sold millions of SelectQuote shares in the Offering. |
| Registration Statement | Registration Statement refers to the set of documents, including the Prospectus, that SelectQuote filed on November 27, 2019 and which, after six amendments, was declared effective by the SEC on May 20, 2020. |
| Sadun, Raffaele ("Sadun") | Raffaele Sadun is a named Defendant. Sadun was a Chief Financial Officer of SelectQuote since April 2017. Sadun resigned from SelectQuote in May 2022. |
| SEC | The United States Securities and Exchange Commission. |
| Securities Act Defendants | Securities Act Defendants refers to the Brookside, Offering Defendants, and Underwriter Defendants. |
| SelectQuote Revenue Tracking System ("SRTS") | SRTS is fully integrated, proprietary revenue tracking and financial reporting tool that also supports financial and customer falloff / retention prediction algorithms, allowing for real-time workflow and actions with SelectQuote's customer service teams. |
| SelectQuote, Inc. ("SelectQuote" or the "Company") | SelectQuote, Inc. is a named Defendant. SelectQuote was founded in 1985 and is a direct-to-consumer brokerage business that sells various insurance products on behalf of several insurance carriers. |
| Selling Stockholders | Selling Stockholders refers to the stockholders that sold SelectQuote stock immediately after the IPO, and include Defendants Brookside, Sadun, Danker, Grant II and Grant III. |
| Senior segment/ division/business | The Senior segment is one of SelectQuote's reportable business lines. The Senior segment or division primarily sells senior Medicare-related health insurance and the Company's overall |

| Term | Description/Definition |
|------|------------------------|
| | operating results are substantially dependent upon the success of the Senior segment. |
| Special Enrollment Period ("SEP") | The Special Enrollment Period refers to a period when eligible Medicare enrollees can add or change coverage (outside of the Annual and Open Enrollment periods) under certain unique circumstances. These circumstances include qualifying life events (such as moving, getting married, or losing a job), a Medicare enrollee's income dropping below a certain level, or an "exceptional circumstance" which prevents a Medicare enrollee from enrolling in a timely fashion. |
| Stockholders Agreement | The Stockholders Agreement is a Series D Preferred Stock Investors' Rights and Stockholders Agreement entered into by Brookside and SelectQuote. The agreement granted Brookside and its affiliates certain rights, including the right to appoint directors, information rights, and registration rights. |
| Underwriter Defendants | Underwriter Defendants refers to Credit Suisse, Evercore ISI, Barclays, Citigroup, Morgan Stanley, RBC Capital Markets, Jefferies, Cantor, Keefe Bruyette & Woods, Piper Sandler, and Drexel Hamilton. |
| Weldon, Raymond F. ("Weldon") | Raymond F. Weldon is a named Defendant. Weldon is a Managing Director and co-founder of Brookside. Weldon was appointed to the Board in 2014 in conjunction with the Stockholders Agreement and continues to serve as a Director of SelectQuote. |

**APPENDIX B**
# TIMELINE OF KEY EVENTS/ MEDICARE ENROLLMENT PERIODS



## Appendix C

